UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

TPTCC NY, INC.,
THE PROTON INSTITUTE OF NY, LLC,
NY MEDSCAN LLC,

            Plaintiffs,

    - against -

RADIATION THERAPY SERVICES, INC.,
RADIATION THERAPY SERVICES
   HOLDINGS INC.,
21st CENTURY ONCOLOGY, INC.,
NEW YORK PROTON
   MANAGEMENT LLC,
THE NEW YORK PROTON CENTER,
OPPENHEIMER & CO., INC.,
CICERO CONSULTING
   ASSOCIATES VCC, INC.,
NORTON L. TRAVIS,
FRANK M. CICERO,

            Defendants.

------------------------------------------------------------x

JUDGE RAKOFF

10 CIV 7097

Case No. 10 Civ. _____

ECF CASE



## COMPLAINT

Plaintiffs, NY MEDSCAN LLC ("Medscan"), THE PROTON INSTITUTE OF NY, LLC

("TPIONY"), and TPTCC NY, INC. ("TPTCC"), by their undersigned attorneys, for their

Complaint herein, allege as follows:

### PRELIMINARY STATEMENT

1.    This action arises from defendants' combination and conspiracy to eliminate

plaintiffs as competitors in the market for providing proton beam therapy ("PBT"), a developing

but very expensive modality, with life saving potential for thousands of New York cancer

patients.  Commencing in or about November 2008 and for the following year, defendants

ostensibly worked with plaintiffs, entering into non-disclosure agreements (NDA's) and Letters of Intent ("LOI's") and attending joint meetings with experienced clinicians, potential partners, vendors, lenders, investors and consultants. Defendants thereby gained access to all of plaintiffs' confidential business plans, business contacts, financial projections and architectural plans ("Confidential Information") for a new, multimillion dollar PBT facility to be constructed in New York City. Plaintiffs invested millions of dollars, to the point of having effectively secured financing, equipment sourcing, a site and hospital partners. Defendants, having by then learned from plaintiffs and at plaintiffs' expense, everything defendants needed to know to build and operate such a PBT facility, defendants turned on plaintiffs and implemented a plan to take over their project, destroy them as competitors and to monopolize the market. In November 2009, the defendants who had been working with plaintiffs suddenly announced an end to the collaboration, breaching or inducing breaches of contracts, NDA's and LOI's and refusing to return plaintiffs' confidential information and usurping plaintiffs' identified sources, site, specialized architects, partners and planners. The next day after declaring an end to the parties' relationship, defendants created a competing company, defendant NEW YORK PROTON MANAGEMENT LLC, with plans to create and manage a PBT facility. Defendants thereby avoided the cost and lead time defendants would have had to incur if they had started such a project without any misappropriation of confidential information from plaintiffs. As more fully alleged below, defendants have effectively eliminated plaintiffs as a competitor and unless preliminarily and permanently enjoined, will be the sole supplier of such PBT services in New York and will monopolize such services. This will harm competition and consumers by allowing defendants to control and raise prices, and reduce the quantity and quality of available services, unfettered by free and open competition from plaintiffs.

## JURISDICTION AND VENUE

2.     Plaintiffs bring this action under Section 4 of Clayton Act 15 U.S.C. §15 to recover treble damages, injunctive relief, and the costs of suit, including reasonable attorneys fees, against defendants for the injuries sustained by the plaintiffs in their business and property by reason of defendants' violations as hereinafter alleged of the antitrust laws, and, more particularly, Sections 1 and 2 of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act. Plaintiffs also seek damages and injunctive relief for defendants' past and continuing breach of fiduciary duty, breach of contract, tortious interference with contracts, conversion, misappropriation of confidential information and trade secrets and unfair competition. This Court has jurisdiction over the subject matter and the parties pursuant to 15 U.S.C. § 15 and 28 U.S.C. § 1337. Jurisdiction is also based on principles of supplemental jurisdiction under 28 U.S.C. § 1367.

3.     Venue is appropriate in this Court pursuant to 15 U.S.C. §§ 15, 22 and 28 U.S.C. § 1391 in that each defendant named herein is found, transacts business, has an agent or maintains an office within this district, and the defendants directly or indirectly performed acts within this judicial district in furtherance of the conspiracies alleged herein. In addition, the claims arose in this district and a substantial part of the events giving rise to the claims occurred in this district.

## THE PARTIES

4.     Plaintiff NY Medscan, LLC ("Medscan") is a New York limited liability company having its principal office at 751 Second Avenue, New York, NY 10017. Medscan

3

was formed in 2001 and is in the business of providing state-of-the-art diagnostic imaging technology facilities and practice management services for physicians who specialize in diagnosing a variety of forms of cancer and in the development of new facilities and methods for treating cancer.

5.     Plaintiff The Proton Institute of NY LLC is a New York limited liability company formed by plaintiff Medscan on September 8, 2009 with principal offices at 755 Second Avenue, New York, NY 10017.

6.     Plaintiff TPTCC NY, INC is a not-for profit corporation organized and existing under the laws of the state of New York, formed by Dr. Karolyn R. Kerr on June 17, 2010 for the purpose of operating a PBT facility intended to be located in New York City. TPTCC NY currently has principal offices at 755 Second Avenue, New York, New York 10017.

5.     Defendant RADIATION THERAPY SERVICES, INC. ("RTSI"), at all relevant times was a corporation organized and existing under the laws of the state of Florida with a principal place of business at 2234 Colonial Boulevard, Fort Meyers, FL 33907 and offices at 1010 Northern Boulevard, Suite 314, Great Neck, NY. RTSI describes itself as a national company which owns and operates more than 80 radiation therapy centers in 15 states for the treatment of human cancers and other diseases. RTSI is a major competitor in the radiation therapy business with 2009 annual revenues in excess of $500 million.

6.     Defendant RADIATION THERAPY SERVICES HOLDINGS, INC. ("RTSHI"), at all relevant times was a corporation organized and existing under the laws of the state of Delaware with a principal place of business at 2234 Colonial Boulevard, Fort Meyers, FL 33907. On February 1, 2008, defendant RTSI merged with its parent, RTSHI, with RTSI as the surviving corporation in a transaction valued at over $627 million. RTSHI describes itself as

4

"the largest company in the U.S. focused principally on providing radiation therapy. The Company's size and scale enables it to share significant technology and clinical resources across its national network . . . ." (RTSHI Audited Consolidated Financial Statement for 2009, Note 1).

7.     Defendant 21st CENTURY ONCOLOGY INC. ("21C") is, upon information and belief, an affiliate or a/k/a of defendants RTSI and RTSHI with offices at the same address as RTSI and also at 1010 Northern Boulevard, Suite 314, Great Neck, New York.

8.     Defendant NEW YORK PROTON MANAGEMENT LLC ("NYPM") is a New York limited liability company formed by certain of the defendants on November 6, 2009, using as its principal office that of defendant Norton Travis, a lawyer, then located at 111 Great Neck Road, Great Neck, NY 11021. Upon information and belief, NYPM was formed by defendants to provide, among other things, consulting and administrative services to the not for profit entity, defendant The New York Proton Center, which will operate defendants' PBT treatment facility.

9.     Defendant THE NEW YORK PROTON CENTER ("NYPC") is a not for profit corporation formed by certain of the defendants on June 1, 2010 to operate defendants' PBT treatment facility, expected to be constructed at 621 West 57th Street, New York, NY at a cost of approximately $227 million. (NYPC Demonstration Project Full Review Certificate of Need Application, Schedule 1B to submitted to the New York State Department of Health ("DOH").)

10.     Upon information and belief, unless enjoined by this Court, defendants' NYPC will be the only facility in New York for PBT services and defendants will thereby obtain a monopoly in the market for PBT services in New York and nearby regions as hereinafter described and plaintiffs' competing business will be destroyed.

11.     Defendant OPPENHEIMER & CO., INC. ("OPCO") is a corporation organized and existing under the laws of the state of New York, with a principal place of business at 125

5

Broad Street, New York, NY 10004. OPCO initially acted under contract with plaintiffs Medscan and TPIONY for an initial retainer of $50.000 to provide investment-banking services to plaintiffs in connection with their development of a PBT facility. OPCO also executed numerous NDA's on plaintiffs' behalf in connection with their investment banking and financial advisory services.

12. Defendant CICERO CONSULTING ASSOCIATES VCC, INC. ("CCA VCC") is a corporation organized and existing as VCC INC. under the laws of the state of New York, with a principal place of business at 701 Westchester Avenue, White Plains, New York, in this district. Upon information and belief, CCA VCC is a health care consulting firm with experience in health care financial issues, certificates of need, and strategic planning. CCA is a d/b/a of VCC, INC. CCA VCC had entered into an exclusive agreement dated June 4, 2009 with plaintiff Medscan to provide consulting services in connection with plaintiffs' applications to N.Y. State DOH. CCA VCC later breached its agreement with plaintiffs and undertook by separate agreement to represent defendant NYPC.

13. Defendant FRANK M. CICERO ("Frank M. Cicero") is upon information and belief an individual residing in New York and at all relevant times was the Chairman and Chief Executive Officer of defendant CCA VCC and knowingly participated in the combination and conspiracy to misappropriate plaintiffs' confidential information and put plaintiff out of business in favor of CCA VCC's new client, defendant NYPC.

14. Defendant NORTON L. TRAVIS ("TRAVIS") is an individual residing in this District, and upon information and belief, an attorney licensed to practice in the State of New York. In 2008, TRAVIS was a name partner in the law firm Garfunkel, Wild & Travis P.C. ("GWT") which for many years had acted as corporate counsel to Medscan. Commencing in or

6

about November 2008, TRAVIS, while still a partner at GWT, acted as legal counsel to plaintiffs in their planning and negotiations with third parties for the establishment and operation of a PBT facility in New York. Among other things, TRAVIS drafted or had his GWT partners or associates draft agreements for the operation of plaintiffs'' planned PBT facility, LOI's, and NDA's. During the relevant time period, and upon information and belief, continuing to date, TRAVIS simultaneously served in a conflicting capacity as Executive Vice President and General Counsel of defendant RTSI, a competitor of plaintiffs..

15. As more fully set forth below, upon information and belief, TRAVIS, while acting in his fiduciary capacity as counsel, concluded that plaintiffs' project would be a huge success and decided he wanted to participate in the project not merely as a lawyer but as an equity partner. He then drafted a proposed Operating Agreement in which he identified the participating owners as the "TRAVIS ENTITY," the "MEDSCAN ENTITY" and "RTSI NY PROTON LLC." TRAVIS introduced plaintiffs to RTSI, where TRAVIS was simultaneously Executive Vice President and General Counsel, and in furtherance of his plan to obtain an equity interest in this valuable project and eliminate plaintiffs in favor of his employer RTSI, TRAVIS thereafter breached his fiduciary duties to plaintiffs and conspired with the other defendants to misappropriate plaintiffs' Confidential Information, and form certain of the corporate defendants in order to replace and eliminate plaintiffs as competitors and potential providers of the subject PBT facility.

16. Through his position as attorney for plaintiffs TRAVIS directly and in combination and conspiracy with other defendants, had access to all of plaintiffs' Confidential Information, and turned it over to his other employer, RTSI and co-conspirators. TRAVIS had the power and position to see to it that plaintiffs' were replaced by RTSI and the co-defendants

in the formation of a new project owner, defendant NYPC. As hereinafter set forth, NYPC then filed a Certificate of Need Application with the New York Department of Health, in competition with plaintiff TPTCC NY for creation and management of a PBT facility in New York.

17.    While TRAVIS was ostensibly acting as plaintiffs' counsel, and stood to benefit personally from his income as an attorney, unknown to plaintiffs, he simultaneously sought to benefit through his corporate position at RTSI, and further benefit personally as a partner or owner of defendants' new PBT facility. Accordingly, at all times relevant TRAVIS had multiple independent personal stakes in furthering the unlawful acts alleged herein.

18.    In June 2009, Memorial Sloan Kettering Cancer Center ("MSKCC") signed an NDA with plaintiff Medscan and obtained access to plaintiffs' Confidential Information.    Dr. Michael P. Gutnick ("Gutnick") was at all relevant times the Senior Vice President of Finance and Assistant Treasurer of MSKCC and was a licensed medical doctor. Upon information and belief, some months after MSKCC signed the NDA with Medscan, Gutnick determined to have MSKCC join the defendants in support of NYPC's PBT facility being developed with plaintiff's Confidential Information. Thereafter, MSKCC became affiliated defendant NYPC and in or about June 2010, Gutnick became a director of defendant NYPC. When NYPC filed its Certificate of Need application with the NY DOH, Gutnick personally signed the attestation as to the accuracy of the defendant NYPC's application as a person "duly authorized to subscribe and submit this application on behalf of the applicant" NYPC.

19.    Similarly, plaintiffs signed an NDA with Beth Israel Continuum Health Partners ("Beth Israel"). Thereafter, officers of Beth Israel, including Clinical Director Dr. Louis Harrison and Senior Executive VP Gail Donovan, who both had access to plaintiffs' Confidential

8

Information under the NDA, proceeded to work with defendants and in or about June 2010, became directors of defendant NYPC.

20.     Upon information and belief, various individuals and entities, both known and unknown to plaintiffs and not named as defendants in this Complaint, participated as co-conspirators with the named defendants in the offenses alleged herein and performed acts and made statements in furtherance thereof. These unnamed individuals and entities include, without limitation, during the relevant times, certain of the hospitals and contractors who would have participated in the project with plaintiffs or who signed NDA's or LOI's with plaintiffs but later breached them, and various of the corporate defendants' executives, board members,   and employees.   Plaintiffs may seek to amend this Complaint to add additional defendants as appropriate.

## INTERSTATE TRADE AND COMMERCE INVOLVED

21.     Advances in medical technology have made available newer and more effective treatments for cancer. One such promising development is PBT. PBT is achieved by using a multimillion-dollar cyclotron, which accelerates subatomic particles in spiral paths in a magnetic field to separate protons and enable them to be directed in a focused stream at a target such as a cancerous lesion. Thus, PBT is an expensive but emerging form of radiation therapy that can maximize radiation doses to the target tumor, while sparing adjacent healthy tissue. PBT was introduced on an experimental basis in the 1950s, but was not approved as a radiation treatment option by the FDA until 1988, and then only for localized tumors. In 1990, Loma Linda University in California, opened the first hospital-based proton beam clinic in the United States, followed in 2001 by the Northeast Proton Therapy Center at Massachusetts General Hospital in Boston. Today, there are eight PBT facilities in operation in the United States but none in New York.

9

22.     PBT has demonstrated efficacy for a number of relatively rare cancers – providing high rates of tumor control and survival, while reducing radiation-related side effects. Due to the physics of proton particles, protons enter the body, and deposit most of their energy in the final portion of their trajectory and stop (known as the Bragg peak). There is no exit dose. As a result, exposure of normal tissue to radiation is minimized, and higher radiation doses can be administered in the tumor area.

23.     It is believed that PBT's ability to maximize the dose and target it with high precision translates into better tumor control, fewer radiation-induced complications, and better outcomes overall than photon therapy.    Definitive outcome studies comparing PBT to conventional electron beam therapy, however, are lacking.

24.     Based on its precision, PBT is indicated for tumors that are not amenable to surgery or conventional forms of radiation, usually because they are located adjacent to critical tissues or structures and/or because they require comparatively high doses of radiation to provide sufficient cancer control. It is also used as an additional therapy after surgery for certain cancers. It is not recommended when the cancer has metastasized. PBT is indicated in the case of many types of cancers, such as pediatric cancers, intraocular melanomas, malignant lesions of the head and neck, lung and beast cancers among others.

25.     Clinical studies of PBT have shown promising results with respect to tumor control and survival rates. PBT has achieved high rates of tumor control, reduced side affects, and improved survival for difficult or inoperable lesions.

26.     PBT treatement requires the patient to travel to a PBT facility having the expensive, high technology medical equipment and technical personnel to perform the therapy on the patient.  Patients will typically be referred for PBT treatment, or will seek out such

treatment, at a location geographically convenient to their work or residence. PBT requires that the patient undergo a long series of sequential treatments at the facility so that patients will prefer not to travel any significant distance for each treatment. Therefore, the market for such services is localized to the patient. But for the unlawful acts alleged, this need for PBT treatments should result in competition among local providers and facilities in localized areas within the state of New York and immediately surrounding geography of nearby parts of New Jersey and Connecticut.

27.     Because of the extremely high cost of the cyclotron and the physical requirements for setting up a functioning PBT facility, there are high barriers to entry in the market for providing PBT services. A typical cyclotron costs over $75 million, weighs 200 tons and the gantries are each 3 stories high and weigh 100 tons apiece. A typical PBT facility requires 60,000 to 100,000 square feet of space, with walls and ceilings that are 6 to 18 feet thick to protect against radiation leakage. A large multidisciplinary medical and support staff is also required. Accordingly, there are very high barriers to entry in the market for providing a PBT facility.

28.     Currently, access by New Yorkers to PBT is quite limited given the distances involved and the capacity of the machines. There are eight operating proton beam centers in the U.S., with Boston and Philadelphia facilities being the closest to New York. Even existing centers have waiting lists of patients seeking treatment. The New York State DOH reports that there were an average of over 99,000 new cancer cases diagnosed in New York residents annually from 2003-2006. Of these, more than 13,000 cases (not including prostate cancer) involved tumor sites that could benefit from the precision and higher doses offered by PBT. If the efficacy of PBT in prostate cancers is established, this could double the number of patients

annually which would benefit from PBT. Because of the timing and repetition of treatment required, even a large PBT facility is estimated to be able to treat only 2000 patients a year. Therefore, there is a great need and demand for PBT facilities but high barriers to market entry.

29.    Accordingly, in March 2010, the DOH undertook to develop and promulgate procedures and a process for considering applications to establish a PBT facility in New York. Article 28 of the NY Public Health Law, and Part 705 of the applicable rules, 10 NYCCRR Part 705), allows the Commission of Health to determine that a new medical technology should be eligible for evaluation through a demonstration project. The DOH concluded in May 2010 that it would consider applications for demonstration PBT projects and announced a deadline of June 21, 2010 for submission of applications for Certificates of Need ("CON").

30.    Applications for a CON were ultimately filed with DOH in June 2010 by plaintiff TPTCC NY and by defendant NYPC..

## FACTS COMMON TO THE VIOLATIONS ALLEGED

31.    In or about November 2008, plaintiff Medscan approached defendant TRAVIS pursuant to its ongoing relationship with GWT since 2001, to act as its attorney and to provide legal advice in connection with plaintiffs' plans to develop a PBT facility in New York and to establish the appropriate corporate entities to effectuate that project.  TRAVIS proceeded to represent plaintiffs in that connection and, among numerous legal services, drafted NDA's and LOI's as deemed necessary to advance the project with suppliers, hospital partners, investment bankers and real estate agencies and architects to establish the physical plant.

32.    In or about December 2009, TRAVIS suggested to plaintiffs that it would add to the strength and viability of the PBT project if plaintiffs joined with RTSI because of RTSI's

12

experience and size in operating more traditional radiation therapy centers for treatment of cancer.

33.     In or about December 8, 2008, the parties conducted meetings in Florida with RTSI and Ion Beam Applications S.A. ("IBA"), a cyclotron supplier. The attendees included TRAVIS and representatives from RTSI, Medscan, and Bonnie Siegel on behalf of defendant OPCO.

34.     Thereafter TRAVIS, in his multiple conflicting capacities, prepared several drafts of an "Operating Agreement" by which he purported to have Medscan, RTSI and himself as equity owners in various percentages and later, Medscan, RTSI and a new entity to be formed. These agreements were never signed.

35.     Over the next year, plaintiffs proceeded with efforts and investments to advance their PBT project and make necessary filings with the NY DOH. This involved extensive planning and expense with consultants and health care firms including an NDA signed by RTSI and Continuum Health Partners on December 29, 2008 concerning plaintiffs' confidential project, an agreement hiring as consultants defendant CCA VCC, preparing financial projections and hiring real estate broker Newmark Knight Frank ("Newmark"). With Newmark's assistance, plaintiff's located a site at 621 West 57 Street, New York, NY on property controlled by Durst Development LLC ("Durst"), with whom Medscan signed an NDA. Plaintiffs also hired VOA Architects to draw plans for the facility at the site and to work with Durst's architects FXFOWLE in revising those plans.

36.     In addition, the project required clinical partners and plaintiffs signed NDA's or LOI's drafted by defendant TRAVIS with numerous local hospitals experienced in treating cancer including MSKCC, New York Presbyterian, Beth Israel Continuum Health Partners and

13

Montefiore Medical Center. Plaintiffs also signed an NDA with Ion Beam Applications, S.A., a firm capable of providing the expensive cyclotron needed for the project.

37. During this one-year period, plaintiffs went to numerous meetings all over the country, from Florida to New York and to potential suppliers in Japan, accompanied by defendant TRAVIS. Plaintiffs paid for all this travel. In total, plaintiffs' development costs, exceed $2 million.

38. During this same period, all of the aforesaid participants in plaintiffs' project had access, protected by contract or fiduciary obligations, to plaintiffs' Confidential Information. This included details as to product sources, financial planning, site location and planning and clinical partners.

39. Unexpectedly, on or about November 5, 2009, plaintiffs received a letter from the law firm of Greenberg Traurig, stating that they represented RTSI and that they were "terminat[ing]" the parties' "discussions" regarding "development of a proton beam facility." A copy of this letter is annexed hereto as Exhibit A. On November 6, 2009, the very next day after that letter was sent, defendants filed with the New York Secretary of State to form an entity called "New York Proton Management LLC," a defendant herein.

40. Plaintiffs replied to the November 5, 2009 letter by letter dated November 9, 2009 stating, among other things, that while Greenberg Traurig's clients may choose to proceed alone, "your clients are well aware of our complex Proton Beam Therapy business plan which our company painstaking[ly] and costly developed over the last two years. The plan is extremely confidential and highly valuable to us. Therefore, at this time, we demand that all of our confidential printed and electronic materials that your client are in possession of ought to be send [sent] back to our office or confirmation of its destruction and electronic deletion and not be

14

shared with others." The letter went on to specifically identify individuals who "had access to the plan" including Norton Travis and employees of defendants 21C and RTSI. A copy of plaintiffs' letter is annexed hereto as Exhibit B.

41.     Notwithstanding this letter, plaintiffs never received back the requested materials or any confirmation they had been destroyed.   Plaintiffs endeavored to continue their development of the PBT project but discovered that many of their partners were being solicited away or interfered with by defendants. Thus, for example, hospitals which had signed NDA's with plaintiffs commenced negotiating with defendants including RTSI and TRAVIS.   Upon information and belief, defendants also interfered with plaintiffs ongoing   relationships with Goldman Sachs and with Proskaur Rose LLP, another law firm advising Medscan.

42.     Later, defendants CCA VCC and Oppenheimer also ceased to represent plaintiffs and began work with defendants.

43.     In or about May, 2010, DOH announced that pursuant to the NY Public Health Law, it was requesting submissions for the operation of PBT services in New York State on a demonstration basis to evaluate the medical efficacy, cost-effectiveness, efficiency and public need for PBT.  Projects would have to obtain a Certificate of Need ("CON") and were to be approved for up to 10 years. The DOH announcement set forth in great detail the extensive application materials that would have to be prepared and submitted no later than June 21, 2010, barely a month after the announcement.  Required papers included over 20 separate categories of documents which plaintiffs had been preparing over the last six months.   DOH regulations also required that the responsible individuals on each project provide "personal qualifying information" on forms provided by DOH, because these individuals were subject to DOH's "character and competence" review process, which screens for dishonest or fraudulent conduct.

15

44.     Because of their extensive prior planning and preparation, at great effort and expense, plaintiffs were in position to submit a timely application by the June 21, 2010 DOH deadline and did so.

45.     Unknown to plaintiffs at the time, defendants also submitted a CON application, but using substantial portions of the very same confidential materials of plaintiffs to which defendants previously had access.  Plaintiffs only recently learned that these submissions included copies or materials substantially drawn from copies of plaintiffs Confidential Information.  These included financial projections and architectural plans.  Defendant NYPC even selected the same site plaintiffs had previously selected, 621 W. 57 Street, controlled by Durst.  Defendants' real estate "term sheet" dated May 2, 2010, annexed hereto as Exhibit C, is substantially similar to plaintiffs' term sheet dated March 31, 2009, previously negotiated with Durst.  The term sheet actually states on page 2 that Durst's architects "FXFowle Architects drawings dated April 29, 2010 which were based on drawings previously submitted by VOA." (Emphasis added.)  VOA had previously been retained by plaintiffs to prepare confidential drawings for the same site.

46.     But for defendants' misappropriation of plaintiffs' Confidential Information, defendants would not have been able to timely submit their CON application to DOH and would have needed a one to two year lead time and the investment of millions of dollars to prepare the materials necessary for such an application.

47.     Defendants' copying of plaintiffs' confidential information was so blatant, that defendants' architectural drawings for the 57th Street site, which plaintiffs had been planning, even included a Ground Floor drawing with a space marked with plaintiffs' name "New York

16

Proton Institute Lobby" (copy annexed as Exhibit D). This is "smoking gun" evidence proving that defendants copied plaintiffs' original drawings made by plaintiffs' architect VOA.

48. Upon information and belief, DOH was not aware that defendant NYPC's CON application, which was submitted under cover of a letter from CCA VCC, was substantially based on misappropriated Confidential Information of plaintiffs' wrongfully taken and used by NYPC and the other defendants. Defendants' CON application to DOH was fraudulent in not disclosing this misappropriation. For example, the NYPC architectural drawings showing FXFowle as architects were certified by VOA Architects on June 21, 2010 (the day of the submission), who could do so only because these were drawings previously prepared and submitted by VOA under contract with plaintiffs. A copy of the VOA certification is annexed hereto as Exhibit E.

49. On or about September 8, 2010, DOH's appointed committee issued a Memorandum recommending that defendant NYPC's CON application (containing confidential materials misappropriated from plaintiffs) be approved and that plaintiff's CON application not be approved. Upon information and belief, in view of DOH's regulations requiring a character and competence review as aforesaid, DOH would not have recommended NYPC's CON application if DOH had known it relied on misappropriated information.

50. Moreover, but for defendants' combination and conspiracy to eliminate plaintiffs as competitors, defendants would not have been able to timely submit an acceptable CON application to DOH. By reason of defendants' conduct, DOH and the public were deprived of the submission of different and competitive CON proposals.

51. Accordingly, defendants' unlawful conduct, unless enjoined, is likely to harm competition by allowing approval of a CON application on misappropriated information taken

17

from and developed by plaintiffs. Approval solely of NYPC's application will provide no competition in PBT facilities.

52.     If defendants' fraudulent application is not enjoined and is now considered, and if plaintiffs' application is thereby denied, plaintiffs will likely go out of business and there will be no competition with defendants.

53.     Unless this court enjoins defendants, the public will suffer harm to competition in the form of lack of price competition, reduced output and availability of PBT services, and quality not measured against any competition.

## VIOLATIONS ALLEGED

## FIRST CAUSE OF ACTION

54.     Plaintiffs repeat and reallege paragraphs 1 through 53 of this complaint as if set forth in full herein.

55.     In furtherance of the conspiracies and other unlawful conduct herein alleged, defendants including those in direct horizontal competition with plaintiffs such as RTSI and NYPC, agreed to eliminate plaintiffs as a competitor in the New York PBT market.

56.     Unless enjoined, defendants and co-conspirators will thereby effectuate an unlawful group boycott of plaintiffs and destroy them as competitors in the PBT market in New York.

57.     By reason of the foregoing, commencing at least as early as December 2008, and continuing thereafter up to and including the date of the filing of this Complaint, defendants and co-conspirators have entered into contracts and engaged in a conspiracy in a per se unreasonable restraint of trade of the aforesaid interstate trade and commerce in PBT services to patients to

18

eliminate competition in the provision of such services in violation of Section 1 of the Sherman

Act, 15 U.S.C. § 1.

58.   The aforesaid contracts, combination, and conspiracy have consisted of a

continuing agreement, understanding, concert of action, plan and course of dealing by and

between the defendants and co-conspirators, the substantial terms and purposes of which have

included, among other things:

> a. the restraint, elimination and suppression of competition in the provision of PBT services, including restraint of competition from plaintiffs;
>
> b. the elimination and suppression of price competition in the provision of PBT services;
>
> c. the elimination from the market of plaintiffs' competing services and facilities for providing PBT services;
>
> d. the maintenance of higher than competitive prices for PBT services;
>
> e. the attempted destruction of plaintiffs as competitors of defendants and defendants' facilities and the exclusion of plaintiffs from the market for PBT services; and
>
> f. the substantial foreclosure of plaintiffs and other competition from access to the market for providing PBT services to patients.

59.   Pursuant to and in furtherance of the unlawful contracts, combination and

conspiracy alleged herein, and with the intent of effectuating same, defendants and co-

conspirators have participated in the conspiracy and done those things which they combined and

conspired to do, including, among other things:

> a. effectuating a group boycott of plaintiffs, a per se violation of the Sherman Act, § 1;
>
> b. effectuating a horizontal agreement fixing the prices to be paid for PBT services, a per se violation of Sherman Act § 1;
>
> c. eliminating competition for PBT services in the relevant market and submarkets.

19

60. To the extent that the aforesaid conduct, contracts, combination and conspiracies of defendants, including to horizontally fix prices among competitors and to boycott plaintiffs as competitors, are not deemed per se violations of Sherman Act § 1, then such conduct represents and has effectuated an unreasonable restraint of trade and anticompetitive effects, by reason of defendants' market power and barriers to entry of competition.

61. The contracts, combination and conspiracy hereinabove alleged and the wrongful acts done pursuant thereto have had, and unless enjoined will have, the following harmful effects, among others:

> a. competition in the provision of PBT services has been suppressed and restrained;
>
> b. defendants have been recommended and plaintiffs have not been recommended to be approved as a PBT provider based entirely on defendants' wrongful conduct and theft and misappropriation of plaintiffs' confidential information and submission of a fraudulent application;
>
> c. plaintiffs will suffer injury in their relationships with patients and referring doctors because of their inability to provide PBT services and by damage to plaintiffs' good will, reputation and impairment of plaintiffs' business and property;
>
> d. plaintiffs will lose revenue and profits from existing and prospective patients;
>
> e. patients and New York State are denied the benefit of a free and competitive market for obtaining PBT services, output of such services is restricted and quality of patient care is adversely affected.

62. By reason of the conduct of defendants and co-conspirators as hereinabove alleged, plaintiffs have been, and continue to be, substantially, materially and directly injured in their businesses and property in an amount to be determined at trial but which is at least $350 million.

## SECOND CAUSE OF ACTION

63. Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 62 of this Complaint as if fully set forth herein.

64. Since at least 2008, defendants and co-conspirators, with specific intent to obtain a monopoly, have combined and conspired to monopolize, and have attempted to monopolize, the provision of PBT services in New York in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

65. Defendants and co-conspirators have conspired and attempted by improper means and exclusionary conduct to acquire and maintain the power to control prices and to exclude competition in the provision of PBT services to patients.

66. Defendants and co-conspirators have increased barriers to entry to competition in the provision of PBT services and have conspired and attempted to forestall, foreclose and limit entry into those markets by plaintiffs and other competitors and potential competitors.

67. The purpose and specific intent of the illegal acts of defendants and co-conspirators as hereinabove alleged has been to obtain and maintain the aforesaid power to control prices and exclude competition, with the effect that defendants have achieved a monopoly or there is a dangerous probability that defendants will succeed in their purpose and achieve a monopoly.

68. By reason of the conduct of defendants and co-conspirators hereinabove alleged, plaintiffs have been and continue to be substantially, materially and directly injured in their business and property in an amount to be determined at trial but which is at least $350,000.

## THIRD CAUSE OF ACTION
### (Conversion)

69. Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70. At all relevant times herein, and since the inception of plaintiffs' PBT project, plaintiffs were and still are the rightful owners of the Confidential Information and materials that they developed, created, or caused to be created, and paid for in connection that with the project. This Confidential Information includes, but is not limited to, business plans, business contacts, financial projections, source and vendor lists, and architectural drawings and other site plans.

71. Each of the defendants, in combination and conspiracy with one another, had access to plaintiffs' Confidential Information either directly or through the terms of their NDA's and other agreements with plaintiffs.

72. On November 9, 2009, upon the announcement and declaration that defendants no longer wished to be associated and do business with plaintiffs in connection with plaintiffs' PBT project, plaintiffs reminded defendants of their obligations with respect to plaintiffs' proprietary Confidential Information: "your clients are well aware of our complex Proton Beam Therapy business plan which our company painstaking[ly] and costly developed over the last two years. The plan is extremely confidential and highly valuable to us." Exhibit B hereto. Plaintiffs expressly demanded the return of all of their Confidential Information from defendants, or confirmation that all such confidential information was destroyed and electronically deleted.

73. Defendants failed and refused to return to plaintiffs its Confidential Information, notwithstanding plaintiffs' request that they do so, and continued to wrongfully detain, use and convert plaintiffs' Confidential Information to defendants' own benefit in connection with defendants' fraudulent CON application for a PBT facility in New York, causing serious and

irreparable injury to plaintiffs. Plaintiffs have been damaged by reason of such wrongful detention and defendants' continued wrongful use of plaintiffs' Confidential Information in connection with defendants' application to DOH for approval to construct a PBT facility in New York, using plaintiffs' business plans, financial projections, architectural drawings for plaintiffs' original project site, despite plaintiffs' due demand for return. Unless defendants' continued conversion of plaintiffs' Confidential trade secrets, as hereinabove alleged, is enjoined, plaintiffs will suffer continuing damages, in an amount to be determined at trial, but which is at least $350,000,000.

## FOURTH CAUSE OF ACTION
### (Misappropriation of Confidential Information and Trade Secrets)

74. Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75. Since plaintiffs began developing their plan for a PBT facility in New York, plaintiffs expended millions of dollars and nearly two years worth of human resources in developing the necessary business plans, financial projections, architectural drawings, and locating the appropriate site for their planned facilities and forging partnerships and consultancy with various real estate, financing and health care professionals necessary to facilitate the completion of the project.

76. In order to protect the confidentiality of its expenses and business plans, including its vendors and sources, and other secret and proprietary information, plaintiffs undertook very deliberate steps well known to each of the individual defendants to ensure that plaintiffs' Confidential Information, including their entire business plan, remained confidential and was not disclosed other than as necessary under contract for the development of plaintiffs' PBT facility, for the purpose of, among other things, insuring a

23

competitive advantage to plaintiffs. To maintain and protect plaintiffs' Confidential Information from improper use and disclosure, NDAs were signed with third parties who would have a need to know the Confidential Information in order to assist plaintiffs. By way of example only, the NDA's provided that none of the Confidential Information was to be used for any purpose other than in connection with the development and institution of plaintiffs' PBT facility.

77.     Plaintiffs did not otherwise authorize defendants or to use or disseminate or make public plaintiffs' Confidential Information other than as necessary for the development of plaintiffs' PBT facility and not without appropriate protections to prevent disclosure of plaintiffs' Confidential Information, including by NDA's.

78.     Without plaintiffs' knowledge, permission or authorized, defendants misappropriated and utilized plaintiffs' Confidential Information and trade secrets in connection with defendants' own CON submission to the DOH for a competing PBT facility. Unbeknownst to plaintiffs, defendants' DOH submission contained copies or substantially similar copies of, among other things, plaintiffs' confidential financial projections and architectural plans for the same site plaintiffs had already selected at 621 W. 57 Street, prior to defendants' improper conduct, including its unfair competition. Defendants were only able to timely submit a CON application to DOH because of their misappropriation of plaintiffs' Confidential Information.

79.     Defendants' misappropriation of plaintiffs' Confidential Information and trade secrets, as hereinabove alleged, has damaged plaintiffs, and unless, enjoined, is likely to cause plaintiffs continuing damages, in an amount to be determined at trial, but which is at least $350,000,000.

## FIFTH CAUSE OF ACTION

### (Unfair Competition)

80.     Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 79 of this Complaint as if fully set forth herein.

81.     As hereinabove alleged, since the commencement of their PBT project, plaintiffs spent millions of dollars and considerable effort to develop their project and make the necessary DOH filings. Those efforts, include but are not limited to developments of relationships with various health care, real estate, financial and other professionals and consultants for the purpose of developing business plans and financial projections, securing an appropriate site for the PBT facility and identifying investors to finance the project, costing at least $300,000,000. Plaintiffs also expended time and money to locate and secure suppliers of the PBT equipment, which itself costs between $76,000,000 and $120,000,000.     Plaintiffs also developed relationships and engaged in substantial discussions and negotiations with the clinical partners necessary for plaintiffs' PBT facility.

82.     As a result of plaintiffs' substantial skill and prior efforts and financial expense, plaintiffs were in a position to timely submit a CON application to DOH notwithstanding DOH's short notice for that submission.

83.     As hereinabove alleged, defendants' misappropriating plaintiffs' Confidential Information, which it paid for, and improperly soliciting and interfering with plaintiffs' developed business relations with, among others, Goldman Sachs, CCA VCC, Oppenheimer, Durst, MSKCC, IBA and others, defendants unfairly competed with plaintiffs and effectively eliminated the one to two year lead time defendants otherwise would have needed on their own

25

to develop, create and prepare the materials necessary to submit a timely CON application to DOH.

84.     Defendants' wrongful conduct and misappropriations, individually and in active concert, conspiracy and cooperation, as hereinabove alleged have enabled and will continue to enable defendants to unfairly profit and benefit from plaintiffs' time, skill, labor and expenditures in connection with the PBT facility in New York.

85.     Defendants have acted in bad faith, and, defendants TRAVIS, CCA VCC, and Cicero have done so, in breach of their fiduciary duties to plaintiffs.

86.     Defendants' actions as hereinabove alleged constitute unfair competition under the common law of the State of New York.

87.     By reason of defendants' unfair competition with plaintiffs, plaintiffs have been damaged, and unless, enjoined, defendants' unfair competition is likely to cause plaintiffs continuing damages, in an amount to be determined at trial, but which is at least $350,000,000.

## SIXTH CAUSE OF ACTION
## (Breach of Fiduciary Duty)

88.     Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 87 of this Complaint as if fully set forth herein.

89.     By virtue of their respective agreements with plaintiffs, defendants TRAVIS, CCA VCC, and Cicerco occupied positions of trust and confidence, and had access to plaintiffs' Confidential Information and trade secrets. These defendants owed plaintiffs fiduciary duties of undivided loyalty, utmost good faith and complete honesty with respect to all matters affecting or potentially affecting the scope of their retention and agreements with plaintiffs as well as the development and construction of plaintiffs' PBT facility in New York.

26

90.     Such fiduciary duties owed by these defendants existed throughout the term of

their respective engagement with plaintiffs and survived the termination of those respective

engagements.

91.     By virtue of the acts and conducted alleged herein above, these defendants

breached their fiduciary duties to plaintiffs by, among other things:

a.      Taking advantage of and diverting to themselves and others,
        tangible existing business opportunities and expectancies that
        they helped develop and obtain while under exclusive contract
        with plaintiffs, which would have benefited and profited plaintiffs

        but for the wrongful acts of these defendants;

b.      taking advantage of and diverting to themselves by disloyal,
        faithless and dishonest means, potential and prospective business
        opportunities expectancies that would have come to and profited
        plaintiffs but for the wrongful acts of these defendants;

c.      deliberately and for their own gain, undermining and
        interfering with plaintiffs' ongoing and prospective business
        relationships and attempting to divert, and actually diverting to
        themselves the goodwill and trust and confidence that plaintiffs
        had developed with such great effort and expense,
        notwithstanding their position of trust and confidence with
        plaintiffs;

d.      misappropriating, disclosing or using in competition with and
        to the detriment of plaintiffs, plaintiffs' Confidential Information and
        trade secrets, notwithstanding the positions of trust and
        confidence they had with respect to plaintiffs; and

e.      failing to act solely and exclusively in the best interests of
        plaintiffs notwithstanding the positions of trust and confidence
        they had with respect to plaintiffs.

92.     As a result of the aforementioned breaches of fiduciary duty, plaintiffs have been

damaged, and, unless defendants are enjoined, will continued to be damaged in an amount to be

determine at trial, but which is at least $350,000,000.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract)

93.     Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     Pursuant to the terms of their December 28, 2009 agreement, defendant OPCO agreed to provide exclusive investment banker and advisory services to plaintiff The Proton Institute of NY LLC in connection with plaintiffs' New York PBT facility. Pursuant to the terms of that exclusive agreement, OPCO was to provide general advisory and negotiation and debt equity placement services for plaintiffs' New York PBT facility. In connection with OPCO's exclusive engagement, it was provided with and had access to plaintiffs' Confidential Information and trade secrets.

95.     Pursuant to its terms, OPCO's exclusive agreement with plaintiff The Proton Institute of NY LLC was to continue until, among other events, the date on which either party received written notice from the other party of termination.

96.     As consideration for its services, plaintiffs Medscan and TPIONY paid OPCO an initial retainer of $50,000, and in the event that OPCO secured financing for plaintiffs' PBT facility, OPCO would received additional remuneration.

97.     Plaintiffs fully performed their obligations under the terms of the agreement with OPCO.

98.     By letter dated July 9, 2010, OPCO purported to terminate its exclusive agreement with plaintiffs. However, at least as early as June 16, 2010, prior to the termination of its agreement and in breach of its obligations therein, OPCO contracted with defendant RTSI, among others, to serve as defendants' financial advisor in connection with the PBT facility defendants co-opted from plaintiffs, and the plans misappropriated from plaintiffs. Upon

28

information and belief, in connection with OPCO's engagement with RTSI, OPCO, misappropriated and used plaintiffs' Confidential Information.

99.     As a result of the foregoing, defendant OPCO breached its agreement with plaintiffs, and plaintiffs have been damaged in an amount to be determined at trial, but which is at least $350,000,000.

## EIGHTH CAUSE OF ACTION
### (Interference with Contract and Prospective Advantage)

100.    Plaintiffs reallege and incorporate by reference herein the allegations in paragraphs 1 through 99 of this Complaint as if fully set forth herein.

101.    At all times relevant, defendants RTSI, RTSHI, NYPM, NYPC and TRAVIS had knowledge of plaintiffs' contracts with OPCO and CCA VCC. Notwithstanding such knowledge, said defendants intentionally and improperly procured the breach of those contracts with plaintiffs with the malicious intent of taking over plaintiff's PBT project and the services of OPCO and CCA VCC for themselves at plaintiffs' expense.

102.    At all times relevant, said defendants also knew of plaintiffs' business relationships with Durst to negotiate for facility space, and with various hospitals as hereinabove alleged to obtain their participation in plaintiff's PBT facility. Nevertheless, with the sole and malicious purpose of putting plaintiffs out of business and destroying them as competitors, said defendants improperly and unfairly approached Durst and the hospital partners to terminate their dealings and prospective advantages with plaintiffs. Defendants were successful in that regard and those parties ceased to do business or negotiate with plaintiffs.

103.    Plaintiffs were damaged by said tortious interference in an amount to be determined at trial.

WHEREFORE, plaintiffs ask that the Court:

A.      enter judgment that defendants have engaged in conduct in violation of Sections 1 and 2 of the Sherman Act;

B.      enter judgment for plaintiffs against each defendant on the aforesaid antitrust causes of action in an amount equal to three times the amount of damages sustained by plaintiffs as a result of their being injured in their business and property by reason of defendants' violations of the Sherman and Clayton Acts;

C.      enter judgment for plaintiffs against each defendant on the aforesaid state law causes of action in an amount equal to $350 million and together with punitive damages of three times the amount of damages sustained by plaintiffs

D.      enter judgment for plaintiffs against each defendant awarding plaintiffs their reasonable attorneys fees and costs of this action;

E.      enter a preliminary and permanent injunction and restraining defendants and their employees, successors, assigns and all those in active concert or participation with them from further use of plaintiffs' Confidential Information, ordering them to withdraw all filings and applications heretofore made using plaintiffs' Confidential Information including those made to municipalities and lenders, and enjoining them from continuing their unlawful conduct and acts of unfair competition, breach of contract and tortious conduct as hereinabove alleged; and

F.      enter such other and further orders and judgments as may be necessary and proper in order to dissipate the effects of the violations of law and wrongful conduct complained of herein, and to restore free competition in the provision of PBT services; and

G.    order such other and further relief as is just and proper.

## PLAINTIFFS DEMAND TRIAL BY JURY

SCHWARTZ & THOMASHOWER LLP

Dated: September 15, 2010                          By: _William Thomashower_
          New York, New York

William Thomashower
Rachel Schwartz

15 Maiden Lane, Suite 705
New York, New York 10038
Tel: (212) 227-4300

Attorneys for Plaintiffs

31

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.,*
Docket No. 10 Civ. 7097 (JSR) (S.D.N.Y.)

# Exhibit A



Robert H. Cohen
(212) 801-6907
cohenr@gtlaw.com

November 5, 2009

Mr. Jack Lefkowitz
New York MedScan Inc.
751 Second Avenue
New York, NY 10017

Dear Mr. Lefkowitz:

Greenberg Traurig, LLP represents Radiation Therapy Services, Inc. ("RTSI") in connection with the development of a proton therapy facility in the greater New York area.

It has come to RTSI's attention that you have engaged a consultant, Robert Shapiro, who has requested a meeting with the New York State Department of Health regarding a proton therapy facility in New York City. This meeting was requested without the knowledge or consent of RTSI. Furthermore, Mr. Shapiro has not been retained by RTSI, nor has he been asked by RTSI to act on its behalf or on behalf of any proton therapy facility being pursued by RTSI.

As you are aware, RTSI has been discussing with you a potential arrangement in which you and RTSI might have worked together in pursuing the development of a proton therapy facility in the greater New York area. Based on your recent actions, we can only assume that you have elected to proceed on your own in this regard, and RTSI has no choice but to terminate, effective immediately, any further discussions with you regarding any possible collaboration in the development of a proton therapy facility.

To reiterate, RTSI will therefore be pursuing the development of a proton therapy facility in greater New York area without your participation. RTSI wishes you the best of luck in your future endeavors.

Very truly yours,

Robert Cohen

Robert H. Cohen

RHC/dj

239898640NYv1

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.,*
Docket No. 10 Civ. 7097 (JSR) (S.D.N.Y.)

# Exhibit B



*PET/CT IMAGING*
a Whole New World

**Med Scan**

Via Fax 212-801-6400
**Mr. Robert H. Cohen**                                                    November 9, 2009
Greenberg Traurig LLP
200 Park Avenue
New York, New York 10166                    **Re: The Proton Institute of New York, LLC**

Dear Mr. Cohen:

We are in receipt of your letter dated November 5th and the email from Mr. Gerasimovich of your firm. We are shocked to learn that your client views our hiring of Mr. Shapiro as a violation of any agreement with your client. Furthermore, we are perplexed with the statement in your letter stating that "Mr. Shapiro has not been retained by RTSI". Since, in the past year we have retained and advanced huge sums of monies to numerous consultants to the Proton project and not once did RTSI participate in any of the approvals, retentions or the payments thereof.

Even more disturbing to us is the fact that DOH notified your client in Florida that Bob Shapiro has made contact with them on our behalf. Since, the Department is well aware of TPIoNY as the developer of the Proton project, and Bob never knew of any discussions with RTSI, he merely called DOH to open a dialogue on behalf of TPIoNY. We suspect that something is going on here more then what meets the eye! Nevertheless, we respect your client's decision and wish them best of luck in all their endeavors.

However, your clients are well aware of our complex Proton Beam Therapy business plan which our company painstaking and costly developed over the last two years. The plan is extremely confidential and highly valuable to us. Therefore, at this time, we demand that all of our confidential printed and electronic materials that your client are in possession of ought to be send back to our office or confirmation of its destruction and electronic deletion and not to be shared with others.

In particular the following individuals had access to the plan:
**Norton Travis**, General Counsel at RTSI and GWT law firm
**Jon Travis**, Business Development at 21st Century Oncology (Norton's son)
**Jonathan Weinbach**, Business Development at RTSI
**Daniel Galmarini**, Director, 21st Century Oncology

Our phone lines remain open for further dialogue,

Jack Lefkowitz

751 Second Avenue ◆ New York, NY 10017 ◆ tel. 212.599.5555 ◆ fax. 212.599.5554 ◆ www.nymedscan.com

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.,*
Docket No. 10 Civ. 7097 (JSR) (S.D.N.Y.)

# Exhibit C

57 SANDWICH LLC
c/o The Durst Organization
One Bryant Park, 49th Floor
New York, New York 10036

June 17, 2010

Norton L. Travis
Executive Vice President & General Counsel
Radiation Therapy Services, Inc.
1010 Northern Boulevard - Suite 314
Great Neck, NY 11021

        Re:    The New York Proton Center

Dear Mr. Travis:

        Please find enclosed a term sheet providing our proposal to New York Proton Management, LLC ("Management") regarding the site at 621 West 57th Street, New York (New York County), New York 10019 ("Site"). We understand that Management proposes to construct a proton beam therapy center at the Site and to provide access to the Site to The New York Proton Center ("Center") through a license agreement, upon approval of the Center by the New York State Public Health Council. We also understand that the Center will be controlled by a consortium of several of the leading academic medical and cancer centers in New York City. This letter confirms our interest in entering into a sub-sublease agreement with Management, in accordance with the attached proposed term sheet.

        As we have discussed, an entity that we control, Durst Development, L.L.C. ("Durst"), controls the Site through a Ground Lease with Four Plus Corporation, et al. ("Ground Lease"). Durst subleases the site to 57 Sandwich LLC ("Sandwich"), which is managed by The Durst Manager LLC ("Manager"). Sandwich and Manager are also entities that we control. In accordance with the terms of the Ground Lease, Durst and Sandwich are allowed to further lease the site to an entity/business operation such as that contemplated by Management and Center.

        We look forward to working with you in order to finalize our relationship and wish you every success with your project.

Sincerely yours,

57 SANDWICH LLC

By: The Durst Manager LLC, its Manager/

    By: SRDA Manager, LLC, its Managing Member

    By
        Jonathan Durst, Co-President

RE\12895\01\53\423537v1

## TERM SHEET

The New York Proton Management LLC
May 3, 2010
West 57th Street Midblock Development

| 1. | Fee Owner: | Four Plus et al. (collectively, "Fee Owner") |
|---|---|---|
| 2. | Ground Lessee: | Durst Development L.L.C. ("Ground Lessee") |
| 3. | Sublessee: | 57 Sandwich LLC ("Sandwich") |
| 4. | Development Sublease/SNDA: | A Development Sublease of the "Property" (as defined in Paragraph 5 below) (in a minimum of 300,000 square feet of Zoning FAR) shall be entered into by and between Ground Lessee and Sandwich of the Property for a term through January 20, 2098. Sandwich to obtain a SNDA from Fee Owner. |
| 5. | Property: | Midblock between 11th & 12th Avenues and 57th & 58th Streets, measuring approximately 200' x 295' (the "Midblock Premises") plus the land leased to Edison Mini Storage[1] by Ground Lessee (the "Edison Premises"). The Midblock Premises and the Edison Premises hereinafter collectively referred to as the "Property"[2]. |
| 6. | Building on Midblock Premises: | A to be constructed building on the Midblock Premises to be owned by Sandwich consisting of approximately 202,500 square feet of Zoning FAR (the "Building"). <br><br> The Building is anticipated to consist of four (4) components: <br><br> 1.) Retail Premises consisting of approximately 11,665 square feet of Zoning FAR (on the 57th Street side of the Building) on the first floor); <br><br> 2.) Parking Premises consisting of approximately 41,359 square feet of gross building area (cellar, subcellar and access through a portion of the ground floor of the Building of approximately 2,343 square feet of Zoning FAR); <br><br> 3.) Facility Premises consisting of approximately 150,987 square feet of Zoning FAR (consisting of part of the ground floor, all (or substantially all) of floors 2 through [3] of the Building, , and any portion of the Facility Premises Below Grade Area as defined on Exhibit A); and <br><br> 4.) Office Premises consisting of approximately 37,188 square feet of Zoning FAR (the [fourth and fifth floor] of |

---

[1] The Edison Mini Storage is approximately 97,500 sq ft of zoning FAR. The Edison Premises are leased through 2013.

[2] Durst Development LLC is the ground lessee under that certain Ground Lease dated February 1, 1999 between Four Plus ... ground lessor (the "Ground Lease ") for the block bounded by 11th Avenue, 12th Avenue, 57th Street and 58th Street ... (the "Site"). The Property comprises a portion of the Site.

|   |   | the Building). |
|---|---|---|
|   |   | The Building, may at Sandwich's option, contain a roof terrace/recreational area which shall be accessible solely to the residents of buildings controlled by The Durst Organization, including The Helena, upon terms and conditions to be agreed upon in final documents. |
|   |   | These areas were taken from FXFowle Architects drawings dated April 29, 2010 which were based on drawings previously submitted by VOA. The areas are subject to change due to design development. |
| 7. | Proton Sublease: | Sandwich shall sub-sublease the Facility Premises to the The New York Proton Management LLC ("Proton") through January 19, 2098 (the "Proton Sublease"). A SNDA shall be provided by Ground Lessee upon terms reasonably acceptable to Ground Lessee and Proton. For federal income tax purposes the parties will be obligated to recognize the Proton Sublease under Section 467 of the Internal Revenue Code. |
| 8. | Projected Timing: | • Non-binding Term Sheet to be executed on/or before June 1, 2010

• Proton to demonstrate that it has the equity necessary to fund their share of the development costs on/or before June 1, 2010.

• Definitive documents to be executed on/or before August 1, 2010.

• Proton to finalize their project financing on/or before September 1, 2010.

• 50% Design Development Plans provided by Proton on/or before September 1, 2010

• Construction of foundations to commence on/or about January 1, 2011. (Assumes 16 weeks to obtain a building permit.)

• Other project and construction milestones to be determined. |
| 9. | Improvements to be Constructed: | The improvements, consisting of the Building and the Facility Premises will be constructed by Developer in accordance with architectural plans to be developed by VOA ("Proton's Architect") in consultation with FXFowle Architects ("Sandwich's Architect"), (collectively, "Architects"). Customary provisions regarding plan approvals and coordination among the Architects shall be included in the Development Agreement. |

| | | |
|---|---|---|
| | | The Building will be mixed use with aesthetics and quality of improvements consistent with Ground Lessee's building located at 601 West 57th Street, (known as The Helena) and Ground Lessee's planned development on the remaining portion of the block (a 12th Avenue building to be determined). |
| | | Proton, Developer and Sandwich will work with the Architects to design the Building, including the Facility Premises. Developer will construct the Building substantially in accordance with a full set of architectural and engineering plans to be developed. |
| | | The Building shall be constructed with the target of achieving certification under the LEED rating system promulgated by the United States Green Building Council. |
| 10. | Developer: | An affiliate of Ground Lessee ("Developer"). |
| 11. | Developer's Fee: | Developer shall be entitled to a fee equal to 5% of the development costs (i.e., hard costs and soft costs) attributable to the Facility Premises ("Developer's Fee") as part of the development budget. |
| 12 | Development Agreement/Development Costs: | Proton shall pay for 100% of the Development Costs allocable to the construction of the Facility Premises. |
| | | "Development Costs" shall mean all costs and expenses of the Work and the development of the Building, except to the extent specifically excluded herein, which shall include (i) "soft costs" including but not limited to all fees and expenses paid to Proton's Architect, Developer's Architect, engineers, project counsel and other consultants, the project management costs, brokerage commissions, costs of the construction lender's representative, debt service payments pursuant to the construction loan, builder's risk insurance, inspection costs, equipment procured, real estate taxes, ground rent payable to Ground Lessee, projected costs of the initial permanent loan and any interest, fees or other expenses incurred by Sandwich (or any Affiliate thereof) in connection with the construction loan and the initial permanent loan, (ii) "hard costs" including but not limited to the direct cost of the work, the construction management fee and general conditions contained in the construction management agreement, owner's insurance, contractor's insurance, and "subguard" or payment and performance bond costs, and construction manager's construction contingency, and (iii) the Developer's Fee. In no event shall the Development Costs include any tax credits resulting from the inclusion of all or any portion of the Premises in the New York State Department of Environmental Conservation's Brownfield Cleanup Program be treated as a reduction of, or credit against, the Development Costs. |

| 13. | Guaranty: | Sandwich shall provide an entity or entities ("Guarantor") with a combined net worth of at least $50,000,000. This guaranty requires (i) all Proton's Development Costs for the Facility Premises to be paid by Proton and guarantees only that Guarantor will provide all construction costs with respect to the Retail Premises, the Parking Premises and the Office Premises and (ii) provided that so long as the required funding by Proton is available, Developer shall continue to act as Developer until the Building is complete. |
|---|---|---|
| 14. | Proton Sublease Delivery Date: | Substantial completion of construction of the Building |
| 15. | Proton Sublease Expiration Date: | January 18, 2098 |
| 16. | Proton Sublease Base Rent Payments: | Proton shall pay Base Rent Payments in accordance with Exhibit A. |
| 17. | Proton Sublease Use: | Medical facility use only. |
| 18. | Proton Sublease Electricity: | Direct Meter |
| 19. | Proton Sublease Cleaning: | Proton to maintain the Facility Premises except for snow removal on 57th Street. |
| 20. | Proton Sublease HVAC: | HVAC system will be a separate independent unit from the HVAC system serving the Retail Premises, Parking Premises and Office Premises. |
| 21. | Proton Sublease Alterations: | Proton shall not perform (a) structural alterations, additions or replacements in or to the Facility Premises or the Building, (b) alterations, additions or replacements which affect Building systems outside the Facility Premises, or (c) alterations, additions or replacements which effect other Building tenant(s), without Sandwich's prior written consent, such consent not to be unreasonably withheld, delayed or conditioned, and then only by contractors or mechanics reasonably approved by Sandwich and otherwise in accordance with the terms of the Lease. Proton shall have the right, without Sandwich, to make whatever non-structural changes Proton desires in, or additions to, the Facility Premises, provided such alterations comply with all Legal Requirements and Insurance Requirements, and Proton obtains all required permits, consents, approvals and certificates and delivers copies of the same to Sandwich. |
| 22. | Proton Sublease Sublet and Assignment: | TBD |
| 23. | Proton Sublease Security Deposit: | TBD |
| 24. | Facility Premises Signage: | Proton to have signage rights and a separate identity for its Facility Premises consistent with the overall design of the Building and subject to i) Sandwich's approval and ii) applicable zoning regulations and building codes. |

| 25. | Proton Sublease Real Estate Taxes: | Proton shall pay 100% of the real estate taxes attributable to the Facility Premises. |
|---|---|---|
| 26. | Proton Sublease Operating Expenses: | Proton shall pay 100% of the operating expenses attributable to the Facility Premises. Responsibility for items such as insurance, sidewalks or other common expenses to be shared and further detailed in the final documents. |
| 27. | Confidentiality: | This Term Sheet and all discussions related thereto shall be held in confidence by Ground Lessee and Proton in accordance with the Confidentiality Agreement dated March 22, 2010. |
| 28. | Commission: | Sandwich will pay a brokerage commission to Newmark Knight Frank ("Broker"), pursuant to a separate commission agreement.<br><br>Ground Lessee and Proton represent and warrant to the other that it has not dealt with any broker in connection with this Term Sheet or the Property other than Broker. |
| 29. | Non-Binding Term Sheet: | It is strictly understood and agreed that (a) this Term Sheet shall not be binding upon Ground Lessee or Proton in any way unless and until definitive documents (in form and content satisfactory to both parties) is executed by both parties (in their respective sole and absolute discretion) and (b) neither party shall be liable to the other or to the Broker on account of this Term Sheet or the proposed transaction or as a result of any written or parole representations or negotiations, or drafts, comments or correspondence between the parties or their respective agents or representatives on any legal or equitable theory (including, without limitation, part performance, promissory estoppels, fraud, or undue enrichment). |

## EXHIBIT A
## BASE RENTAL PAYMENTS
## BEING REVIEWED FOR DURST TAX IMPLICATIONS

| | |
|---|---|
| Commencement Date of the Proton Sublease January 31, 2027: | For the period commencing on August 1, 2010 (whether or not definitive documents have been executed) through January 31, 2027, Proton shall pay to Sandwich monthly 1/12 of the amount equal to 7% of the "Proton Payment". The "Proton Payment" shall be equal to the sum of \$350.00 per square foot of Zoning FAR for the Facility Premises plus \$175.00 per square foot of gross building area of below grade space included within the Facility Premises or unusable or unexcavated due to the Facility Premises use (collectively, the "Facility Premises Below Grade Area"). The Facility Premises Below Grade Area is currently estimated to be approximately 42,000 square feet. |
| February 2027 through January 2097: | A. For each year commencing on February 1, 2027 up to and including January 31, 2037, Proton shall make monthly payments to Sandwich based on an annual amount equal to the greater of (a) (x) the product of the Initial Adjusted Treasury Note Rate[3] multiplied by (y) the per square foot fair market value (as determined by the provisions of the Ground Lease) for the Zoning FAR of the above-grade portion of the Facility Premises (the "Above Grade Zoning FAR FMV"), *plus* fifty percent (50%) of (i) the Above Grade Zoning FAR FMV multiplied by (ii) the Facility Premises Below Grade Area and (b) the total payments due for the immediately preceding year.

B. For each year commencing on February 1, 2037 up to and including January 31, 2047, Proton shall make monthly payments to Sandwich based on an annual amount equal to the greater of (a) (x) the product of the Adjusted Treasury Note Rate multiplied by (y) the Above Grade Zoning FAR FMV, *plus* fifty percent (50%) of (i) the Above Grade Zoning FAR FMV multiplied by (ii) the Facility Premises Below Grade Area and (b) the total payments that would have been due for the immediately preceding year if the payment calculation pursuant to A above had been calculated using the Adjusted Treasury Note Rate instead of the Initial Adjusted Treasury Note Rate.[4]

C. For each year commencing on February 1, 2047 up to and including January 2097, as determined on February 1, 2047 and recalculated every ten (10) years, Proton shall make monthly payments to Sandwich based on an annual amount equal to the greater of (a) (x) the product of the Adjusted Treasury Note Rate multiplied by (y) the Above Grade Zoning FAR FMV, *plus* fifty percent |

---

[3]    "Initial Adjusted Treasury Note Rate" means the greater of (a) one hundred fifty (150) basis points over the average yield to maturity of United States Treasury obligations with a ten-year maturity for 2022, 2023 and 2024 or (b) the average of the percentage rate stated in clause (a) hereof and seven percent (7%).

[4]    "Adjusted Treasury Note Rate" means one hundred fifty (150) basis points over the average yield to maturity of United States Treasury obligations with a ten-year maturity for the sixth, seventh and eighth years of the immediately preceding ten-year period.

(50%) of (i) the Above Grade Zoning FAR FMV multiplied by (ii) the Facility Premises Below Grade Area and (b) the total payments due for the immediately preceding year.

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.,*
Docket No. 10 Civ. 7097 (JSR) (S.D.N.Y.)

# Exhibit D



WEST 58TH STREET

PARKING RAMP

STACKED LOADING
(2 BERTHS)

82'-0"

40'-0"

255'-0"

MECHANICAL & SUPPORT
(ASSUME 25% ZFA DEDUCTION)

SHARED
LOBBY

NEW YORK
PROTON
INSTITUTE
LOBBY

295'-0"

WEST 57TH STREET

DRIVE THROUGH

88'-0"

62'-10"

50'-0"

FX FOWLE

GROUND FLOOR
WEST 57TH STREET DEVELOPMENT
THE DURST ORGANIZATION

NEW YORK PROTON MANAGEMENT
MIDBLOCK DEVELOPMENT SCHEME A

*TPTCC NY, Inc. v. Radiation Therapy Services, Inc.,*
Docket No. 10 Civ. 7097 (JSR) (S.D.N.Y.)

# Exhibit E

architecture   +   planning   +   interior design

Exhibit D
ARCHITECT'S OR ENGINEER'S LETTER OF CERTIFICATION FOR PROPOSED CONSTRUCTION

June 21, 2010

NYS Department of Health/Office of Health Systems Management
Division of Health Facility Planning
Bureau of Architectural and Engineering Review
433 River Street, 6th Floor
Troy, New York 12180-2299

Re:

|  |  |
|---|---|
| Project Number: | 8612C.00 |
| Name: | New York Proton Center, Inc. |
| Location: | Midblock between 11th and 12th Avenues and 56th and 57th Streets, New York (New York County), New York |
| Description: | Establishment and Construction of a Proton Beam Therapy Diagnostic & Treatment Center |

To the New York State Department of Health:

This is to certify that under the terms of my contract for the above-named facility to provide services to design, prepare working drawings and specifications, and during construction to make periodic visits to the site and to perform such other required services to familiarize myself with the general progress, quality and conformance of the work, I have ascertained that to the best of my knowledge, information and belief, this project will be designed in substantial compliance with the provisions of the construction sections of the State Hospital Code, which are in effect at the time this application is being submitted.

I also certify that I have read and understood the conditions of Section 710.1 of 10 NYCRR.

June 21, 2010
Date

Signature of Architect or Engineer

033170
Professional New York State License Number
VOA Associates Inc.
Suite 100
722 12th St NW
Washington DC  20005
Business Address

722 12th STREET NORTHWEST   FIRST FLOOR   WASHINGTON, DC  20005          VOICE   202 922-9227     FACSIMILE   202 822-3698