UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TPTCC NY, INC.,
THE PROTON INSTITUTE OF NY, LLC, and
NY MEDSCAN LLC,

                    Plaintiffs,

             -against-

RADIATION THERAPY SERVICES, INC.,
RADIATION THERAPY SERVICES
    HOLDINGS INC.,
21st CENTURY ONCOLOGY, INC.,
NEW YORK PROTON
    MANAGEMENT LLC,
THE NEW YORK PROTON CENTER,
    OPPENHEIMER & CO., INC.,
CICERO CONSULTING
    ASSOCIATES VCC, INC.,
NORTON L. TRAVIS, and
FRANK M. CICERO,

                   Defendants.

---

Case No. 10 Civ. 7097 (JSR)

ECF CASE

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 3

I.    PLAINTIFFS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED .................... 3

    A.    Plaintiffs' Claims Are Not Exempt From The Antitrust Laws ........................... 3

        1.    Defendants' Conduct is Not Protected by the Noerr-Pennington Doctrine.................................................................................. 4

        2.    State Action is Not a Defense to Conduct Occurring Prior to Action by the State.................................................................... 7

    B.    Defendants Are Not Entitled To Immunity For Misrepresentations In The NYDOH Adjudicatory Agency Process ........................... 8

    C.    Plaintiffs Have Adequately Pleaded a Plausible Section 1 Claim ...................... 10

        1.    The Amended Complaint Contains Sufficient Factual Allegations......... 10

        2.    Defendants are Independent Economic Actors Capable of Conspiring.................................................................. 16

    D.    Plaintiffs Have Adequately Pleaded a Section 2 Claim Against All Defendants ............................................................ 18

    E.    Plaintiffs Have Adequately Pleaded the Relevant Markets ................................ 19

    F.    Plaintiffs Have Adequately Pleaded Antitrust Injury .......................................... 21

II.    PLAINTIFFS ADEQUATELY ALLEGE COPYRIGHT INFRINGEMENT BY RTSI.................................................................................... 24

    A.    Plaintiffs' Business Plan is Presumptively Copyrightable................................... 25

    B.    Plaintiffs' Business Plan Contains the Requisite Elements of Originality and Creativity............................................ 26

    C.    The Merger Doctrine and Blank Forms Rule Do Not Operate to Defeat Plaintiffs' Copyright Claim.................................. 29

    D.    Defendants Have Failed to Demonstrate Joint Authorship................................. 30

III.    PLAINTIFFS' STATE LAW CLAIMS HAVE BEEN ADEQUATELY PLEADED .................................................................. 31

    A.    Plaintiffs Have Pleaded Adequately a Joint Venture Between Plaintiffs and RTSI ......................................................... 32

        1.    RTSI Breached the Joint Venture and Plaintiffs Are Entitled to an Accounting and Damages. ................................... 36

i

## TABLE OF CONTENTS
### (continued)

Page

2.     Based on RTSI's Repudiation of the Joint Venture, Plaintiffs are Entitled to an Accounting and Damages.................................................. 37

3.     Plaintiffs Adequately Plead a Claim For a Constructive Trust............... 38

B.     The Breach of Fiduciary Duty Claim Withstands Dismissal.............................. 39

     1.     Governing Law ................................................................................... 39

     2.     Defendants Were Plaintiffs' Fiduciaries .................................................. 40

C.     Plaintiffs' Unfair Competition Claim Should Be Sustained ............................... 48

D.     Plaintiffs' Claim For Misappropriation Of Trade Secrets Withstands Dismissal................................................................................................................. 51

     1.     Defendants' Challenge to the Secrecy of Plaintiffs' Confidential Information is Meritless.......................................................................... 52

     2.     Defendants Misappropriated Plaintiffs' Information in Breach of Their Confidential Relationship............................................................. 53

E.     Plaintiffs' Allegations in Support of Their Claim for Unjust Enrichment are Sufficient to Withstand Defendants' Motion to Dismiss ............................... 53

F.     Plaintiffs Have Adequately Pleaded Breach of Contract Claims Against Cicero and OPCO .............................................................................................. 55

     1.     Cicero's Arguments Cannot Overcome the Well-Pleaded Allegations........................................................................................... 55

     2.     OPCO's Arguments Fail as a Matter of Law ........................................... 56

G.     The RTSI Defendants' Defense of Economic Justification Does Not Warrant Dismissal of Either Claim for Tortious Interference with Contract or Prospective Business Advantage ..................................................................... 59

IV.     THE NEW YORK PROTON CENTER IS CAPABLE OF BEING SUED .................. 61

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*777388 Ontario Ltd. v. Lencore Acoustics Corp.*,
105 F. Supp. 2d 56 (E.D.N.Y. 2000) ....................................................................53

*Abernathy-Thomas Eng'g Co. v. Pall Corp.*,
103 F. Supp. 2d 582, 609 (E.D.N.Y. 2000) .........................................................43

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)................................................................................................8

*Am. Needle, Inc. v. Nat'l Football League*,
130 S. Ct. 2201 (2010).....................................................................................16, 17

*Am. Int'l Group, Inc. v. Greenberg*,
877 N.Y.S. 2d 614 (N.Y. Sup. Ct. 2008) .............................................................47

*Arbor Hill Concerned Citizens Neighborhood Assoc. v. City of Albany*,
250 F. Supp. 2d 48 (N.D.N.Y. 2003)...................................................................62

*Armstrong Surgical Ctr. Inc. v. Armstrong County Mem'l Hosp.*,
185 F.3d 154 (3d Cir. 1999)................................................................................6, 9

*Ashland Mgmt. Inc. v. Janien*,
82 N.Y.2d 395 (1993).......................................................................................51, 52

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*,
295 F. Supp. 2d 75 (D.D.C. 2003) .......................................................................16

*Attia v. Soc'y of the N.Y. Hosp.*,
201 F.3d 50 (2d Cir. 1999)...................................................................................28

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys. Inc.*,
155 F.3d 59 (2d Cir. 1998).....................................................................................8

*Balaklaw v. Lovell*,
14 F.3d 793 (2d Cir. 1994)...................................................................................22

*BanxCorp v. Costco Wholesale Corp.*,
723 F. Supp. 2d 596 (S.D.N.Y. 2010)..................................................................30

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................10, 11, 12

*Berman v. Sugo LLC*,
580 F. Supp. 2d 191 (S.D.N.Y. 2008).......................................................39, 45, 48

*Bestolife Corp. v. Am. Amicable Life*,
   5 A.D.3d 211, 774 N.Y.S.2d 18 (1st Dep't 2004) ............................................................44, 45

*Blank v. Blank*,
   222 A.D.2d 851, 634 N.Y.S.2d 886 (3d Dep't 1995) ..............................................................33

*Block v. Razorfish, Inc.*,
   121 F. Supp. 2d 401 (S.D.N.Y. 2000)......................................................................................43

*Bloor v. Falstaff Brewing Corp.*,
   454 F. Supp. 258 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979)..................................57

*Blue Planet Software, Inc. v. Games Inc. LLC*,
   331 F. Supp. 2d 273 (S.D.N.Y. 2004)......................................................................................40

*Bongo Apparel, Inc. v. Iconix Brand Group, Inc.*,
   No. 601903/06, 2008 WL 41341 (Sup. Ct. NY. Cty. Jan. 2, 2008).........................................48

*Bowman Imp./Exp. Ltd. v. F.J. Elsner N. Am. Ltd.*,
   5 Misc. 3d 1026(A) (N.Y. Sup. Ct. 2004) ...............................................................................59

*Brown v. Leach*,
   189 A.D. 158, 178 N.Y.S. 319 (1st Dep't 1919) .....................................................................43

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).................................................................................................................22

*BUSA Corp., et al. v. Ecogloves, Inc., et al.*,
   No. 05 Civ. 9988(JSR), 2009 WL 3076042 (S.D.N.Y. Sept. 28, 2009)..................................31

CA-*POWZ v. City of Greece, New York*,
   No. 10-CV-6035-CJS, 2010 WL 3663409 (W.D.N.Y. Sept. 14, 2010) ..................................62

*California Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972)...................................................................................................................8

*Carell v. The Shubert Org., Inc.*,
   104 F. Supp. 2d 236 (S.D.N.Y. 2000)......................................................................................31

*Carvel Corp. v. Noonan*,
   350 F.3d 6 (2d Cir. 2003) ........................................................................................................58

*CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*,
   44 F.3d 61 (2d Cir. 1994) ........................................................................................................26

*Centra Industries, Inc. v. McGuirewoods, L.P.*,
   270 F. Supp. 2d 386 (S.D.N.Y. 2003)......................................................................................47

iv

*Cheminor Drugs Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999)................................................................9

*Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.*,
   790 F.2d 1032 (2d Cir. 1986)............................................................7

*City of Columbia v. Omni Outdoor Advertising Inc.*,
   499 U.S. 365 (1991)...........................................................................8

*Clarett v. NFL*,
   306 F. Supp. 2d 379 (S.D.N.Y. 2004)..............................................22

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ..........................................................9

*Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*,
   No. CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5, 2003)............9

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962).........................................................................12

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)...................................................................16, 17

*Decker, Decker & Assocs., Inc. v. Assoc. of Nat'l Advertisers, Inc.*,
   15 Misc. 3d 1117(A) (N.Y. Sup. Ct. 2007) ....................................34

*Discon, Inc. v. NYNEX Corp.*,
   93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998)........................................................................18

*Doron Precision Sys., Inc. v. FAAC, Inc.*,
   423 F. Supp. 2d 173 (S.D.N.Y. 2006)..............................................20

*Dunay v. Ladenburg, Thalmann & Co., Inc.*,
   106 A.D.2d 318, 483 N.Y.S.2d 234 (1st Dep't 1984).......................42

*EBC I, Inc. v. Goldman Sachs & Co.*,
   5 N.Y.3d 11 (2005) ......................................................39, 43, 45, 46

*Eberhard Inv. Assocs., Inc. v. Santino*,
   No. 01 Civ. 3840, 2003 WL 22126846 (S.D.N.Y. Sept. 12, 2003)........52

*Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*,
   140 F.2d 266 (2d Cir. 1944)............................................................31

*Erickson v. Pardus*,
   551 U.S. 89 (2007)...........................................................................11

v

*Eskenazi v. Shapiro*,
    27 A.D.3d 312, 812 N.Y.S.2d 474 (1st Dep't 2006) ..................................................38

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*,
    375 F.3d 168 (2d Cir. 2004)...........................................................................................55

*Exceller Software Corp. v. Pearson Educ., Inc.*,
    No. 10 Civ. 0381, 2010 WL 4486944 (S.D.N.Y. Nov. 9, 2010) .................................31

*Excellus Health Plan, Inc. v. Tran*,
    287 F. Supp. 2d 167 (W.D.N.Y 2003) .....................................................43, 49, 50

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)......................................................................................................26

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.*,
    808 F.2d 204 (2d Cir. 1986)..........................................................................................28

*Fishman v. Wirtz*,
    807 F.2d 520 (7th Cir. 1986).............................................................22, 23, 24

*Fonar Corp. v. Domenick*,
    105 F.3d 99 (2d Cir. 1997)............................................................................................25

*Foster v. Churchill*,
    87 N.Y.2d 744 (1996) .............................................................................................58, 59

*Foster v. Kovner*,
    44 A.D.3d 23 (1st Dep't 2007) .................................................................................36

*Franklin Elec. Publishers, Inc. v. Unisonic Prods. Corp.*,
    763 F. Supp. 1 (S.D.N.Y. 1991)...................................................................................25

*Friedl v. City of New York*,
    210 F.3d 79 (2d Cir. 2000)............................................................................................41

*Frydman & Co. v. Credit Suisse First Boston Corp.*,
    272 A.D.2d 236, 708 N.Y.S.2d 77 (1st Dep't 2000) .........................44, 45, 53, 59

*Goldblatt v. Englander Commc'ns, L.L.C.*,
    No. 06 Civ. 3208 (RWS), 2007 WL 148699 (S.D.N.Y. Jan. 22, 2007) ....................56

*Gupta v. Rubin*,
    No. 00 Civ 3094 (DLC), 2001 WL59237 (S.D.N.Y. Jan. 24, 2001) .........................41

*Hinds County Mississippi v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................................11, 15

*Hudson Hotels Corp. v. Choice Hotels Int'l,*
  995 F.2d 1173 (2d Cir. 1993) ................................................................. 51

*Iannuzzi v. Wash. Mut. Bank,*
  No. 07-CV-964 (JFB)(WDW), 2008 WL 3978189 (E.D.N.Y. Aug. 21, 2008) ..................... 44

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.,*
  253 F. Supp. 2d 262 (D. Conn. 2003) ............................................................ 15

*Imtrac Indus., Inc. v. Glassexport Co.,*
  No. 90 Civ. 6058, 1995 WL 39294 (S.D.N.Y. Feb. 1, 1996) .................................. 59

*Natsource LLC v. GFI Group, Inc.,*
  332 F. Supp. 2d 626 (S.D.N.Y. 2004) ........................................................... 19

*In re Packaged Ice Antitrust Litig.,*
  723 F. Supp. 2d 987 (E.D. Mich. 2010) ......................................................... 12

*In re Rockefeller Ctr. Properties, Inc. Sec. Litig.,*
  184 F.3d 280 (3d Cir. 1999) ........................................................................ 2

*In re Wireless Tel. Servs. Antitrust Litig.,*
  No. 02 Civ. 2637(DLC), 2003 WL 21912603 (S.D.N.Y. Aug. 12, 2003) ....................... 20

*Island Rehab. Servs. Corp. v. Maimonides Med. Ctr.,*
  No 28726/05, 2008 WL 786507 (N.Y. Sup. Ct. March 24, 2008) ........................ 60, 61

*Kasada, Inc. v. Access Capital, Inc.,*
  No. 01 Civ. 8893(GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ....................... 20

*Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters, Inc.,*
  945 F.2d 509 (2d Cir. 1991) ............................................................. 26, 27, 28

*Kirk v. Heppt,*
  532 F. Supp. 2d 586 (S.D.N.Y. 2008) ........................................................... 41

*Kosower v. Gutowitz,*
  No. 00 Civ. 9011, 2001 WL 1488440 (S.D.N.Y. Nov. 21, 2001) ............................ 52

*Kottle v. NW Kidney Ctrs.,*
  146 F.3d 1056 (9th Cir. 1998), *cert. denied*, 525 U.S. 1140 (1999) ......................... 9

*Kregos v. Associated Press,*
  937 F.2d 700 (2d Cir. 1991) ................................................................... 29, 30

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.,*
  829 N.Y.S.2d 7 (1st Dep't 2006) ................................................................ 60

*Lane's Floor Coverings, Inc. v. Ardex, Inc.*,
   No. CV-95-4078 , 1996 WL 19182 (E.D.N.Y. Jan 4, 1996) ...............................................50

*Lehman v. Dow Jones & Co.*,
   783 F.2d 285 (2d Cir. 1986).............................................................................................52

*Lockheed Martin Corp. v. Boeing*,
   390 F. Supp. 2d 1073 (M.D. Fla. 2005) ...........................................................................22

*Matthew Bender & Co., Inc. v. Kluwer Law Book Publishers, Inc.*,
   672 F. Supp. 107 (S.D.N.Y. 1987).....................................................................................28

*McCullough v. Owens Enters., Inc.*,
   No. 3:07CV527, 2008 WL 2374245 (S.D. Miss. June 5, 2008).........................................25

*McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*,
   No. 89 Civ. 1489 (PNL), 1990 WL 138959 (S.D.N.Y. Sept. 19, 1990)..............................57

*Med. Diagnostic Imaging, PLLC v. Carecore Nat'l, LLC*,
   542 F. Supp. 2d 296 (S.D.N.Y. 2008) ...............................................................................40

*Medtech Prods. Inc. v. Ramir, LLC*,
   596 F. Supp. 2d 778 (S.D.N.Y. 2008) ..........................................................................43, 52

*Michelle Pommier Models, Inc. v. Men Women N.Y. Model Mgmt.*,
   No. 97 Civ. 6837, 1997 WL 724575 (S.D.N.Y. Nov. 18, 1997) ........................................50

*Modesto Irrigation District v. PG&E Co.*,
   54 Fed. Appx. 882 (9th Cir. 2002).......................................................................................6

*Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*,
   No. 107-CV-567, 2009 WL 1514912 (N.D.N.Y. June 1, 2009).....................................47, 59

*Music Ctr v. Prestini Musical Instruments Corp.*,
   874 F. Supp. 543 (E.D.N.Y. 1995) ......................................................................................9

*N. Atl. Instruments, Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999).................................................................................................53

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*,
   497 F.3d 109 (2d Cir. 2007)..........................................................................................29, 30

*N.Y. State v. St. Francis Hospital*,
   94 F. Supp. 2d 399 (S.D.N.Y. 2000)....................................................................................8

*Nadel v. Play-by-Play Toys & Novelties Inc.*,
   208 F.3d 368 (2d Cir. 2000)...............................................................................................51

ny-959421

*New York Jets LLC v. Cablevision Sys. Corp.*,
    No. 05 Civ. 2875 (HB), 2005 WL 2649330 (S.D.N.Y. Oct. 17, 2005) ..............................9, 19

*New York Racing Assoc. v. Nassau Regional Off-Track Betting Corp.*,
    909 N.Y.S. 2d 866 (Sup. Ct. Nassau Cty. 2010) ....................................................................48

*Parker v. Brown*,
    317 U.S. 341 (1943)....................................................................................................................24

*Parr v. Ronkonkoma Realty Venture I, LLC*,
    65 A.D.3d 1199, 885 N.Y.S.2d 522 (2d Dep't 2009) ......................................................38, 42

*Petrollo v. White*,
    344 Fed. Appx. 651 (2d Cir. 2009)............................................................................................41

*Plumitallo v. Hudson Atl. Land Co.*,
    74 A.D.3d 1038, 903 N.Y.S.2d 127 (2d Dep't 2010) ......................................................38, 42

*Polk v. Jordan*,
    No. 0602274/2006, 2008 WL 279233 (Sup. Ct. N.Y. Cty. Jan. 22, 2008)............................35

*Powe v. Cambium Learning Co.*,
    No. 08 Civ. 1963(JGK), 2009 WL 2001440 (S.D.N.Y. July 9, 2009) ...................................55

*Preil v. Heby*,
    11160/94, 2004 NY Slip Op 50820U (Sup. Ct. N.Y. Cty. May 26, 2004))...........................33

*Prof'l Real Estate Investors Inc. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993).......................................................................................................................8

*Prudential Oil Corp. v. Phillips Petroleum Co.*,
    392 F. Supp. 1018 (S.D.N.Y. 1975)....................................................................................36, 37

*Purgess v. Sharrock*,
    No. 91 Civ. 621 (LJF), 1992 WL 349683 (S.D.N.Y. Nov. 9, 1992) ......................................20

*Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*,
    309 A.D.2d 288, 765 N.Y.S.2d 574 (1st Dep't 2003) .........................................32, 33, 35, 36

*Robin Bay Associates, LLC v. Merrill Lynch & Co.*,
    No. 07 Civ. 376 (JMB), 2008 WL 2275902 (S.D.N.Y. June 3, 2008) ..............................57, 58

*SCF Arizona v. Wachovia Bank, N.A.*,
    No. 09 Civ. 9513(WHP). 2010 WL 5422505 (S.D.N.Y. Dec. 14, 2010) ...............................40

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001).....................................................................................................37, 38

*Scotto Princeton LLC v. Felsen Associates, Inc.*,
   807 N.Y.S. 2d 546 (Sup. Ct. 2005)......................................................................46

*SEC v. Am. Beryllium & Oil Corp.*,
   303 F. Supp. 903 (S.D.N.Y. 1968).....................................................................38

*SEC v. Kueng*,
   No. 09 Civ. 8763 (BSJ) (AJP), 2010 WL 3026618 (S.D.N.Y. Aug. 2, 2010)....................2, 41

*SEC. v. Lee*,
   720 F. Supp. 2d 305 (S.D.N.Y. 2010).................................................................55

*Segal v. Cooper*,
   49 A.D.3d 467, 856 N.Y.S. 2d 12 (1st Dep't 2008) ............................................53

*Sergeants Benev. Ass'n Annuity Fund v. Renck*,
   19 A.D.3d 107, 796 N.Y.S.2d 77 (1st Dep't 2005) ........................................44, 45

*Shapsis v. Kogan*,
   No. 38418/07, 2011 WL 61727 (N.Y. Sup. Ct. Jan. 7, 2011)................................53

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*,
   118 F.3d 955 (2d Cir. 1997)...........................................................................51

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
   376 F.3d 1065 (11th Cir. 2004) ......................................................................18

*Spectators' Commc'ns Network Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) .........................................................................15

*St. Joseph's Hosp. v. Hosp. Corp. of Am.*,
   795 F.2d 948 (11th Cir. 1986) ........................................................................9

*Standard Corp. v. Schmid Bros., Inc.*,
   647 F. Supp. 4 (S.D.N.Y. 1986).......................................................................17

*Starr v. Sony BMG Ent.*,
   592 F.3d 314 (2d Cir. 2010), *cert. denied*, *Sony Music Ent. v. Starr.*, No. 10-263,
   2011 WL 55814 (Jan. 10, 2011) ....................................................................11

*Stem v. Warren*,
   185 A.D. 823, 174 N.Y.S. 30 (1st Dep't 1919) .................................................43

*TADCO Constr. Corp. v. Dormitory Auth. of State of New York*,
   700 F. Supp. 2d 253 at n.1 (E.D.N.Y. 2010) .......................................................2

*Telesca v. The Long Island Housing P'ship, Inc.*,
   443 F. Supp. 2d 397 (E.D.N.Y. 2006) ..............................................................41

x

*Thomson v. Larson*,
    147 F.3d 195 (2d Cir. 1998)................................................................30

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)................................................................20

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)................................................................19

*Tuosto v. Philip Morris USA Inc.*,
    No. 05 Civ. 9384(PKL), 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007)..................9

*Twin City Bakery Workers and Welfare Fund v. Astra Aktiebolag*,
    207 F. Supp. 2d 221 (S.D.N.Y. 2002)........................................................32

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
    679 F. Supp. 2d 1120 (C.D. Cal. 2009) ......................................................17

*U.S. Futures Exch. LLC v. Board of Trade & CME*,
    No. 04 C 6756, 2005 WL 2035652 (N.D. Ill. Aug. 22, 2005)...............................5, 9

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3*,
    No. 00 Civ. 4763 (RMB), 2002 WL 91625 (S.D.N.Y. Jan. 23, 2002) ....................61

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948)........................................................................16

*University of Texas at Austin, et al. v. The Honorable Kathryn H. Vratil*,
    96 F.3d 1337 (10th Cir. 1996) ............................................................61

*USAirways Grp., Inc. v. British Airways PLC*,
    989 F. Supp. 482 (S.D.N.Y. 1997)........................................................57

*Westwoods Aviation, LLC v. Atl. Aviation Flight Serv., Inc.*,
    06 Civ. 15525 (JSR), 2007 WL 245415 (S.D.N.Y. Aug. 27, 2007)....................39, 46

*World Alliance Financial Corp. v. Guardian Fist Funding Group*,
    No. 1196-2010, 2010 WL 4732786 (Sup. Ct. N.Y. Cty. Nov. 12, 2010)................54

## STATUTES

17 U.S.C. § 101................................................................................26, 30

17 U.S.C. § 410(c) ............................................................................25

28 U.S.C. § 1367(c)(3)........................................................................31

N.Y. Gen. Assns. Law § 13 ..............................................................................................61


OTHER AUTHORITIES

37 C.F.R. § 202.1(c) .........................................................................................................30

72 N.Y. Jur. 2d Investment Securities § 216 ...................................................................43

54A Am.Jur.2d Monopolies and Restraints of Trade § 1066 .........................................48

*ABA Antitrust Law Developments* (6th Ed. 2007) ...........................................................9

Fed. R. Civ. P. 17(b)(3)(A) ..............................................................................................61

Fed. R. Evid. 201(b)(1) ......................................................................................................2

Fed. R. Evid. 201(b)(2) ......................................................................................................2

ny-959421

Plaintiffs NY MEDSCAN LLC ("Medscan"), THE PROTON INSTITUTE OF NY, LLC

("TPIONY"), and TPTCC NY, INC. ("TPTCC"), by their undersigned attorneys, submit this

consolidated memorandum of law in opposition to each defendant's motion to dismiss the First

Amended Complaint ("AC" or "Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.[1]  As demonstrated below, defendants' motions should each be denied in their

entirety.

## PRELIMINARY STATEMENT

Plaintiffs' Complaint details in 66 pages of allegations and many pages of exhibits the

factual underpinnings of their claims.  The Complaint specifically outlines defendants' scheme to

oust plaintiffs from the PBT project and to pursue the project entirely for defendants' sole

benefit.  The Complaint specifies plaintiffs' efforts and investments in the PBT project,

commencing long before defendants' involvement, the confidential, proprietary and copyright-

protected information that plaintiffs developed and that defendants misappropriated and the

contractual and business relationships with which defendants interfered.  And, the Complaint

articulates the parameters of defendants' conspiracy to cripple plaintiffs' ability to compete for

the right to provide PBT services in New York.  The Complaint, in short, provides allegations

that—when taken as true as they must be on these motions—plainly state actionable claims on

all counts.

Defendants nonetheless contend that they are entitled to dismissal of all claims at the

pleading stage.  In their quest for a quick disposition, defendants resort to recasting and

misstating plaintiffs' theories and allegations to assert the defenses they believe to be most

advantageous to them.  But, as we demonstrate below, those defenses are inapplicable in this

case or are simply premature because they implicate issues of ultimate proof.  Defendants

---

[1] Unless otherwise stated, "RTSI" refers defendants Radiation Therapy Services, Inc., Radiation Therapy Services Holdings, Inc., 21st Century Oncology, Inc., New York Proton Management LLC, The New York Proton Center and Norton Travis, who is sometimes referred to as "Travis"; "OPCO" refers to defendant Oppenheimer & Co. LLC; and "Cicero" refers to defendants VCC, Inc. d/b/a Cicero Consulting Associates and Frank M. Cicero.

compound that error by interjecting their own "facts" in an attempt to contradict the well-pleaded

allegations—a tactic obviously proscribed at the Rule 12 stage when those allegations must be

accepted as true, with all inferences drawn in plaintiffs' favor.[2]

Thus, for example:

- Defendants spend over 24 pages arguing that plaintiffs' claims are barred by the *Noerr-Pennington* and State Action doctrines. But those defenses are simply inapposite here because plaintiffs are challenging neither defendants' petitioning activities nor the decisions of the Department of Health ("NYDOH"). Rather, plaintiffs' claims are premised on defendants' exclusionary and tortious conduct *before* defendants submitted an application to NYDOH. That conduct ensured that plaintiffs would not be able to submit a viable application to NYDOH, and thus directly undermined the competitive process that otherwise would have taken place before NYDOH.

- On the copyright infringement claim, defendants seek to fight the facts, but ignore that Medscan has a registered copyright, which has a presumption of validity. None of the defendants' arguments are thus cognizable on a motion to dismiss, and, in any event, are wrong on the facts and law.

- Similarly, defendants dispute the well-pleaded facts on the joint venture claims, arguing not that the Complaint fails to allege enough facts to plead the existence of a joint venture, but rather that other so-called facts rebut the Complaint's

---

[2] RTSI references several documents (attached as exhibits to the Declaration of Allan Arffa, dated January 7, 2011 ("Arffa Decl.")) that purport to be "taken from the Amended Complaint, … incorporated by reference in the Amended Complaint, and official public records of which this Court may take judicial notice." RTSI Br. at 5. However, Exhibits 2, 3, and 10-12 do not belong to any of the aforementioned categories and, as such, the Court should exclude these materials and disregard all portions of RTSI's brief that make reference to them. *SEC v. Kueng*, No. 09 Civ. 8763 (BSJ) (AJP), 2010 WL 3026618, *2 (S.D.N.Y. Aug. 2, 2010). In particular, Exhibits 2 and 3 (materials relating to PBT applications by non-parties made to the Virginia and Illinois Departments of Health, respectively) are not referred to in the Complaint and not the proper subjects of judicial notice because they are not "generally known within the territorial jurisdiction of the trial court." Fed. R. Evid. 201(b)(1). *See also TADCO Constr. Corp. v. Dormitory Auth. of State of New York*, 700 F. Supp. 2d 253, 261 at n.1 (E.D.N.Y. 2010) (holding that publicly filed communications between state agencies and third parties are not public records of which a court may take judicial notice). Further, none of these exhibits are "capable of accurate and ready determination." Fed. R. Evid. 201(b)(2). Finally, Exhibits 10-12 (excerpts from transcripts of NYDOH committee or council meetings) were, according to the Arffa Declaration, obtained "pursuant to a New York State Freedom of Information Law request." Arffa Decl. ¶¶ 11-13. As courts have noted, such documents do not qualify as "public records" for purposes of a motion to dismiss. *See, e.g.*, *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 184 F.3d 280, 292-93 (3d Cir. 1999) (holding that two letters from the NYC Planning Commission obtained through the Freedom of Information Act could not be considered on a motion to dismiss) (citations omitted).

allegations.  Defendants are premature.  They are also wrong.  As plaintiffs allege, defendants themselves repeatedly represented their relationship with Medscan as a joint venture.

- To avoid the breach of fiduciary duty claim against Travis, RTSI completely ignores plaintiffs' numerous specific allegations that Travis acted as Medscan's attorney in connection with the PBT project, and instead relies on counsel's unsworn, unsubstantiated averments that Travis acted only as counsel to and a representative of RTSI and was not "engaged as Medscan's lawyer."

- OPCO argues that it could not have had any role in the conspiracy, but ignores the well-pleaded facts that it recommended that plaintiffs spend six months pursuing financing from a sham operation, while at the same time using plaintiffs' confidential information and trade secrets to help RTSI obtain financing for the PBT project it stole from plaintiffs.

- Cicero argues that there can be no breach of contract claim because the parties' contract did not cover a PBT facility, an argument that necessarily relies on a subjective interpretation of the contract—an inherent issue of fact—to overcome plaintiffs' allegations.

And the list goes on.

None of defendants' efforts changes the fact that plaintiffs have adequately pleaded their claims.  Indeed, in many cases, defendants do not even dispute that point.  Instead, they seek to bypass the pleading stage altogether and go straight to some distorted version of summary judgment in an effort to shield their unlawful conduct from scrutiny and short circuit plaintiffs' ability to develop additional evidence.  Plaintiffs have met their initial burden and are thus entitled to full discovery and the opportunity to prove their claims.  Defendants' tactics should be rejected and their motions denied.

## ARGUMENT

## I.   PLAINTIFFS' ANTITRUST CLAIMS SHOULD NOT BE DISMISSED

### A.   Plaintiffs' Claims Are Not Exempt From The Antitrust Laws.

Defendants' primary attack on plaintiffs' antitrust claims is to argue that the challenged conduct is protected by the *Noerr-Pennington* and State Action doctrines.  But defendants' arguments in this regard rely on a fundamental misreading of the Complaint.  Contrary to defendants' assertion, plaintiffs' claims in this action are not based on NYDOH's decision or on defendants' conduct in petitioning NYDOH.  Instead, they are premised on "defendants' pre-submission conduct," which took place many months "prior to the subsequent application process."  AC ¶¶ 100, 8.

3

1.    <u>Defendants' Conduct is Not Protected by the *Noerr-Pennington* Doctrine</u>.

The *Noerr-Pennington* doctrine generally exempts government petitioning activities from antitrust liability.  However, plaintiffs' claims alleging a conspiracy and anticompetitive conduct *prior to and wholly outside* the government agency application process do not implicate the *Noerr-Pennington* doctrine.  The Complaint repeatedly makes clear that it was "defendants' pre-submission conduct" for many months "prior to the subsequent application process" (AC ¶¶ 100, 8) that "caused plaintiffs' plan to be inferior to defendants' plan," undermined the process "to be approved as a PBT" facility and restrained competition.  AC ¶¶ 26, 100.  Plaintiffs allege that defendants' conspiracy began in 2008 or 2009, and that they usurped the Medscan PBT project by November 2009 to destroy plaintiffs as competitors in "the application process" and to be approved by the state as a PBT services provider.  AC ¶¶ 8, 64, 111, Ex. A.  Further, the Complaint details and charges that defendants continued their "scheme through exclusionary behavior and other wrongful conduct *outside the NYDOH application process*."  AC ¶ 102 (emphasis added).

Except as discussed below on the more narrow issue of the sham/misrepresentation exception to *Noerr-Pennington*, the Complaint does not charge misconduct in the defendants' actual submission to NYDOH and does not take issue with the decisions made by NYDOH.[3] Plaintiffs simply are not complaining here about defendants' "petitioning" NYDOH to approve their application, but about conduct well before, and in certain respects after but outside, the NYDOH process.

As set forth in great factual detail in the Complaint, before any applications were submitted to NYDOH, defendants ensured that plaintiffs would no longer have a chance to partner with the prospective clinical partners with which plaintiffs had previously developed relationships, and defendants took the proposed facility site and architectural plans for themselves.  AC ¶¶ 69-70.  "Thus, within weeks, if not days, of RTSI's November 5, 2009 letter,

---

[3] Issues with NYDOH's decisions are reserved for another forum.

the Medscan PBT Project was without clinical partners, a medical director, a site, architectural plans, and an equipment vendor." AC ¶ 71. Since the parties' applications to NYDOH were not filed until June 21, 2010 (AC ¶¶ 18, 93), it is clear that the wrongful conduct was not in defendants' "filing" with NYDOH or in NYDOH's decision, but in the exclusionary acts before that time.[4] As a result, defendants' conspiracy and exclusionary conduct had rendered plaintiffs' "submission to the NYDOH . . . materially inferior to the submission it would have made absent defendants' wrongful acts." AC ¶ 95.

Anticompetitive activities occurring "prior" to any submission of bids or any "petition" to a governmental agency are *not* protected as *Noerr-Pennington* petitioning activity because the conduct is itself directed against plaintiff prior to and outside the governmental process. For example, in *U.S. Futures Exchange LLC v. Board of Trade and CME*, No. 04 Civ. 6756, 2005 WL 2035652 (N.D. Ill. Aug. 22, 2005), the defendants were charged with exclusionary conduct preventing plaintiff from launching a registered futures and options exchange. Defendants argued that *Noerr-Pennington* immunized their conduct because they petitioned Congress and the CFTC arguing against "the feasibility of [Plaintiff's] market entry." *Id.* at *2. The court rejected this defense. The court observed that "[m]uch of the exclusionary conduct alleged . . . has nothing to do with Defendants' petitioning activities," so that *Noerr-Pennington* was not applicable. *Id.* at *1. As in this case, the independent activities alleged against defendants had included efforts aimed at "preventing Plaintiffs from obtaining clearing services" from a particular vendor, efforts to "interfere" with plaintiffs' regulatory services agreement, and false statements to "potential customers, and the financial community." *Id.* Likewise here, defendants

_____

[4] RTSI actually understands that the Complaint "appears to suggest that defendants' alleged wrongful antitrust conduct somehow occurred *prior* to the application process," RTSI Br. at 15, but then myopically argues that the only pre-application activity was the idea of Travis and Cicero in the Sept. 27, 2009 email to mislead NYDOH to require a CON demonstration project "solely to hinder competition" citing AC ¶ 90 (in Travis' words "this will . . . scare off any potential competitors," *id.*). The pleading makes clear the long period of pre-application plotting and exclusionary conduct aside from this one event.

5

usurped plaintiffs' site provider and architectural plans, interfered with plaintiffs' preexisting plans with clinical partners and ensured that plaintiffs would not secure financing, all in an effort to eliminate plaintiffs as a competitive force in the bid to win the right to provide PBT services in New York.  AC ¶¶ 70.

Similarly, in *Modesto Irrigation District v. PG&E Co*., 54 Fed. Appx. 882, 2002-2 Trade Cases ¶ 73,898 (9th Cir. 2002), the Ninth Circuit reversed dismissal of an antitrust complaint charging that PG&E, in conspiracy with others under Sherman Act Sections 1 and 2, refused to allow plaintiff to connect to its electric service system.  PG&E argued that *Noerr-Pennington* protected this conduct because PG&E was litigating before FERC the question of whether plaintiff's proposed connection was proper.  The court rejected the *Noerr-Pennington* defense:

> As in *Columbia Steel Casting Co. v. Portland General Electric Co.,* 111 F.3d 1427, 1446 (9th Cir.1996), the theory of liability is not that PG&E petitioned the agency, but that it *acted* privately and voluntarily *prior* to and independently of agency *action*.  *Id.* at 2 (emphasis in original.)

In contending that *Noerr-Pennington* nonetheless applies here to immunize their conduct, defendants rely heavily on *Armstrong Surgical Center Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154, 156 (3d Cir. 1999).  In that case, the Third Circuit affirmed dismissal of plaintiff's antitrust claims based on the charge that defendant submitted "false and misleading information" to the Pennsylvania Department of Health in connection with plaintiff's application for a Certificate of Need ("CON") to open an ambulatory surgical center.  In *Armstrong*, however, the principally challenged conduct was that defendants misled the agency *with false statements* during the CON process and also said they *"would boycott"* plaintiffs' facility.

Unlike here, the plaintiff in *Armstrong* did not contend that the defendant actually damaged its proposed plan before the application for the CON.[5]  Thus, while both cases involve

---

[5] *Armstrong* is also distinguishable because there was a full record of independent agency hearings, board and court appeals all addressing the alleged conduct before a final decision. Insofar as *Armstrong* rejects the sham/misrepresentation exception to *Noerr-Pennington*, it is distinguishable and acknowledged to be in the minority of circuit authority.

6

a CON, they are otherwise quite factually distinct, particularly on the dispositive issue of the timing of the challenged conduct.  Plaintiffs here rely on conspiratorial and anticompetitive acts prior to submission of the CON applications.  That conduct harmed plaintiffs in the formation of their PBT plan before they even applied for a CON.  *Noerr-Pennington* is not implicated in these circumstances.

      2.    <u>State Action is Not a Defense to Conduct Occurring Prior to Action by the State</u>.

Similarly, defendants can take no comfort from the State Action doctrine.  The conduct challenged in the Complaint does not arise from any action by the State of New York, but instead arises squarely out of defendants' wrongful conduct that deprived the state, and ultimately downstream consumers, of the competitive process to which they were entitled.

As already explained, defendants' pre-application exclusionary conduct rendered plaintiffs' CON application "materially inferior" such that it was not truly viable.  As a direct result, plaintiffs were injured in the competition to be an approved provider.[6]  Likewise, defendants' interference with plaintiffs' substitute clinical partner on or about September 23, 2010, after the applications were submitted and while the state was considering the applications, was not "authorized by" or "in reliance on" any state action.  AC ¶ 102.  Rather, it was further direct interference with plaintiffs' application, again before the state made any decisions.[7]

Plaintiffs' Complaint clearly charges defendants' conspiracy and exclusionary conduct before any applications were submitted to NYDOH.  Accordingly, subsequent action by NYDOH simply cannot be a defense to that pre-application conduct.[8]

---

[6] Defendants' alternative argument that the state, and not defendants, is the cause of plaintiffs' injury is wrong as a matter of law as explained in the Antitrust Injury section.

[7] *See* Establishment Committee ("EC") Transcript at 6.  "North Shore LIJ has formally withdrawn" as a clinical partner of TPTCC after its application was submitted.  Arffa Decl., Ex. 11 at 7.  We cite to this transcript only *arguendo* since as explained above, Arffa Decl. Exs. 10-12 are not properly considered on this motion.

[8] Defendants cite cases where the state was a contracting party and chose a particular supplier *for the state* to do business with.  *Cine 42nd Street Theater Corp. v. Nederlander Org.,*

(Footnote continues on next page.)

ny-959421

B.    Defendants Are Not Entitled To Immunity For Misrepresentations In The NYDOH Adjudicatory Agency Process.

Because, as we have demonstrated, the challenged illegal conduct occurred substantially prior to the applications being submitted to NYDOH, both the *Noerr-Pennington* and State Action defenses are inapplicable.  But even if there were a basis to conclude that *Noerr-Pennington* would otherwise be implicated, it still would not shield defendants' conduct from liability because of the "sham" exception.  The Complaint alleges plausibly that certain of defendants' conduct before NYDOH was fraudulent.  AC ¶¶ 94, 100-102.  As such, they would not be immunized by *Noerr*.  These allegations cannot be resolved at the pleading stage.

In arguing that there is no "sham" exception applicable to their conduct before NYDOH because the law allowed them to lie to NYDOH, defendants rely on *City of Columbia v. Omni Outdoor Advertising Inc.*, 499 U.S. 365 (1991) (legislative and political action) and *Prof'l Real Estate Investors Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 61 (1993) (sham test for litigation).  RTSI Br. at 18; OPCO Br. at 5-8.  Defendants misapprehend the applicable law.

As the Supreme Court has stated in two cases, "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."  *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).  In particular, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988), stated that unethical and deceptive practices in "less political arenas," such as administrative or adjudicatory settings, could violate antitrust laws.  Thus, *Noerr-Pennington* immunity is not intended to shield petitioning activities that do not further, but rather distort, the *decision-making process* in the non-legislative context, namely in the administrative adjudicatory process.  It is now

(Footnote continued from previous page.)

*Inc.*, 790 F.2d 1032 (2d Cir. 1986) (UDC licensing property to defendants) and *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys. Inc.*, 155 F.3d 59 (2d Cir. 1998) (agreement signed with the state).  These citations are inapplicable to the instant case because NYDOH was not contracting with defendants.  In any event, none of defendants' cases hold that a NYDOH CON proceeding decision qualifies for State Action immunity.  Compare *N.Y. State v. St. Francis Hospital*, 94 F. Supp. 2d 399 (S.D.N.Y. 2000) (OPCO Br. at 14), where the court *rejected* defendants' State Action defense based on a CON issued by NYDOH.

8

authoritatively recognized that misrepresentations "designed to influence adjudicatory functions do not" enjoy *Noerr-Pennington* immunity. *ABA Antitrust Law Developments* at 1293-94 (6th Ed. 2007) (citations omitted). Ample precedent confirms that CON proceedings before state health agencies are deemed *adjudicatory*, not legislative. Accordingly, misrepresentations in the CON proceeding remove defendants' conduct from any otherwise applicable *Noerr-Pennington* immunity.[9] *See, e.g.*, *St. Joseph's Hosp. v. Hosp. Corp. of Am.*, 795 F.2d 948, 955 (11th Cir. 1986);[10] *Kottle v. NW Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998), *cert. denied*, 525 U.S. 1140 (1999) (a CON is "adjudicatory" and does not have *Noerr-Pennington* immunity, but the allegations in the case were "vague" and conclusory).[11]

Defendants cannot summarily escape scrutiny of their conduct under the *Noerr-Pennington* and State Action doctrines. Their motions should be denied.

---

[9]  Defendants' cases (RTSI Br. at 18-19; OPCO Br. at 7-8) are inapposite because they do not take place in the context of an adjudicatory setting, where misrepresentations are not summarily immunized. In *Tuosto v. Philip Morris USA Inc.*, No. 05 Civ. 9384(PKL), 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007), and *Music Ctr v. Prestini Musical Instruments Corp.*, 874 F. Supp. 543, 547 (E.D.N.Y. 1995), the false and misleading statements were made to legislative bodies (Congress and the Department of Commerce, respectively); and in *New York Jets LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875 (HB), 2005 WL 2649330 (S.D.N.Y. Oct. 17, 2005), the misrepresentations were made in the course of a public advertising campaign intended to influence the public and politicians.

[10]  RTSI Br. at 19 n. 11 claims that *St. Joseph's Hospital* would not apply here because plaintiffs "do not allege any affirmative misrepresentation to any agency involved in review." The case refers only to false information on which the agency relied. 795 F.2d. at 953. This is exactly what plaintiffs allege. AC ¶¶ 100-101.

[11]  Numerous decisions confirm there is no *Noerr-Pennington* immunity for misrepresentations in analogous agency *adjudicatory* situations besides a CON. *See, e.g.*, *U.S. Futures Exch. v. Board of Trade & CME*, No. 04 C 6756, 2005 WL 2035652 (N.D. Ill. Aug. 22, 2005) (misrepresentations to CFTC were not protected); *Cheminor Drugs Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3d Cir. 1999); *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 (9th Cir. 1982) (misrepresentations before ICC). *See also Confederated Tribes of Siletz Indians v. Weyerhaeuser Co.*, No. CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5, 2003), citing *Clipper Express*, *Kottle*, and *Cheminor*, *supra*, and distinguishing *Armstrong Surgical* (RTSI Br. at 19-20), to deny a *Noerr-Pennington* exemption for misrepresentations to the Oregon Department of Forestry.

9

     C.     <u>Plaintiffs Have Adequately Pleaded a Plausible Section 1 Claim</u>.

          1.     <u>The Amended Complaint Contains Sufficient Factual Allegations</u>.

Perhaps recognizing the futility of their *Noerr-Pennington* and State Action defenses, defendants next argue that plaintiffs have not adequately pleaded a Section 1 claim in any event. The crux of defendants' argument is that the Complaint does not contain sufficient factual allegations regarding the specific details of the conspiracy, and thus fails under *Twombly* and its progeny.  RTSI Br. at 20; OPCO Br. at 18-19; Cicero Br. at 8-10.

Plaintiffs' Complaint, however, provides precisely the factual allegations that defendants contend are missing.  The "who, what and when" of the conspiracy are all outlined in specific detail:

**WHO:**  Plaintiffs allege that all defendants participated in the conspiracy; namely, RTSI, RTSHI, 21C, NYPM, NYPC, OPCO, VCC, Cicero and Travis.  AC ¶¶ 6-8, 14-21, 102.

**WHAT:**  Plaintiffs also allege the nature of the conspiracy and its purpose.  Specifically, plaintiffs allege that "defendants combined and conspired to oust plaintiffs and take over the PBT project solely for defendants' benefit and simultaneously to destroy plaintiffs as competitors and to monopolize the PBT market in New York."  AC ¶ 6.  Plaintiffs further allege that defendants engaged in anticompetitive conduct specifically designed to ensure that plaintiffs could not put together a competitive application for the right to provide PBT services in New York.  Plaintiffs' conduct thereby deprived New York of a legitimate competitive process in selecting the market entrant, and ensured that RTSI would be the state-sanctioned monopolist.  AC ¶¶ 69-70, 74-77, 80-87, 102.

**WHEN:**  Plaintiffs allege the conspiracy commenced "prior to November 5, 2009" and "as early as October 22, 2009, and in all likelihood much earlier."  AC ¶¶ 6, 60.  The allegations further suggest that the conspiracy could have begun as early as December 2008, when Travis, alleged to be acting as Medscan's counsel, made RTSI a party to a confidentiality agreement he drafted for potential clinical partner Beth Israel even though Medscan up until that point was the

sole communicator with Beth Israel.  *Id.* ¶ 44.  In addition, throughout the Complaint, plaintiffs provide specific dates and timeframes for the other challenged conduct.

The law requires no more.  Indeed, the law does not even require the level of detail that plaintiffs have provided.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[a] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (rejecting need for "specific facts" and clarifying that at the pleading stage plaintiff need only "give the defendant fair notice of what the … claim is and the grounds upon which it rests").  Defendants' proposition that to survive a Rule 12 motion a plaintiff must provide all of the precise details of the alleged conspiracy stands unsupported—and indeed is contradicted—by the law, as the Second Circuit recently confirmed.  *Starr v. Sony BMG Ent.*, 592 F.3d 314, 325 (2d Cir. 2010), *cert. denied*, *Sony Music Ent. v. Starr.,* No. 10-263, 2011 WL 55814 (Jan. 10, 2011) (rejecting defendants' argument that "*Twombly* requires a plaintiff identify the specific time, place, or person related to each conspiracy allegation" and emphasizing that *Twombly* does not require "heightened fact pleading of specifics"); *see also Hinds County Mississippi v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 384 (S.D.N.Y. 2010) ("the who, when or where" of each allegation is not required).  Plaintiffs must only set forth "enough factual matter (taken as true) to suggest an agreement was made." *Twombly*, 550 U.S. at 555.  Plaintiffs have done that here.  "[A] well-pleaded complaint may proceed even it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation omitted).

Defendants attempt to overcome the sufficiency of plaintiffs' factual allegations by employing two tactics.  Neither succeeds.

First, defendants try to diffuse the dispositive effect of allegations in their totality by parsing and isolating them to argue that none standing alone suffices.  For example, RTSI focuses on the confidential and proprietary business plan that plaintiffs contend defendants misappropriated.  RTSI Br. at 21.  It argues that plaintiffs do not allege that defendants actually

excluded plaintiffs from using the plan, and in fact plaintiffs submitted it as part of their CON application.  While true, that is not the whole story.  Plaintiffs' claims are predicated on the entirety of defendants' exclusionary conduct, including not only the misappropriation of the plan but also interference with plaintiffs' relationship with real estate developer Durst, taking plaintiffs' architectural drawings, interfering with relationships with prospective clinical partners and so on.  Plaintiffs' allegations, and defendants' conduct, must be viewed as a whole and not parsed and examined individually.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts."); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005-06 (E.D. Mich. 2010) (discussing cases that reject defendants' attempts to read allegations in isolation and dismember the complaint).

More broadly, defendants argue that the conspiracy does not "make sense" and therefore is not "plausible" under *Twombly*.  RTSI Br. at 20-21; OPCO at 19-20; Cicero Br. at 9.  But the claim makes perfect sense.  Defendants were involved in a joint venture with plaintiffs.  They wanted to keep the benefits of that project all to themselves.  They also wanted to make sure that plaintiffs would be in no position to compete with them to win the demonstration project bid at NYDOH.  So, defendants took affirmative and unlawful steps to prevent plaintiffs from effectively being able to do so, all as alleged in the Complaint.  The conduct is unlawful and wrong, but in what plausible way can it be argued that it does not "make sense."

Plaintiffs have provided ample factual content to support a reasonable inference of the alleged conspiracy, and therefore have satisfied both the plausibility standard and the newly-minted "make sense" standard.  Plaintiffs have not premised their claims solely on parallel conduct that could reasonably be construed as competitive behavior, as was the case in *Twombly* and many of its progeny.  *Twombly*, 555 U.S. at 553-54, 557.  Rather, plaintiffs have detailed a scheme in which each defendant participated and did its part to ensure the unlawful end:  an ill-gotten monopoly position for the RTSI PBT facility.

12

RTSI nonetheless pursues its does not "make sense" standard and argues therefore the complaint is insufficient.  RTSI Br. at 20-21.  While acknowledging plaintiffs' allegations that defendants restrained trade by "preventing plaintiffs and others from submitting competitive CON applications,"[12] RTSI argues that nothing in the perceived shortcomings of plaintiffs' application can be linked to the alleged conspiracy.  They focus in particular on the lack of "financial investors and committed clinical partners."  *Id.* at 21.  The Complaint, however, explains how both are the product of defendants' unlawful conspiracy.

The Complaint explains that the goal of the conspiracy was to exclude competition so as to ensure that the RTSI PBT project would be the sole viable contender for the right to provide PBT services in New York, and thus would be certain to have a monopoly.  AC ¶ 7.  The first step in this conspiracy was for RTSI to oust plaintiffs from the joint venture and misappropriate the entire Medscan PBT project for themselves.  But it was not enough to simply deprive plaintiffs of their confidential, proprietary and protected materials and other fruits of their labor and financial investments.  To achieve their goal, defendants wanted to ensure that plaintiffs would not be able to put together another PBT project that would be a competitive threat to the RTSI project during the NYDOH CON process.  Two ways to do that were to prevent plaintiffs from securing financing and to prevent them from partnering with adequate clinical partners.

Defendants' conspiracy, as the Complaint alleges, accomplished both.  First, as to financing, the Complaint details that (1) plaintiffs relied on OPCO to secure financing for their PBT project; (2) after commencement of the conspiracy, rather than operate in good faith and use its best efforts to secure legitimate financing for plaintiffs, OPCO focused its efforts on securing financing for the RTSI project and sent plaintiffs to negotiate with only a single financing prospect, which plaintiffs discovered later was a complete sham; and (3) by the time plaintiffs

---

[12] Plaintiffs do not, as RTSI suggests, contend that defendants prevented plaintiffs or any other firm from filing an application with NYDOH at all.  Plaintiffs claim that defendants conspired and took steps to ensure that plaintiffs would not be in a position to submit a truly competitive application

13

discovered that it was a sham, it was too late to secure appropriate financing to present a proposal as part of its application for a CON, and OPCO terminated its contract with plaintiffs. AC ¶¶ 80-86.[13]  The Complaint also alleges other interference with financing that was revealed to one of plaintiffs' principals second-hand.  Plaintiffs require discovery from defendants and third-parties to get to the bottom of this additional allegation.

Second, with respect to the clinical partners, the Complaint alleges that as part of the conspiracy, "Travis and RTSI advised the Medscan PBT project's then-current partners in sum and substance that plaintiffs were 'out' of the PBT project, that RTSI now controlled NYPM. . . and that going forward, RTSI, not plaintiffs, would control the PBT project together with certain of the hospitals."  AC ¶ 70.  Plaintiffs further allege that after accomplishing their goal of cutting plaintiffs off from any chance to compete for the existing clinical partner prospects, "defendants interfered with one of plaintiffs' new clinical partners, causing it to withdraw from the Substitute PBT Project" (*id.* at 102) and "engaged in further exclusionary acts directly undermining plaintiffs' ability to establish relationships with multiple, appropriate clinical partners."  *Id.*at 89.  Moreover, by ousting plaintiffs from the PBT project and usurping the entire project for themselves, defendants left plaintiffs with insufficient time to build relationships with alternative clinical partners.  *Id.*  Plaintiffs clearly allege that defendants' conduct pursued as part of the conspiracy resulted in plaintiffs' inability to secure adequate clinical partners to support a viable application to NYDOH.  AC ¶¶ 89, 95.

OPCO supplements RTSI's arguments with two additional points.  First, it contends that the Complaint "fail[s] to identify specific acts taken by OPCO in furtherance of the purported conspiracy" and therefore the claim should be dismissed.  OPCO Br. at 19.  While the pleading must put the defendants on notice of the claims against them, "it need not be detailed with overt

---

[13] RTSI's characterization of these allegations as "plaintiffs unsuccessfully sought financing from a single source for five months *without any defendant's involvement*" ignores OPCO's actions and cannot be reconciled with any plain reading of the Complaint.  RTSI Br. at 21 (emphasis added).

acts by each defendant." *Hinds*, 700 F. Supp. at 54; *see also Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262 (D. Conn. 2003).  In any event, the Complaint in fact does detail actions taken by OPCO in furtherance of the conspiracy, including providing only sham financing to plaintiffs as detailed above and OPCO agreeing to seek financing for two very similar projects at the same time.  AC ¶¶ 80-87.  Thus, OPCO's second contention that "the investment bank [itself] is not alleged to have attributes that would assist the conspiracy" (OPCO Br. at 20) is flatly wrong.

Indeed, OPCO's general argument that the Section 1 claim should be dismissed as to OPCO because plaintiffs have not pleaded any motive for OPCO to join the conspiracy fails from its inception.  The Complaint contains detailed allegations of OPCO's motive:  Plaintiffs allege that OPCO's arrangement with RTSI included "significant additional contingent fees" and that "OPCO was given a direct stake in the RTSI project."  AC ¶ 87.  Plaintiffs thus allege that it was in OPCO's financial interest to ensure that the RTSI project succeeded at plaintiffs' expense.

Cicero picks up on OPCO's theme that it had no plausible motive for joining the conspiracy.  Cicero Br. at 9.  Again, the Complaint provides allegations of such a motive, which must be taken as true on this motion.  Plaintiffs allege that Cicero stood to gain from the success of the RTSI project because that success would enhance Cicero's reputation and lead to increased revenues.  AC ¶ 76.

The fact that defendants may have had different motives with respect to the conspiracy is no impediment to Section 1 liability.  "Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy." *Spectators' Commc'ns Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220-22 (5th Cir. 2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act.") (citing *NW Wholesale Stationers, Inc. v. Pac. Stationery &*

*Printing Co.*, 472 U.S. 284, 294 (1985))*: see also Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 92-93 (D.D.C. 2003) ("That conspirators may have different underlying motives for restraining potential competitors does not vitiate the existence of a § 1 conspiracy," even when the co-conspirators are "not direct competitors").  Indeed, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."  *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948).

        2.    <u>Defendants are Independent Economic Actors Capable of Conspiring</u>.

        Defendants also argue that they do not constitute independent economic actors and thus are immune from Sherman Act liability because they were all working toward the same goal of a successful PBT project and were engaged in "collaborative activity."  RTSI Br. at 22-23; Cicero Br. at 10.  Defendants' argument is akin to saying that a general contractor cannot conspire with subcontractors or an architect because they are collaborating with the common goal of building a house.  The argument finds no support in the law.

        Defendants ground their argument on *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) and *Am. Needle, Inc. v. Nat'l Football League*, 130 S. Ct. 2201 (2010).  The thrust of those decisions and their progeny is that in certain circumstances – in *Copperweld*, a parent corporation and its wholly-owned subsidiary – entities do not function as independent decision-makers and otherwise are not independent forces in the marketplace.  The principal has no application here, and certainly does not shield these independent defendants from plaintiffs' conspiracy claims.

        While defendants may have (or have had) a "common interest" in the approval of the PBT facility, each member of the conspiracy retains a separate "corporate consciousness" and remains a "separate, profit-maximizing entit[y]" outside of the PBT venture.  *Am. Needle*, 130 S. Ct. at 2212-13.  As the Supreme Court held in *American Needle*, when the "general corporate actions [of the co-conspirators] are guided or determined by separate corporate consciousnesses," such "separate, profit-maximizing entities" may not immunize themselves from Section 1 liability merely because they decide to pursue "common interests," even if they might be unable

ny-959421

to attain their common goal absent cooperation.  *Id.* at 2212-13 (emphasis added) (citing *Copperweld*, 467 U.S. at 771 and *Nat'l Football League v. NFL*, 670 F.2d 1249, 1252 (2d Cir. 1982)).

Defendants' cited cases confirm the futility of their argument.  In each case in which *Copperweld* immunity applied, the entities lacked a corporate existence independent of the relationship subject to challenge, or one entity completely controlled the actions of another.

Defendants here do not argue that they lacked a separate corporate existence or independent decision-making authority or otherwise lacked independent "consciousness" with respect to the PBT project.  More to the point, plaintiffs' allegations—which control at this stage of the litigation—specifically assert the independent nature of the defendants.  OPCO and VCC are each independent companies with independent financial interests to gain from the conspiracy.  Even RTSI, and in particular defendant Norton Travis who had multiple and conflicting roles and economic interests (AC ¶ 50), are alleged to be independent economic actors within the meaning of *Copperweld*.[14]  *See Standard Corp. v. Schmid Bros., Inc*., 647 F. Supp. 4 (S.D.N.Y. 1986) (sister corporations can conspire).  At most, defendants' argument raises an issue of fact inappropriate for resolution at the pleading stage.

Wrapped up in defendants' independent economic actors argument is the suggestion that defendants are incapable of conspiring under Section 1 because they are not direct competitors in the marketplace.  But Section 1 liability exists even when members of a conspiracy do not operate in the same marketplace.  *See, e.g.*, *TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1135-36 (C.D. Cal. 2009) (finding "no merit to [the defendant's] argument that a Section 1 conspiracy somehow requires all members to be 'market participants.' . . . [A] single market participant can conspire with a nonparticipant to restrain trade.").

---

[14] Defendants' Rule 7.1 Statements confirm the allegations and demonstrate that RTSI does not control defendants New York Proton Management LLC or the New York Proton Center.

In short, plaintiffs have pleaded a viable Section 1 claim against all defendants.  The claim should not be dismissed.

D.  Plaintiffs Have Adequately Pleaded a Section 2 Claim Against All Defendants.

For all of the same reasons that plaintiffs have adequately stated a Section 1 conspiracy, they have adequately stated a conspiracy to monopolize claim under Section 2 against all defendants.[15]  Again, the co-conspirators need not be direct competitors or in the same marketplace.  Precisely because only one firm can be the monopolist in a particular marketplace, courts routinely uphold conspiracy to monopolize claims against defendants that operate in different markets.  *See, e.g.*, *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062 (2d Cir. 1996), *vacated on other grounds*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) ("[T]o be liable for conspiracy to monopolize, it is not necessary that the NYNEX Defendants compete directly in the market for removal services.  A defendant may be liable for conspiracy to monopolize where it agrees with another firm to assist that firm in its attempt to monopolize the relevant market."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1078 n.10 (11th Cir. 2004) ("Nothing in our case law suggests that a conspiracy [to monopolize] must be limited solely to market participants so long as the conspiracy also involves a market participant and the non-participant has an incentive to join the conspiracy.").

Plaintiffs have also adequately pleaded monopolization claims as to RTSI.  Contending otherwise, RTSI essentially recycles arguments it makes with respect to the Section 1 claim.  The essence of its arguments appears to be that the sort of tortious conduct that plaintiffs allege cannot support the anticompetitive or exclusionary conduct element of a monopolization claim.  RTSI is wrong.

---

[15] Defendants OPCO and Cicero both make arguments as to why the Complaint does not state a monopolization or attempted monopolization claim as to them, but plaintiffs are not pressing those claims against those defendants.  The only Section 2 claim against OPCO and Cicero is the conspiracy to monopolize.

18

The Second Circuit and courts in this district have held that the commission of business torts of the very same type plaintiffs allege is sufficient to sustain a Section 2 claim.  In *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 93-95 (2d Cir. 1998), for example, the plaintiff ("Tops") attempted to purchase land in order to enter the retail grocery store market, but was thwarted when a competing store owner ("Quality") tortiously interfered with the land contract, thereby preventing Tops from entering the market.  The Second Circuit reversed summary judgment on Tops' attempted monopolization claim (even though another competitor was subsequently able to enter the market successfully), holding that "[t]he plain effect of this conduct was to prevent Tops, a Quality competitor, from entering the . . . market at the . . . site." *Id.* at 100.

Similarly, *in Natsource LLC v. GFI Group, Inc.*, 332 F. Supp. 2d 626 (S.D.N.Y. 2004), the court denied the defendant's motion to dismiss where the plaintiff alleged the defendant had "tortiously interfered with its contracts and business relationships, that it aided and abetted certain Natsource employees in breaching their fiduciary duties, that it intentionally breached a confidentiality agreement for the purposes of co-opting Natsource's business, and that it misappropriated Natsource's trade secrets." *Id.* at 631.  Plaintiffs' allegations of exclusionary conduct suffice.  The Section 2 claim should not be dismissed.

E.    Plaintiffs Have Adequately Pleaded the Relevant Markets.

In yet another attempt to achieve dismissal, RTSI takes issue with plaintiffs' definition of the relevant market.  It claims that the proposed geographic market—New York or, alternatively, the New York City metropolitan area—is wrong because patients will "travel" to receive PBT treatment.  RTSI Br. at 25.  It claims that the proposed product market—PBT services—is wrong because other types of treatment are sometimes used for some of the same types of cancer that PBT therapy treats.  *Id.*  But the issue on a motion to dismiss is not whether the proposed market will ultimately be supported based on all of the facts and evidence that might be developed, but whether the Complaint alleges a relevant market sufficient factual allegations to be plausible. *New York Jets LLC v. Cablevision Sys. Corp.*, No. 05 Civ. 2875(HB), 2005 WL 2649330

(S.D.N.Y. Oct. 17, 2005) (plaintiff need only allege a "plausible" market); *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir. 2001) ("To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand …and it must be "plausible.").

Relevant market definition is a question of fact; it is one of the most fact-specific analyses in antitrust cases, typically involving the presentation of expert economic evidence. *See, e.g.*, *id.* at 199 ("market definition is a deeply fact-intensive inquiry"); *Purgess v. Sharrock*, No. 91 Civ. 621 (LJF), 1992 WL 349683 (S.D.N.Y. Nov. 9, 1992) (market definition is usually a question of fact for the jury to decide). Accordingly, market definition is very rarely an appropriate ground for dismissing a complaint. *See, e.g.*, *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 180 (S.D.N.Y. 2006) ("The determination of what constitutes a relevant market, . . . is 'a "deeply fact-intensive inquiry," and "courts are hesitant to grant motions to dismiss for failure to plead the relevant product market.")"; *Kasada, Inc. v. Access Capital, Inc.*, No. 01 Civ. 8893(GBD), 2004 WL 2903776, at *11 (S.D.N.Y. Dec. 14, 2004) ("because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market"); *In re Wireless Tel. Servs. Antitrust Litig.*, No. 02 Civ. 2637(DLC), 2003 WL 21912603 (S.D.N.Y. Aug. 12, 2003) (same).

Plaintiffs have alleged a relevant product and geographic market that is plausible, and thus have met their pleading burden. Indeed, plaintiffs have provided ample factual allegations to support their market definitions. For example, plaintiffs allege facts throughout the Complaint that justify defining PBT as a distinct product market from other forms of cancer treatment. *See, e.g.*, AC ¶¶ 2 (PBT has "life saving potential for thousands of cancer patients, *many of whom cannot be treated with more conventional radiation therapy*") (emphasis added), 24-26 ("PBT is particularly indicated for tumors that are not amenable to surgery or conventional forms of radiation [for several stated reasons] . . . . By reason of the foregoing, *PBT is not reasonably*

*interchangeable with any other form of cancer treatment* for those cancers that are particularly difficult to treat and have not been or cannot be successfully treated with conventional drugs or ordinary radiation treatments (photon radiation) which [are] not as focused and [are] more likely to damage adjacent tissue.") (emphasis added).  Similarly, plaintiffs provide a detailed rationale for limiting the geographic market to New York or, alternatively, the New York tri-state area. *See, e.g.*, AC ¶ 27 ( "PBT treatment requires the patient to be at the PBT facility for a lengthy and repetitive series of proton irradiations over a period from several months to a year.  Due to the nature of the treatment, patients . . . will seek out such treatment[] at a location geographically convenient to their work or residence to avoid, among other things, significant travel before, and, particularly, after each treatment. *Therefore, the geographic market for such services is localized to the patient.*") (emphasis added).  These allegations are more than sufficient to meet plaintiffs' pleading burden.  Defendants' disagreement with the proposed relevant market amounts to a factual-based challenge to the allegations that is insufficient to sustain dismissal.

       F.     <u>Plaintiffs Have Adequately Pleaded Antitrust Injury</u>.

       Defendants argue that plaintiffs do not allege antitrust injury, only injury to one competitor.  RTSI Br. at 17 18; OPCO Br. at 18; Cicero Br. at 7.  The Complaint, however, addresses in detail injury the resulting of of defendants' wrongful conduct, which constitutes antitrust injury.  AC ¶¶ 8, 26, 100-113, 116, 118-125.  The Complaint is explicit that defendants damaged plaintiffs before their application was submitted, making it "materially inferior."  AC ¶¶ 95, 100.  As a result, NYDOH did not receive the benefit of robust competition at the application stage.  The destruction of a free and open competitive process before NYDOH that resulted from defendants' conduct itself constitutes antitrust injury.  Further, plaintiffs have alleged how the elimination of plaintiffs, one a competitor, could have a direct effect and "harm PBT prices and the output of services," directly rebutting defendants' contention to the contrary.  RTSI Br. at 26; AC ¶¶ 113, 119, 121 (plaintiffs' plan would have treated more cancer patients

than defendants).[16]   Specifically, defendants "thereby effectuated a reduction in competition in the applications to NYDOH with necessary adverse effects in the relevant market of services to consumer and cancer patients."  AC ¶ 116.

As the Supreme Court has explained, this is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  The effective elimination of plaintiffs at the application stage deprived the NYDOH of the benefits of a choice in quality, output and price that would have flowed from an unrestrained competitive process with at least two "equally viable competitive proposal[s]."  AC ¶¶ 109, 119, 121.

While defendants urge that "not a single allegation plausibly suggests that defendants' conduct prevented others, including plaintiffs from submitting a CON application" (RTSI Br. at 26), plaintiffs have set forth detailed allegations of the ways in which defendants' conduct "irreparably damaged," and rendered "materially inferior" plaintiffs' CON application.

The antitrust laws fully protect "injury to competition at the level of entry to the market" even if the downstream outcome will be the selection of a single provider or if the downstream market could only "naturally support" one provider.  *Fishman v. Wirtz*, 807 F.2d 520, 537 (7th Cir. 1986); *Lockheed Martin Corp. v. Boeing*, 390 F. Supp. 2d 1073 (M.D. Fla. 2005).  In *Fishman*, defendants who sought to purchase the Chicago Bulls professional basketball team, conspired with co-defendants who controlled the Chicago stadium, where the Bulls would play,

---

[16] *Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994), cited by RTSI Br. at 27, has no relevance here.  First, Dr. Balaklaw did not claim that defendant orchestrated a conspiracy to damage his performance or application *before* he could apply to the hospital in question. Further, in that case the court was ruling on lack of market impact, that a single doctor established "only that he has been harmed as an individual competitor" by being excluded from an individual hospital.  It is conceded here that the winner of the NYDOH application process received a monopoly and there are effects on the entire PBT-treatable population of New York. *See also Clarett v. NFL*, 306 F. Supp. 2d 379, 401 (S.D.N.Y. 2004) distinguishing *Balaklaw* from cases, as here, where defendants' conduct "precludes [plaintiff] from entering into 'fair and vigorous competition'" at all.

22

to prevent plaintiffs from obtaining a stadium lease.  This conspiracy thus excluded plaintiff from a viable competing application to the NBA.  *Fishman,* 807 F.2d at 530.  Despite the fact that the court recognized that the NBA would <u>only</u> approve one NBA team in Chicago (a so-called "natural monopoly"), the Seventh Circuit affirmed the district court's finding that there was antitrust injury.  Defendants there, like defendants here, asserted that competition to acquire what would be a monopoly provider "was not protected by the antitrust laws because substitution of one competitor for another would not injure competition . . . .  Chicago fans . . . would face a monopolist in any event."  *Id.* at 532.  Rejecting this contention, the Seventh Circuit explained in terms applicable here:

> The case law, however, does not support such a broad contention.  Indeed, the Supreme Court's decision in *Otter Tail*, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359, involved competition to acquire a natural monopoly and held that the use of monopoly power to preclude such competition violated the Sherman Act.
>
> . . .  The antitrust laws protect against unlawful, exclusionary conduct to acquire a natural monopoly; the Supreme Court has not intimated that *Bowl-O-Mat* has changed this rule.  807 F.2d at 533-535 (emphasis added) (citing a long line of cases).

Thus, even if NYDOH decided to approve only a single demonstration project and thereby create a monopoly, defendants caused antitrust injury by restraining legitimate competition for that right, "at the level of entry to the [anticipated monopoly] market."  *Id.* at 537.

Defendants' singular focus on direct harm to competition, which they equate with harm directly to consumers, is therefore misplaced to the extent it seeks to compel a plaintiff (especially at the pleading stage) to identify with scientific specificity precisely how competition was harmed in the ultimate downstream market.  The Seventh Circuit recognized in *Fishman* the "problem with requiring the plaintiff to pinpoint just how the public is harmed by a short-circuited competitive process" because "plaintiff has never been given an opportunity to compete freely to win the monopoly."  *Fishman,* 807 F.2d at 537.  At the appropriate time, plaintiffs will

make a legally sufficient showing detailing a quantifiable impact on competition-but plaintiffs have clearly met their pleading burden at this point.

Similarly, defendants' argument that the "harm" is "caused" by the NYDOH decision, not by defendants' conduct, is misplaced.  RTSI Br. at 18; OPCO Br. at 18, citing *Armstrong Surgical Ctr. Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154 (3d Cir. 1999).  This would be true only if the competition before NYDOH had been fair and unrestrained by defendants. But here, defendants damaged plaintiffs' plan *prior* to application, so that the competition process was destroyed and injury occurred at that point.  NYDOH's later rejection of a CON application already rendered noncompetitive by defendants, cannot immunize the violations occurring before NYDOH even sought to make a determination.  Moreover, the Supreme Court in *Parker* expressly noted that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful."  *Parker v. Brown*, 317 U.S. 341, 351 (1943).  Therefore NYDOH's decision is not a defense on the facts of this case, whether as a matter of causation of injury or of State Action immunity.

That plaintiffs have pleaded antitrust injury here is clear from the Complaint and flows directly from *Fishman* and similar "natural monopoly" cases.  NYDOH would have benefitted from two robust plans, and that competition would directly benefit the public by providing better or more service, or lower prices.  AC ¶¶ 109, 110.  Defendants' argument should be rejected.

## II.  PLAINTIFFS ADEQUATELY ALLEGE COPYRIGHT INFRINGEMENT BY RTSI

RTSI challenges plaintiffs' copyright infringement claim on the grounds that the work is not copyrightable, the claim is precluded by the merger doctrine, and the parties jointly

24

developed the work at issue.[17]  As explained in detail below, each of these arguments is without

merit and RTSI's motion to dismiss should be denied.[18]

        A.      <u>Plaintiffs' Business Plan is Presumptively Copyrightable</u>.

The "possession of a registration certificate creates a rebuttable presumption that [a] work

in question is copyrightable." *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997)

(quotation marks and citation omitted); 17 U.S.C. § 410(c) (a copyright registration is "prima

facie evidence of the validity of the copyright and of the facts stated in the certificate").

Moreover, a proffer by a plaintiff of a certificate of copyright registration "shifts to [defendants]

the burden of proving the invalidity of the copyright and there the burden rests, unless the

presumptions are rebutted." *Fonar*, 105 F.3d at 104 (citation omitted).  Significantly, the

presumption of validity may be overcome only "where other evidence in the record casts doubt

on the question."  *Id.* (quotation marks and citation omitted) (emphasis in original).  "Thus, while

the presumptive validity of the certificate may be rebutted and defeated on summary judgment,

such a challenge is not properly made via Rule 12(b)(6)."  *McCullough v. Owens Enters., Inc.*,

No. 3:07 Civ. 527, 2008 WL 2374245, at *2 (S.D. Miss. June 5, 2008) (citing *Gross v. NYP

Holdings, Inc.*, No. 06Civ7863, 2007 WL 1040033 (S.D.N.Y. Apr. 4, 2007).)

Here, the business plan at issue has been duly registered with the United States Copyright

office and issued registration No. TXu-1-692-654.  AC Ex. C.  Accordingly, the work carries

---

[17] Plaintiffs assert copyright infringement against RTSI only.  AC ¶ 97 ("*RTSI* unlawfully used Medscan's copyright material.  In particular, the *RTSI submission* included a business plan, significant portions of which were taken directly from Medscan's plan.") (emphasis supplied).

[18] OPCO argues that the copyright claim should be dismissed because it is not alleged with sufficient particularity.  OPCO Br. at 22.  Because OPCO is not a defendant to the copyright claim, its arguments should be disregarded as moot.  In any event, OPCO's argument fails.  The Complaint clearly identifies the work that is the subject of plaintiffs' claim (AC ¶ 128), states that plaintiffs own the work (*id.* ¶ 130), includes the copyright registration number (*id.* ¶ 131), and sets forth the time and manner of RTSI's infringing acts (*id.* ¶¶ 97, 138).  Nothing more is required.  *See Franklin Elec. Publishers, Inc. v. Unisonic Prods. Corp.*, 763 F. Supp. 1, 4 (S.D.N.Y. 1991) (setting forth allegations of copyright infringement necessary to satisfy Fed. R. Civ. P. 8).

with it a presumption that it is copyrightable and defendants' motion to dismiss the copyright claim should, therefore, be summarily denied. Even if this court reaches the question of copyrightability – which it should not – defendants have not and cannot adduce any facts under Rule 12(b)(6) with which to rebut that presumption of validity.

B.    Plaintiffs' Business Plan Contains the Requisite Elements of Originality and Creativity.

Plaintiffs claim copyright protection of a "compilation work" for its "business plan" created in connection with the PBT project. The Copyright Act defines a compilation work as one "formed by the collection and assembling of preexisting material or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. When asserting the copyrightability of a factual compilation such as plaintiffs' business plan, plaintiffs must show only that the plan possesses "some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). As the Supreme Court explained, "the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* Indeed, "most compilations, merely by exercising some independent choice in the coordination, selection, or arrangement of data, will pass the test." *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 65 (2d Cir. 1994) (footnote omitted).[19] Plaintiffs' selection and arrangement of information included in the business plan clearly meet these criteria.

Commencing on or about the beginning of 2008, Medscan "identified and met with numerous experts in the PBT field" and developed "certain nonpublic proprietary information," including financial and business information and "a method of operating a PBT practice in New

---

[19] "Selection implies the exercise of judgment in choosing which facts from a given body of data to include in a compilation," and arrangement "'refers to the ordering or grouping of data into lists or categories that go beyond the mere mechanical grouping of data as such, for example, the alphabetical, chronological, or sequential listings of data.'" *Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters, Inc.*, 945 F.2d 509, 513-14 (2d Cir. 1991) (citing Copyright Office, Guidelines for Registration of Fact-Based Compilations 1 (revised Oct. 11, 1989)).

26

York." AC ¶¶ 31, 62.  Certainly distilling this vast amount of information – acquired over a lengthy time period from a multitude of sources, and related to varying aspects of the business of providing proton beam therapy – necessarily required plaintiffs' independent judgment.  *See Key Publ'ns*, 945 F.2d at 513 (denying defendant's motion for summary judgment on issue of copyrightability of business directory where in assembling the directory, the plaintiff "had to select from a multitude of businesses from New York and elsewhere").[20]

Likewise, plaintiffs' Complaint establishes originality in the arrangement of the business plan and is sufficient to withstand a motion to dismiss.  At this juncture, it simply cannot be concluded, as a matter of law, that the arrangement of information in the business plan was merely "typical" or "mechanical" or somehow "garden variety."  Indeed, the rationale for the arrangement of much of the information included in the business plan is not obvious on the face of the business plan.  For example:

- Plaintiffs do not arrange the information in the "Costs" portion of the plan in either ascending or descending order of amount or in alphabetical order of the entries.  AC. Ex. C at 4-5;
- Likewise, plaintiffs do not arrange the information in the "Depreciation Schedule" portion of the plan in either ascending or descending order of amount or in alphabetical order of the entries.  *Id.* at 9; and
- Plaintiffs do not arrange information in the "Medicare CMS Schedule" in alphabetical order or uniformly by "CPT" number.  *Id.* at 14.

Defendants attempt to convince this Court that the mere fact that some of the selections and arrangements included in the business plan are common to other such plans is dispositive of

---

[20] Defendants' contention that New York law dictated the inclusion of this information raises an issue of fact not ripe for a motion to dismiss as to whether plaintiffs were even responding to the state's requirements when developing the business plan.  The March 2010 memorandum setting forth the process for review of PBT facility applications notes that there was a question at the time—over six months after the business plan was developed—as to whether a CON would even be required.  Arffa Decl., Ex. 7 at 12-14.  Regardless, whether certain categories of information were included in the plan because the state required them says nothing about plaintiffs' selection of *other* categories of information or about the arrangement and expression of the information in the plan.

27

the issue of originality. *See* RTSI Br. at 28-29.[21] Defendants are wrong. "[F]or purposes of copyright, originality is not synonymous with novelty. Similarity to prior works will not, in and of itself, affect the validity of a particular work's copyright." *Key Publ'ns*, 945 F.2d at 513. Moreover, "the individual categories chosen are irrelevant to [this court's] inquiry." *Id.* at 514. The Court need only be "concerned with whether the arrangement of the [business plan], viewed in the aggregate, is original." *Id.* A review of the entirety of the business plan, at this juncture, leaves no doubt that it constitutes an "original" work.

Defendants also press this court to dismiss plaintiffs' copyright claim on a finding that certain individual categories of the business plan may not be afforded copyright protection. RTSI Br. at 29. In particular, defendants point to certain "standard PBT terms" and acronyms used in the plan. *Id.* Plaintiffs take issue with defendants' characterization of these categories of information as being non-copyrightable. Even if defendants' characterizations were accurate – which they are not – the inclusion of this information in the plan is insufficient to support a motion to dismiss. *See Key Publ'ns*, 945 F.2d at 514 (noting, after having found plaintiff's work copyrightable, that "[t]he individual components of a compilation are generally within the public domain").

At bottom, the selection and arrangement of the categories of information contained in the business plan reflect the requisite originality by plaintiffs to establish copyrightability. Defendants have not pointed to facts in the Complaint to the contrary. Defendants have, therefore, failed to meet their burden and their motion to dismiss should be denied accordingly.[22]

---

[21] As previously explained, other plans like those submitted as Arffa Decl. Exs. 2-3 not referenced in the Complaint and not properly the subject of judicial notice may not be considered in a Rule 12(b)(6) motion.

[22] Notably, defendants fail to cite to a single case where the court dismissed a copyright claim for lack of copyrightability on a motion to dismiss pursuant to Rule 12(b)(6). Each of defendants' cases was resolved on motion for summary judgment or after trial. *See, e.g.*, *Attia v. Soc'y of the N.Y. Hosp.*, 201 F.3d 50 (2d Cir. 1999) (summary judgment); *Fin. Info., Inc. v. Moody's Investors Serv., Inc.*, 808 F.2d 204 (2d Cir. 1986) (trial); *Matthew Bender & Co., Inc. v.*

(Footnote continues on next page.)

C.    <u>The Merger Doctrine and Blank Forms Rule Do Not Operate to Defeat Plaintiffs'
Copyright Claim.</u>

To support its contention that plaintiffs' business plan is not copyrightable, RTSI urges

this Court to apply the "merger doctrine."  However, "'[i]n this Circuit, consideration of the

merger doctrine takes place in light of the alleged copying to determine if infringement has

occurred, rather than in analyzing the copyrightability of the original work.'"  *N.Y. Mercantile*

*Exch., Inc. v. Intercontinental Exchange, Inc.*, 497 F.3d 109, 116 n.8 (2d Cir. 2007) (*citing CCC*

*Info. Servs. v. Maclean Hunter Mkt. Rpts.*, 44 F.3d 61, 72 n.26 (2d. Cir. 1994)).  In other words,

copyrightability and infringement are distinct concepts, and it is improper to "collapse[] these

two inquiries."  *Id.*  Accordingly, defendants may not properly invoke the merger doctrine to

challenge the copyrightability of plaintiffs' business plan.

Even if the Court considers this argument in the context of infringement, the merger

doctrine cannot defeat plaintiffs' claims.  The merger doctrine applies only in the narrow

instance "where there is only one or so few ways of expressing an idea that protection of the

expression would effectively accord protection to the idea itself."  *Kregos v. Associated Press*,

937 F.2d 700, 705 (2d Cir. 1991).  In the Second Circuit, courts "look at the range of possible

expressions and consider whether all possible expressions are so 'substantially similar' that

granting the copyright would bar others from expressing the underlying idea."  *N.Y. Mercantile*

*Exch.*, 497 F.3d. at 117 (citation and footnote omitted).

Contrary to defendants' contention, there are innumerable ways to express the idea of the

operation of a PBT facility.  Indeed, defendants themselves point out that despite their obvious

improper copying, there are still differences between their business plan and plaintiffs' plan,

confirming that the merger doctrine is inapplicable.  RTSI Br. at 29 n.3.  Both the Virginia and

Illinois PBT plans (improperly submitted as exhibits by defendants on this motion), *arguendo*,

---

(Footnote continued from previous page.)

*Kluwer Law Book Publishers, Inc.*, 672 F. Supp. 107 (S.D.N.Y. 1987) (summary judgment).  For
this reason, none of defendants' legal authority supports dismissal here.

illustrate different ways of organizing the vast amount of information relevant to the operation of such a facility.  Certainly these few examples are evidence of the number of ways to express a business plan for the development of a PBT facility.

Of course, none of these factual disagreements can be resolved on a motion to dismiss. In fact, courts are cautioned to "exercise 'considerable care' in analyzing merger," *N.Y. Mercantile Exch.*, 497 F.3d at 117 (citation omitted), and this instruction has been taken to "argue[] in favor of allowing parties to present evidence on this issue."  *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 608-09 (S.D.N.Y. 2010) (denying motion to dismiss copyright claim).  "Plaintiffs will, no doubt, have to confront this issue during discovery and at summary judgment, but the Court cannot say that as a matter of law it is implausible that the [information in the business plan is] sufficiently subjective that a wide range of potential [expressions of the information] would be possible."  *Id.* at 608.[23]

D.    Defendants Have Failed to Demonstrate Joint Authorship.

In a further attempt to dispense with the copyright claim, defendants wrongly maintain that the claim should be dismissed because the parties were joint authors.  The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101.  It is well-settled that, in the Second Circuit, a party claiming joint authorship must meet both parts of a two-pronged test:  "that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) *fully intended to be co-authors*."  *Thomson v.*

---

[23] RTSI also maintains that plaintiffs' copyright claim is precluded by the "blank forms" rule, which denies copyright protection to "account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information."  37 C.F.R. § 202.1(c).  A cursory review of the business plan at issue reveals that it bears no resemblance to any of these categories.  *See generally* AC Ex. C.  Thus, the "blank forms" rule is inapplicable to this case and defendants' argument should be disregarded as irrelevant.  Even if the plan had included one or more blank forms, this argument nevertheless fails.  "There is widespread agreement that a work containing a blank form may be copyrightable because of the protectable elements of the textual matter accompanying the form."  *Kregos,* 937 F.2d at 708 n.5.

ny-959421

*Larson*, 147 F.3d 195, 200 (2d Cir. 1998) (emphasis supplied) (citing *Childress v. Taylor*, 945 F.2d 500, 507-08 (2d Cir. 1991)).  Defendants have not made such a showing.

      As a threshold matter, "[t]he question of whether the parties intended to be co-authors is not susceptible to resolution on a motion to dismiss."  *Exceller Software Corp. v. Pearson Educ., Inc.*, No. 10 Civ. 0381, 2010 WL 4486944, at *4 (S.D.N.Y. Nov. 9, 2010).[24]  Even if the matter could be decided in this posture, defendants have not made the requisite showing.  Despite defendants' conclusory statements that they worked jointly with plaintiffs to develop the business plan, defendants fail to identify any allegations in plaintiffs' Complaint that would support such a finding.  *See* RTSI Br. at 31-32.  Likewise, defendants cannot point to a single allegation suggesting that plaintiffs intended to share authorship over the business plan with defendants.  *Id.*  As such, defendants are not entitled to a determination of joint authorship.  *See Carell v. The Shubert Org., Inc.*, 104 F. Supp. 2d 236, 256 (S.D.N.Y. 2000) (declining to find joint authorship where defendants failed to satisfy an intent prong).

## III.    PLAINTIFFS' STATE LAW CLAIMS HAVE BEEN ADEQUATELY PLEADED

      If this Court determines that plaintiffs' federal claims merit dismissal, it should decline to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c)(3).  As noted by defendants, in exercising this discretion, the Court "'must reassess its jurisdiction over the case by considering several related factors-judicial economy, convenience, fairness, and comity.'" *BUSA Corp., et al. v. Ecogloves, Inc., et al.*, No. 05 Civ. 9988(JSR), 2009 WL 3076042, at *10 (S.D.N.Y. Sept. 28, 2009) (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004)).  This Court has regularly weighed these factors and declined to exercise supplemental jurisdiction over state claims under similar circumstances.  *Id.* (declining to

---

[24] *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266 (2d Cir. 1944), relied on by RTSI and decided over 65 years ago, articulates a clearly outdated statement of the relevant law.  Moreover, defendants neglected to inform the Court that dismissal of the copyright claim did not occur on a motion to dismiss but only after trial.  *See Edward B. Marks*, 140 F.2d at 266.

exercise supplemental jurisdiction over, *inter alia*, plaintiffs' claims of trade secret misappropriation and breach of fiduciary duty); *Twin City Bakery Workers and Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 225 (S.D.N.Y. 2002) (declining to exercise supplemental jurisdiction after dismissing plaintiffs' antitrust claims).  Defendants' arguments regarding the supposed "delay" caused by plaintiffs' lawsuit are disingenuous, because, in fact, defendants' development of a proton facility was approved by NYDOH and is proceeding, unhindered, in parallel with this case.[25]

A.      Plaintiffs Have Pleaded Adequately a Joint Venture Between Plaintiffs and RTSI.

The Complaint more than meets the requisite pleading standard with respect to the claims based on the joint venture that existed between plaintiffs and RTSI.  Indeed, as the Complaint specifically alleges, the parties agreed to act as joint venturers and were actively engaged in a broad range of conduct in furtherance of that joint venture (*see* AC, ¶¶ 54, 142, 144) even in the absence of a finalized written agreement, and plaintiffs themselves repeatedly represented to third-parties that they were engaged in a joint venture with plaintiffs. Defendants oppose these and other specific allegations by attempting to raise fact issues – but that approach is inappropriate on a motion to dismiss.

To adequately plead a joint venture, a plaintiff need only allege:  (1) acts manifesting the intent of the parties to be associated as joint venturers; (2) a mutual contribution to the joint undertaking through the combination of property, financial resources, effort, skill or knowledge; (3) a measure of joint proprietorship and control over the enterprise; and (4) provision for sharing of the profits and losses.  *See Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 298, 765 N.Y.S.2d 574, 584 (1st Dep't 2003).  Plaintiffs have more than satisfied their pleading obligations with respect to each of these elements, by alleging, *inter alia*, that:

---

[25] Furthermore, defendants' arguments that the *Noerr-Pennington* doctrine must be applied equally to plaintiffs' state law claims can be addressed by a state court, if, contrary to plaintiffs' submissions the federal claims were to be dismissed.

- Both RTSI and plaintiffs expressly represented to third parties that they were part of a joint venture with each other.  RTSI specifically held itself out to others as "joint venture" partners with plaintiffs.  *See, e.g.*, AC ¶¶ 54, 143(d); Arffa Decl. Ex. 4, at 2;

- Plaintiffs and RTSI actively worked together for at least one year and made mutual contributions to the joint undertaking and shared in the management of the undertaking.  AC ¶ 143(c);

- Plaintiffs and RTSI were acting consistently with, and assented to operate the Company consistent with the terms of a draft Operating Agreement dated May 2009 (Arffa Decl. Ex. 5), which provided for, *inter alia*, joint contribution of efforts, shared management and control and a division of profits or losses of 55% to RTSI and 45% to Medscan.  But even in the absence of a finally executed copy of that agreement, the parties each acted pursuant to their joint venture agreement. AC ¶¶ 52, 143(b);

- RTSI thought that it was necessary to send a lawyer's letter to plaintiffs terminating the joint venture – if no joint venture existed, what exactly was RTSI terminating?  *See Id.* ¶¶ 64-66, 147, Ex. A.

Notwithstanding these well-pleaded facts, RTSI attempts to argue the facts by claiming that the parties also took steps to form a company – New York Proton Management ("NYPM") – to operate a proton beam facility, and that this intent necessarily disproves any joint venture allegations (and what RTSI itself expressly represented to third-parties).  RTSI Br. at 33.  But RTSI's argument, even if factually true – is based on a misunderstanding of relevant law:

> Although earlier case law held that a joint venture cannot be carried out by individuals through the corporate form, this rule has been qualified to permit the individuals to continue the joint venture between themselves as long as third parties, such as creditors, are not involved and the joint venture does not conflict with the corporation's functioning.

*Preil v. Heby*, 11160/94, 2004 NY Slip Op 50820U, at *4 (Sup. Ct. N.Y. Cty. May 26, 2004) (citing *Richbell*, 309 A.D.2d at 299-300)*: see also Blank v. Blank*, 222 A.D.2d 851, 634 N.Y.S.2d 886 (3d Dep't 1995).  In other words, absent an identifiable conflict between the joint venture and the corporation, the joint venture cannot be defeated.  *See Richbell*, 309 A.D.2d at 299-300, 765 N.Y.S.2d at 585 (sustaining joint venture claim notwithstanding formation of corporation where no conflict existed between joint venture and corporation).  Here, RTSI does not and cannot identify any conflict between the joint venture and the planned functioning of

33

NYPM to operate the object of the joint venture.[26]  Accordingly, RTSI's argument fails as a matter of law.  Nor does RTSI's allegation (at this motion to dismiss stage) do anything to contradict the allegations in the Complaint that the parties affirmatively and actively acted as, and represented to others that they were acting as, a joint venture.

RTSI's reliance on a single provision of the draft Operating Agreement to support dismissal of the joint venture claim is also misguided.  RTSI argues that, because, the Operating Agreement states that "no . . . partnership or joint venture is created by this agreement other than the Company. (Arffa Decl. Ex. 5, at 5), this shows that the parties did not intend to create a joint venture.  But this is not at all what the language says – in fact, what this language plainly makes clear is that the "Company" was intended to operate as a joint venture.  Nor does this draft provision suggest in any way that the parties' admittedly joint conduct *before* they started negotiating a written agreement was not in itself intended to be the product of the parties' joint venture.  Rather than defeat a finding of intent, this provision buttresses plaintiffs' allegation that the parties contemplated the creation of a joint venture – albeit one that would ultimately take the form of a company.

In a further effort to undermine the well-pleaded facts, defendants claim that Medscan initially engaged RTSI as a consultant, that defendant Travis drafted certain documents at Medscan's direction and that plaintiffs referred to the effort as "Medscan's PBT Project."  RTSI Br. at 33.  None of these facts operate to surmount plaintiffs' joint venture claim.[27]  Defendants' reliance on these isolated facts does nothing more than reveal their effort to divert this Court away from the abundant allegations supporting intent.  Under law, the intent of the parties cannot

---

[26] Indeed, defendants themselves stress that NYPM is not yet incorporated.  RTSI Br. at 44-45.

[27] *See, e.g., Decker, Decker & Assocs., Inc. v. Assoc. of Nat'l Advertisers, Inc.*, 15 Misc. 3d 1117(A), 839 N.Y.S.2d 432 (N.Y. Sup. Ct. 2007) (denying motion to dismiss a joint venture claim notwithstanding that the initial agreement of the parties clearly and unequivocally provided that it was the initial intent of the parties to be associated as an independent contractor where subsequent conduct evinced intent to create a joint venture).

be gleaned from any isolated set of facts but must be viewed in light of the "totality of the conduct." *See Richbell*, 309 A.D. 2d at 298, 765 N.Y.S.2d at 584 (finding that intent may be implied from the totality of the conduct alleged); *see also Polk v. Jordan*, No. 0602274/2006, 2008 WL 279233, slip op. at *4 (N.Y. Sup. Ct. Jan. 22, 2008) (finding requisite intent where, among other things, defendants represented to third parties that the firm was "minority controlled" because of agreement by plaintiff and defendant to share control of firm, the parties had an oral agreement regarding equitable ownership of the firm under which plaintiff was given 51% ownership, and defendants engaged in alleged tactics to terminate plaintiff from joint venture). The totality of the conduct set forth in the Complaint plausibly alleges that plaintiffs and RTSI intended to create a joint venture – and, of course, as the Complaint makes clear, that is exactly how RTSI described the parties' relationship to third parties.

Next, RTSI contends that plaintiffs fail to allege joint control of the venture. RTSI Br. at 33. In fact, the Complaint is replete with allegations regarding shared management of the venture by plaintiffs and RTSI. For example, plaintiffs allege that the parties contemplated that they would "jointly operate the proton therapy center." AC ¶ 52. Likewise, plaintiffs plead that the parties "agreed to . . . joint control over the venture" (*id.* ¶ 142) and that plaintiffs and RTSI "*assent[ed]* to . . . shared management and control of the joint venture." *Id.* ¶ 143(b). These allegations alone are sufficient to satisfy plaintiffs' pleading requirements.

Finally, RTSI argues that plaintiffs have not sufficiently alleged a provision to share in profits and losses. This too is incorrect. Plaintiffs repeatedly allege that profits and losses were to be divided amongst the parties with RTSI receiving a 55% share and Medscan receiving 45%. *See, e.g., id.* ¶¶ 52, 143. Plaintiffs additionally plead specifically that the parties "*assent[ed]*" to the profit and loss split as outlined in the May 2009 draft Operating Agreement, *id.* ¶ 143, and the parties worked together for five months thereafter pursuant to that understanding. *Id.* ¶¶ 51-60.

It is of no consequence that this assent was not memorialized in an executed agreement. "[T]he parties agreed to the joint venture itself, with the essential understanding of what each party's contribution and potential exposure would be." *See Richbell*, 309 A.D.2d at 298, 765 N.Y.S.2d at 584. Accepting the allegations as true, plaintiffs sufficiently allege a provision to share in profits and losses and share in the management and control of the joint venture. *See id.* (denying motion to dismiss, finding that where the parties acknowledge that they intend to hammer out details of an agreement subsequently, a preliminary agreement may be binding)*: see also Foster v. Kovner*, 44 A.D.3d 23, 27-28 (1st Dep't 2007) (refusing to dismiss joint venture claim even where parties never reached agreement on many of the essential terms of the agreement – including the exact division of profits and losses – but where it was clear that under the oral agreement plaintiff was entitled to an unspecified equity interest in the venture).

1.  <u>RTSI Breached the Joint Venture and Plaintiffs Are Entitled to an Accounting and Damages</u>.

RTSI's wrongful misappropriation and exclusion of plaintiff from the fruits of the joint venture constitute a breach of the joint venture, which is actionable. New York courts have long recognized clams for breach of joint venture based on a co-venturer's exclusion of its partner and its misappropriation of the joint venture property. *See, e.g.*, *Prudential Oil Corp. v. Phillips Petroleum Co.*, 392 F. Supp. 1018 (S.D.N.Y. 1975). Plaintiffs adequately allege such a claim.

In *Prudential*, plaintiff alleged that it entered into a joint venture with defendants for the development of a petrochemical production facility and that over a few years plaintiff and defendants worked closely on the joint venture project. *Id.* at 1019-20. Plaintiff further alleged that it divulged to defendant detailed information that plaintiff had accumulated as a result of its efforts. Significantly, once the project had received the requisite government clearances, plaintiff alleged that defendants excluded it from the venture and proceeded without it, reaping for itself the entirety of all of the joint venture benefits. *Id.* Accordingly, plaintiff brought a lawsuit against defendants alleging, *inter alia*, breach of the joint venture seeking an accounting

and constructive trust.  *Id.* at 1020.  On a motion to strike a demand for a jury trial, the court held

that plaintiff's claims, as alleged, were properly triable to a jury.  *Id.* at 1022-23.

The facts alleged in the Complaint are nearly identical to those alleged in *Prudential*.

That is, plaintiffs allege that the parties had entered the joint venture for the development of a

PBT facility and that plaintiffs devoted substantial resources to the venture and divulged to RTSI

Confidential Information that Medscan had accumulated in connection with its efforts to develop

the facility.  AC ¶¶ 31, 62, 143.  Thereafter, in view of the impending CON application process,

RTSI wrongfully excluded plaintiffs from the joint venture and used the joint venture property to

make its own application to the NYDOH for a PBT facility.  *Id.* ¶¶ 64-78, 97-99.  Defendants

stand to generate over $350 million dollars in revenue from their unilateral and wrongful

continuance of the joint venture without plaintiffs' participation.  As in *Prudential*, these

allegations fairly establish a breach of the joint venture entitling plaintiffs to an accounting, and

damages.

        2.      <u>Based on RTSI's Repudiation of the Joint Venture, Plaintiffs are Entitled</u>
                <u>to an Accounting and Damages</u>.

RTSI's November 5, 2009 letter terminating the joint venture constituted an actionable

breach.  The law is clear.  Where, as here, the joint venture "agreement specifies a durational

term, or a defined project, an attempt unilaterally to dissolve the [joint venture] would violate the

[joint venture] agreement."  *Scholastic, Inc. v. Harris,* 259 F.3d 73, 85 (2d Cir. 2001) (citing

N.Y. Partnership Law § 62).

RTSI cannot escape liability by improperly characterizing its unilateral repudiation of the

joint venture as mutual.  Any contention that plaintiffs' November 9, 2009 letter somehow

evinces plaintiffs' consent to the dissolution of the joint venture is disingenuous at best.  As

alleged in the Complaint, at the time of RTSI's purported termination, plaintiffs "were ready,

willing and able to proceed with the joint venture as agreed . . . ."  AC ¶ 148.  RTSI alone sought

the termination of the joint venture.  *See id.* Ex. A.  That plaintiffs acknowledged "*RTSI's*

*decision*" to withdraw is not tantamount to consent.  At most, plaintiffs' acknowledgement

37

demonstrates an awareness that, as the New York Court of Appeals has recognized, "'any partner may repudiate the agreement at any time . . . . No agreement can prevent this result.  No one can be forced to continue as a partner against his will.  He may be liable for breach of contract.  Nothing more." *Eskenazi v. Shapiro*, 27 A.D.3d 312, 315, 812 N.Y.S.2d 474, 474 (1st Dep't 2006) (quoting *Cahill v. Haff*, 248 N.Y. 377, 382 (1928)).[28]  Plaintiffs' subsequent efforts, even if true, to put a positive characterization on what happened cannot change this result.  As evidenced by plaintiffs' claims here, plaintiffs' simultaneous demand for return of their confidential information reflects the understanding (later discovered to be erroneous) that RTSI intended to proceed on an independent project without joint venture assets.  In any event, whether plaintiffs knowingly and voluntarily consented to the purported termination is certainly a question of fact that cannot be resolved on a motion to dismiss.[29]

### 3.   Plaintiffs Adequately Plead a Claim For a Constructive Trust.

"Plaintiff[s'] status as a partner in a joint venture gives rise to a fiduciary relationship which allows the imposition of a constructive trust." *Plumitallo v. Hudson Atl. Land Co.*, 74 A.D.3d 1038, 1039, 903 N.Y.S.2d 127 (2d Dep't 2010); *Parr v. Ronkonkoma Realty Venture I, LLC*, 65 A.D.3d 1199, 1201, 885 N.Y.S.2d 522 (2d Dep't 2009).  The only argument that RTSI

---

[28] The very fact that plaintiffs commenced this lawsuit less than a year after RTSI's breach further demonstrates that plaintiffs did not consent to the termination.  *See SEC v. Am. Beryllium & Oil Corp.*, 303 F. Supp. 903, 909 (S.D.N.Y. 1968) (finding it apparent that co-venturer did not acquiesce to purported termination of joint venture where ongoing controversy on the subject existed).  Even if this Court were to find that there exists dispute as to whether plaintiffs consented to RTSI's repudiation of the joint venture, such a determination is a question of fact and cannot be made at this juncture.  *See, e.g.*, *Scholastic*, 259 F.3d at 87 ("If – and when – the joint venture was dissolved is a prototypical fact question that a jury must determine.") (citing *Sagus Marine Corp. v. Donald G. Rynne & Co.*, 207 A.D.2d 701, 702 (1st Dep't 1994)).  Accepting the facts as pleaded, plaintiffs have alleged sufficiently that RTSI unilaterally and wrongfully terminated the joint venture in contravention of their agreement.  *See* AC ¶¶ 64-71.

[29] Assuming *arguendo* that this Court concludes that defendants have adduced evidence of consent, such a conclusion does not support dismissal of the joint venture claim altogether.  As explained above, RTSI must still answer for the beach of joint venture based on its wrongful exclusion of plaintiffs and simultaneous misappropriation of the joint venture property.

38

musters in support of its motion to dismiss plaintiffs' claim for constructive trust is that the claim must fail because there is no joint venture.  As explained above, plaintiffs have pleaded adequately a claim for joint venture.  Accordingly, defendants' argument against a constructive trust fails and the pleading must be sustained at this stage.

> B.    The Breach of Fiduciary Duty Claim Withstands Dismissal.

On this 12(b)(6) motion, before any fact discovery about the nature of their relationships with plaintiffs, defendants urge this Court to dismiss plaintiffs' breach of fiduciary duty claim, arguing that they were not plaintiffs' fiduciary.  Defendants instead argue that the allegations in the Complaint only demonstrate an arm's length, garden variety relationship between sophisticated business actors.  RTSI Br. at 42, 44; OPCO Br. at 28-29; Cicero Br. at 22, 23. Defendants misapprehend the applicable law and the pleadings.  The Complaint contains sufficient factual allegations to make a fiduciary relationship between plaintiffs and defendants plausible, and defendants' motions must be denied.

> 1.    Governing Law

Under New York law, a "fiduciary relationship 'exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation'…. It is fundamental that fiduciary 'liability is not dependent solely upon an agreement or contractual relationship between the fiduciary and the beneficiary but results from the relation,'" which is grounded in a higher level of trust than normally present in the marketplace.  *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 20 (2005), citing Restatement (Second) of Torts § 874, cmt. (a&b).  The existence of a fiduciary relationship is not determined by "'recourse to rigid formulas.'  New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first."  *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008).  *See also Westwoods Aviation, LLC v. Atl. Aviation Flight Serv., Inc.*, 06 Civ. 15525 (JSR), 2007 WL 245415, at *2 (S.D.N.Y. Aug. 27, 2007).  However, whether a fiduciary relationship exists between two parties is a highly specific question of fact.  Therefore, claims alleging a fiduciary duty are not generally

subject to dismissal under Rule 12(b)(6).  *See, e.g.*, *SCF Arizona v. Wachovia Bank, N.A.*, No. 09 Civ. 9513(WHP), 2010 WL 5422505, at *6 (S.D.N.Y. Dec. 14, 2010).

      2.     <u>Defendants Were Plaintiffs' Fiduciaries</u>.

<u>Travis owed plaintiffs fiduciary duties.</u>

RTSI and Travis have not and cannot dispute that attorneys are their client's fiduciary. RTSI Br. at 42, 43. The principle is so uncontroversial that it is almost too obvious to require restatement.  It is therefore indisputable that Travis owed plaintiffs a fiduciary duty by virtue of his role as plaintiffs' attorney.

The existence of an attorney client relationship does not depend on the existence of a written retainer agreement or the payment of fees, as Travis weakly suggests.  *See, e.g., Med. Diagnostic Imaging, PLLC v. Carecore Nat'l, LLC,* 542 F. Supp.2d 296 (S.D.N.Y. 2008).  Those are but two elements that are considered, but not required.  Instead, the rule is that "the existence of an [an attorney client relationship] 'turns largely on the client's subjective belief that it exists' provided that belief was formed reasonably."  *Blue Planet Software, Inc. v. Games Inc. LLC,* 331 F. Supp.2d 273, 276 (S.D.N.Y. 2004).

In the Complaint, plaintiffs allege that in November, 2008, Medscan engaged Travis at his law office in Long Island which was the contact Medscan had for Travis given its previous engagement of him as a lawyer on prior projects.   He was contacted in his capacity as a name partner at Garfunkel Wild Travis P.C., "to act as lead counsel in connection with the PBT project" plaintiffs had been developing for almost a year, as well as "to provide general legal advice and guidance in connection with that project, and to establish the appropriate corporate entities for the Medscan PBT Project, draft appropriate NDA's to ensure that the Medscan's confidential and proprietary information was adequately protected, draft LOIs and other related documents for the furtherance of the Medscan PBT Project and perform any other legal necessary to advance that project."  AC ¶35.  The Complaint further expressly alleges that Travis and GWT accepted the retention.  *Id.*  The Complaint further alleges that Travis's further work in connection with the PBT Project included the creation of legal documents that used GWT

document codes, including LOIs and NDAs and proposed Operating Agreements, and using GWT partners and associates.  Plaintiffs additionally and specifically allege that "Travis had extensive email exchanges with plaintiffs and others for this project from his GWT email, ntravis@gwtlaw.com."  *Id.*  These allegations adequately establish an attorney-client relationship.  *See, e.g., Telesca v. The Long Island Housing P'ship, Inc.*, 443 F. Supp.2d 397, 401 (E.D.N.Y. 2006); *Kirk v. Heppt*, 532 F. Supp. 2d 586 (S.D.N.Y. 2008)(denying motion to dismiss breach of fiduciary duty claim against attorney); *Gupta v. Rubin*, No. 00 Civ 3094 (DLC), 2001 WL59237, at *5 (S.D.N.Y. Jan. 24, 2001).

To avoid liability, Travis argues not that these allegations are insufficient to establish an attorney-client relationship between him and Medscan, only that these allegations are "false". RTSI Br. at 6-7 n.3, 42-42.  Notwithstanding the specific, contrary allegations in the Complaint (and notwithstanding that it is very difficult to understand how he can so confidently assert that plaintiffs' "subjective belief" is "false"), Travis insists that in truth he worked only for RTSI as "Executive Vice President and General Counsel," and that neither GWT nor Travis "ever represented Medscan in connection with any PBT project." *Id.*  Travis's reliance on these purported "facts" is misplaced.  None of these "facts" are pleaded in the Complaint, and therefore must be disregarded on this motion to dismiss.  *See, e.g., Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (consideration of factual allegations contained in counsel's legal brief on Rule 12(b)(6) motion constitutes reversible error); *SEC v. Kueng*, No. 09 Civ. 8763(BSJ)(AJP), 2010 WL 3026618, at *2 (S.D.N.Y. Aug. 2, 2010) (factual assertions outside the complaint excluded and motion to dismiss decided solely on the basis of the complaint).[30]

---

[30]  Travis' argument that he and Medscan were engaged in an arm's length transaction is fatally flawed since it is supported only by his contention that he was not Medscan's attorney. Defendants' reliance on *Petrollo v. White*, 344 Fed. Appx. 651 (2d Cir. 2009), is misguided. *Petrollo*, decided on summary judgment, stands for the unremarkable proposition that parties to an arms' length transaction are generally not fiduciaries, even when one of those parties happens to be an attorney.

41

As set forth above, the Complaint is replete with specific factual allegations that plaintiffs and its principals had ample basis to plead that Travis was acting as an attorney on Medscan's behalf on the PBT project. *See, e.g.*, AC ¶¶ 36, 40, 48, 50, 53.  It is therefore indisputable that Travis owed plaintiffs a fiduciary duty by virtue of his role as plaintiffs' attorney.  Although Travis would have it otherwise, at this stage in the litigation, the inquiry ends there.

<u>RTSI Breached the Fiduciary Duty it Owed To Plaintiffs</u>

RTSI's claim that it was not plaintiffs' fiduciary fares no better.  It is well-settled that joint venturers are fiduciaries to their joint venture partners. *See, e.g.*, *Plumitallo v. Hudson Atl. Land Co.*, 74 A.D.3d 1038, 1039, 903 N.Y.S.2d 127, 129 (2d Dep't 2010); *Parr v. Ronkonkoma Realty Venture I, LLC*, 65 A.D.3d 1199, 1201, 885 N.Y.S.2d 522, 524 (2d Dep't 2009).  As demonstrated in Section III. A. *supra*, plaintiffs have more than adequately pleaded a joint venture with RTSI, and any argument that the breach of fiduciary duty claim should be dismissed because there was no joint venture should be disregarded.[31]

Furthermore, RTSI is just plain wrong that any such duty ended when it purported to terminate the joint venture.  RTSI Br. at 45.  To the contrary, that fiduciary duty continued after RTSI breached the joint venture agreement in November, 2009. *See, e.g.*, *Dunay v. Ladenburg, Thalmann & Co., Inc.*, 106 A.D.2d 318, 483 N.Y.S.2d 234 (1st Dep't 1984) (fiduciary duty is a continuing duty, and does not terminate upon dissolution of joint venture, wrongful or otherwise).

Plaintiffs have clearly established the existence of a fiduciary duty and RTSI's breach of that duty.  The law is clear.  Terminating a joint venture after misappropriating its business assets, business relationships, or business opportunities does not shield a joint venturer from

---

[31] Plaintiffs alternatively plead that RTSI was plaintiffs' fiduciary irrespective of the joint venture in its capacity as plaintiffs' expert advisor on health care issues and radiation practices. AC ¶ 39.  Plaintiffs plead that it provided RTSI with access to its confidential information and trade secrets because of their relationship of trust and confidence, which RTSI accepted. *Id.*  The legal authority cited in section III B *supra,* supports finding that the allegations in the Complaint satisfy plaintiffs' pleading burden.

liability for breach of fiduciary duty for that misappropriation, it gives rise to it.  *See, e.g.,*

*Dunay; see also, e.g.*, *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 609

(E.D.N.Y. 2000) (citing 15 N.Y. Jur. 2d Business Relationships, §§ 1458, 1467-68 (1996)).

Plaintiffs expressly allege that the November 5, 2009 "termination" notice was the

"formal communication of a decision that had been made by Travis and RTSI much earlier," but

that Travis and RTSI delayed sending that wrongful termination notice purporting to dissolve the

joint venture "so as to maximize their ability to misappropriate and use solely for their own

benefit information and other fruits of the money, labor and other resources that Medscan had

invested in the Medscan PBT Project over the preceding year." AC ¶ 65.

As plaintiffs' fiduciaries, RTSI was duty bound not to misappropriate the business assets,

relationships and opportunities of the PBT joint venture for its own benefit.  Not surprisingly, the

law prohibits RTSI from relying on its own breach of the joint venture to relieve it of that

fiduciary duty.  *Id.  See also, e.g.*, *Brown v. Leach*, 189 A.D. 158 (1st Dep't 1919); *Stem v.*

*Warren*, 185 A.D. 823, 174 N.Y.S. 30 (1st Dep't 1919).

For its final argument, RTSI suggests that in the absence of a written confidentiality

agreement it had no fiduciary duty to plaintiffs, but that even if it did, that duty was not breached

because the confidential information later became public as part of the CON process.  RTSI Br.

at 44.  RTSI misses the point.  The alleged breach of that duty is far broader than disclosure of

information that later became public.  As the Complaint fully explains, the heart of RTSI's

breach lies in its wrongful misappropriation of the Medscan PBT Project, business relationships

and opportunities, and assets, including business plans, architectural drawings, and other non-

public information.  AC ¶¶ 71, 97-99.  *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167

(W.D.N.Y. 2003).[32]

---

[32] *Block v. Razorfish, Inc.,* 121 F. Supp. 2d 401 (S.D.N.Y. 2000), upon which RTSI
relies, is entirely distinguishable.  There was no fiduciary duty between the parties, defendant
never received the majority of information from the plaintiff he was alleged to have wrongfully
disclosed, and the only claimed breach was the wrongful disclosure of public information.

(Footnote continues on next page.)

43

OPCO

OPCO's grounds for seeking dismissal of this claim are equally infirm.  Under New York law, financial advisers, like attorneys, are held to be their client's fiduciary.  *See, e.g.*, 72 N.Y. Jur. 2d Investment Securities § 216; *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 20, 796 N.Y.S.2d 77 (2005); *Sergeants Benev. Ass'n Annuity Fund v. Renck¸* 19 A.D.3d 107, 109-110, 796 N.Y.S.2d 77 (1st Dep't 2005) (trial court order dismissing breach of fiduciary duty claim at pleading stage reversed); *Frydman & Co. v. Credit Suisse First Boston Corp.*, 272 A.D.2d 236, 708 N.Y.S.2d 77 (1st Dep't 2000) (complaint alleging fiduciary duty between client and financial advisor sustained); *Bestolife Corp. v. Am. Amicable Life*, 5 A.D.3d 211, 216-217, 774 N.Y.S.2d 18 (1st Dep't 2004).

According to those allegations, in December 2008, OPCO started acting as Medscan's financial advisor, rendering it highly sophisticated and specialized advice and strategies to secure debt/equity or other financing for a $200 million PBT project.  There is no allegation that plaintiffs were participating in the financing or that they were themselves involved in securing lenders for the project.  To the contrary, the pleading landscape reveals a picture of a sophisticated investment advisory firm advising a small medical technology business on how to do something it had never done before; and that OPCO knew, plaintiffs were from relying on that advice but were never discouraged from doing so..

OPCO's argument that there is no fiduciary duty arising out of the parties' December 2009 contract is irrelevant.  OPCO Br. at 28.  Plaintiffs' fiduciary duty claim is not born out of contract, but out of a relationship of trust that began in 2008.  The fact that the parties

---

(Footnote continued from previous page.)

Here, unlike in *Block,* RTSI's duty of confidentiality derives from its fiduciary relationship as plaintiffs' co-venturer, and is not dependent on a written confidentiality agreement or expert advisor.  *Second*, as set forth above, RTSI's liability for wrongfully misappropriating the information does not evaporate because the information later became public as part of the CON process.  *See, e.g.*, *Medtech Prods. Inc. v. Ramir, LLC,* 596 F. Supp. 2d 778 (S.D.N.Y. 2008).

subsequently entered into a contractual relationship does not vitiate OPCO's already established duty.

*Sergeants Benev. Ass'n Annuity Fund v. Renck* is only one of the countless cases (see cases cited *supra* herein) that have found a fiduciary relationship at the pleading stage based on nearly identical facts as those alleged here.[33]   In reversing the trial court's dismissal, the court held that plaintiffs' allegations that defendants provided investment advice, held themselves out as experienced in the field of investment consulting and management, and that the trustees, who did not have sophisticated knowledge of investment management, relied on their expertise adequately pleaded a fiduciary duty, notwithstanding the purported arm's-length relationship. This Court should make the same finding.

Cicero

Cicero ignores the well-pleaded factual allegations of the Complaint and argues that Cicero's arm's-length relationship was not transformed into a fiduciary one because plaintiffs trusted and relied on Cicero's health care expertise or shared with them confidential information and trade secrets.  Cicero Br. at 19-21.  Cicero's arguments do not withstand scrutiny.  The Court of Appeals has made clear that for pleading purposes a fiduciary relationship exists when an advisory relationship is alleged in which one party is rendering expert advice to another, who then relies on that advice.  *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d at 20-22.  Moreover, the fiduciary relationship exists regardless of whether the parties are also engaged in an arm's-length transaction.  *Berman v. Sugo*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008);

---

[33] *See, e.g.*, *Iannuzzi v. Wash. Mut. Bank*, No. 07-CV-964 (JFB)(WDW), 2008 WL 3978189 (E.D.N.Y. Aug. 21, 2008) (motion to dismiss breach of fiduciary duty claim against mortgage broker denied); *Sergeants Benev. Ass'n Annuity Fund v. Renck*, 19 A.D.3d at 109-110 (breach of fiduciary duty claim against financial advisor sustained at pleading stage based on allegations that defendants were experienced in the field of investment consulting and management); *Frydman & Co. v. Credit Suisse First Boston Corp.*, 272 A.D. 2d 236, 708 N.Y.S.2d at 77 (investment advisor is a fiduciary; pleading sustained); *Bestolife Corp. v. Am. Amicable Life*, 5 A.D. 3d at 216, 774 N.Y.S.2d 18 (pleading alleging fiduciary duty based on consulting relationship with investment advisor sustained).

*Westwoods Aviations*, 2007 WL 2454115, at *2 (parties in arm's length contractual transaction were also fiduciaries because of nature of the relationship.).

First, the fiduciary relationship alleged between Cicero and plaintiffs is not, as Cicero contends, premised on (a) the June, 2009 Engagement Letter, (b) plaintiffs' reliance on Cicero's promise to perform its contractual obligation to prepare a CON application—a specifically contracted for obligation, or (c) Cicero's receipt of Confidential Information or Trade Secrets in connection with the preparation of that CON application, which application it never prepared. Those allegations would be far more consistent with a garden variety contractual relationship, but that is not what is alleged in the Complaint.[34]

The Complaint is replete with facts that Cicero performed duties outside the scope of a consultant hired to prepare a CON application. These are the facts that transform the parties' relationship into a fiduciary one. Specifically, plaintiffs allege that prior to any contractual undertaking by Cicero to prepare a CON application in connection with the PBT Project, Medscan sought regulatory and other advice and guidance from Cicero, with whom it had a prior time relationship. The purpose of this advice was to help Medscan navigate the regulatory landscape and properly negotiate any regulatory requirements for opening a PBT practice in New York. AC ¶ 57. Plaintiffs further allege that Cicero held itself out has having specialized regulatory healthcare expertise that Medscan did not have, and that Medscan was relying on that superior knowledge and expertise, which Cicero knew and accepted. *Id.* Finally, plaintiffs provided their trade secrets and confidential information to Cicero only in the context of its

---

[34]   All of the cases Cicero cites at pages 19-20 of its brief stand for the unremarkable proposition that parties to a contractual relationship often trust each other and provide each other with confidential information in furtherance of their contractual duties, but that, without more, is insufficient to establish a fiduciary relationship. As the court made clear in *EBI I, Inc. v. Goldman Sachs & Co.*, 5 N.Y. 3d at 20-22, where the contractual relationship contains other elements, such as superior knowledge and expertise upon which one party relies, a fiduciary relationship exists in addition to the contractual one. This is precisely what plaintiffs have alleged in the Complaint with respect to Cicero, both a fiduciary and contractual relationship, and one simply does not exclude the other, as Cicero wrongly suggests.

46

health care advisory duties, not its contractual ones.  As with RTSI and OPCO, these allegations are sufficient to state a plausible claim that Cicero was plaintiffs' fiduciary beginning in March, 2009.[35]

Cicero's final argument confuses an element of a claim with an affirmative defense. Cicero contends its simultaneous engagement with RTSI under the circumstances alleged did not breach any fiduciary duty to plaintiffs because plaintiffs hired another consultant and filed a timely application.  Cicero Br. at 22.  This argument is also fatally flawed for at least two reasons.

First, plaintiffs' fiduciary claim against Cicero is not that plaintiffs were prevented from filing a timely CON application because they lost their healthcare advisor to a competitor and could not find another one.  The gravamen of plaintiffs' fiduciary duty claim is that, with assistance from OPCO and Cicero, RTSI stole the Medscan PBT Project and misappropriated plaintiffs' trade secrets and confidential information.  Specifically with respect to Cicero, plaintiffs allege that Cicero assisted RTSI pursue a stolen PBT project with misappropriated information.  AC ¶¶ 75-77.  Cicero's redrafting of the Complaint aside, the conduct plaintiffs have actually alleged constitutes a breach of Cicero's fiduciary duties to plaintiffs.[36]  *See e.g.*, *Am. Int'l Group, Inc. v. Greenberg*, 877 N.Y.S. 2d 614 (N.Y. Sup. Ct. 2008).

---

[35] Cicero's reliance on cases—mainly in the summary judgment context—of instances where courts have found no fiduciary duty exists to support its contention that professions such as Cicero's are not fiduciary in nature is unavailing.  Cicero Br. at 21.  These cases make clear that the analysis turns on the nature of the particular relationship at issue, not on the profession of the alleged fiduciary, as Cicero wrongly suggests.  *See, e.g.*, *Scotto Princeton LLC v. Felsen Associates, Inc.*, 807 N.Y.S. 2d 546 (Sup. Ct. 2005). (finding that an insurance broker who provided investment advice may be a fiduciary depending on the nature of the relationship).

[36] This Court's decision in *Centra Industries, Inc. v. McGuirewoods, L.P,* 270 F. Supp. 2d 386 (S.D.N.Y. 2003) upon which Cicero so heavily relies is inapposite.  In *Centra*, this Court held that since the individual plaintiffs were not parties to the contracts from which the fiduciary duty flowed, defendants owed them no duty.  But, the Court never held that defendant's failure to disclose a conflict of interest arising from a self-dealing contractual arrangement did not breach a fiduciary duty; it did, but only as to the corporate plaintiffs since they were the only ones to whom defendants owed a duty.

Second, the extent to which plaintiffs were able to mitigate Cicero's breach is an affirmative defense, not an element of the claim.  *See, e.g.*, *Momentive Peformance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*, No. 107-CV-567 (FJS/DRH), 2009 WL 1514912, *6 (N.D.N.Y. June 1, 2009).

      C.     <u>Plaintiffs' Unfair Competition Claim Should Be Sustained</u>.

Under New York law, "unfair competition is a 'broad and flexible doctrine, that encompasses an "incalculable variety of illegal practices." *See, e.g*, *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008).  With it origins the palming-off of one's goods as those of a rival trader,  the essence of unfair competition law is "fair play."  54A Am.Jur.2d Monopolies and Restraints of Trade § 1066.  Unfair competition claims arise under New York law is that "the defendant has misappropriated the labors and expenditures of another."  *Berman v. Sugo*, 580 F. Supp. 2d at 208 (S.D.N.Y. 2008) (citations omitted).

To sustain a claim for unfair competition under New York law, a plaintiff need only show that defendants misappropriated its product, labors, skills, expenditures or goodwill, and displayed some element of bad faith doing so." *Id.*  Plaintiffs have more than sustained their pleading burden.

To escape liability to plaintiffs for misappropriating the Medscan PBT Project, RTSI urges this Court to dismiss plaintiffs' claim for unfair competition based on an inapplicable legal standard.  RTSI Br. at 39-40.[37]  In this regard, RTSI contends that to withstand a motion to dismiss, a claim for unfair competition must be based on the "bad faith" misappropriation of trade secrets or proprietary information.  *Id.* at n. 7.[38]  RTSI is wrong.

---

[37] OPCO and Cicero are alleged to have aided and abetted RTSI's unfair competition. AC ¶¶ 169-176.  Under law, if the underlying claim is sustained so too must the claim for aiding and abetting.  *Cf. Berman*, 580 F. Supp 2d at 205.

[38] The information, does not, as RTSI contends, need to rise to the level of a "trade secret".  *See, e.g. Berman,* 580 F. Supp. at 209.  Moreover, as demonstrated in Section III D, plaintiffs have sufficiently alleged that it had trade secrets and other confidential information.

48

ny-959421

"The general principle evolved from all the cases is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one [company] of a benefit or property right belonging to another." *New York Racing Assoc. v. Nassau Regional Off-Track Betting Corp.*, 909 N.Y.S. 2d 866, 29 Misc.3d 539 (Sup. Ct. Nassau Cty. 2010). The "tort functions to protect property rights of commercial value…from any form of commercial immorality." *Bongo Apparel, Inc. v. Iconix Brand Group, Inc.*, No. 601903/06, 2008 WL 41341 (Sup. Ct. NY. Cty. Jan. 2, 2008).

In the Complaint, plaintiffs allege that long prior to any collaboration with RTSI, and at their great financial expense, they spent a year becoming experts in PBT, compiling source leads with well-placed executives, as well as a myriad of other proprietary information. During its second year of development, although RTSI—which had zero expertise or even knowledge of PBT – was minimally involved, plaintiffs again spearheaded and assumed the laboring oar on all development efforts for the project. Once again, plaintiffs did so at their sole financial expense, now far in excess of a million dollars. These development efforts included the preparation of detailed business plans, financial analyses and projections and countless business presentations. In addition, plaintiffs obtained commitments from several of the leading New York Hospitals such as Memorial Sloan Kettering and Beth Israel to act as clinical partners, and forged numerous other critical relationships and partnerships with individuals and entities in furtherance of the PBT project and located and negotiated terms for the only real estate site in Manhattan fit for development of a PBT facility, for which it spent hundreds of thousands of dollars on architectural plans for a PBT facility at that site. AC ¶¶ 3-4, 31, 46-47, 61. By November, 2009, with the exception of financing, the critical components of the projects were in place: the facility had a medical director, esteemed clinical partners, a cyclotron supplier and an appropriate site. AC ¶ 63.

RTSI's misappropriation of the Medscan PBT Project is precisely what New York's unfair competition law seeks to redress. *See*, *e.g.*, *Excellus Health Plan, Inc.*, 287 F Supp. 2d at

178.  Presumably defendants ended their association or joint venture with plaintiffs to co-opt the profits for themselves.  Whatever the reason, RTSI did not, as their November 5, 2009 letter implied, proceed to develop their own new and independent competing PBT project.  Instead, with OPCO and Cicero's help, RTSI hijacked the Medscan PBT project lock, stock and barrel for their exclusive benefit.  On November 6, 2009, the development of Medscan PBT Project continued much as it had before the November 5, 2009 breach, except that RTSI, not plaintiffs' were at the helm.  This is evidenced by RTSI's next-day filing with the New York Secretary of State to form the entity called "New York Proton Management LLC," using Travis' office address.  Critically, this was the name of the entity that Medscan, Travis and RTSI represented to clinical partners and others would own and manage the Medscan PBT project.

Additional evidence of RTSI's unfair competition lies in plaintiffs' allegation that RTSI's CON contained plaintiffs' business plan and financial projection and plaintiffs' architectural drawings.  More to the point, however, is that the RTSI PBT project NYDOH approved in November, 2010 looked much like the Medscan PBT Project did before defendants' misappropriated it:  it had the same site and architectural plans, the same medical director, and identical clinical partners.  AC ¶¶ 67-74, 88, 97-99.  Any suggestion that this alleged conduct does not constitute unfair competition under New York law is nonsensical.

As the Complaint makes clear, as a result of defendants' conduct, within weeks, if not days, of RTSI's November, 5, 2009 letter, the Medscan PBT Project was without clinical partners, a medical director, a site, architectural plans and an equipment vendor, not because any of them were no longer interested in pursuing a PBT project in New York City, but because they had been improperly hijacked by RTSI.  By hijacking the Medscan PBT project, RTSI avoided having to invest its own time and money to develop their own relationships and business plans, financial analyses and the other components required to establish a viable PBT project.  Any suggestion by RTSI that these allegations are insufficient to state a claim for unfair competition falls flat and is not supported by the well-developed body of unfair competition law in New

50

York.  *See, e.g.*, *Excellus Health Plan, Inc. v. Tran, et al.*, 287 F. Supp. 2d 167, 179 (W.D.N.Y

2003) (finding that specific allegations of bad faith, including communications of false

information regarding plaintiffs, were sufficient to state a claim for unfair competition); *Lane's*

*Floor Coverings, Inc. v. Ardex, Inc.*, No. CV-95-4078, 1996 WL 19182, *4 (E.D.N.Y. Jan 4,

1996) (allegations that defendant negotiated contracts to its own advantage without notifying

plaintiff or obtaining plaintiff's consent enough to state a claim for unfair competition and bad

faith); *Michelle Pommier Models, Inc. v. Men Women N.Y. Model Mgm't*, No. 97 Civ. 6837

(SAS ), 1997 WL 724575, at *4 (S.D.N.Y. Nov. 18, 1997) (noting that an analysis of bad faith

and unfair competition requires a complex factual analysis).[39]

      D.      <u>Plaintiffs' Claim For Misappropriation Of Trade Secrets Withstands Dismissal.</u>[40]

      New York courts define "trade secret" as "'any formula, pattern, device or compilation of

information which is used in one's business, and which gives him an opportunity to obtain an

advantage over competitors who do not know or use it.'"  *Ashland Mgmt. Inc. v. Janien*, 82

N.Y.2d 395, 407 (1993) (quoting Restatement of Torts § 757)*: see also Softel, Inc. v. Dragon*

*Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997).  Six factors are relevant in

determining whether information constitutes a trade secret:

> 1) the extent to which the information is known outside of the business; (2) the
> extent to which it is known by employees and others involved in the business;
> (3) the extent of measures taken by the business to guard the secrecy of the
> information; (4) the value of the information to the business and its competitors;
> (5) the amount of effort or money expended by the business in developing the
> information; (6) the ease or difficulty with which the information could be
> properly acquired or duplicated by others.

---

[39] Although it does not dispute the sufficiency of the bad faith acts of misappropriation alleged as to RTSI, OPCO contends that the unfair competition claims should be dismissed because none are attributed to it.  OPCO Br. at 27.  As noted, the claim against OPCO is for aiding and abetting RTSI's misappropriation and unfair competition.

[40] Plaintiffs assert their trade secrets claim against the RTSI defendants only.  *See* AC ¶ 167 ("defendants misappropriated . . . plaintiffs' . . . Trade Secrets in connection with defendants' own submission to the NYDOH for a competing PBT facility.").

*Ashland Mgmt.*, 82 N.Y.2d at 407 (quoting Restatement of Torts § 757 cmt. b) (internal

quotation marks and brackets omitted).[41]

1.  Defendants' Challenge to the Secrecy of Plaintiffs'
    Confidential Information is Meritless.

RTSI's contention that the public disclosure of plaintiffs' trade secret information in the

CON process deprives it of the requisite secrecy should be soundly rejected.  First, whether a

trade secret is secret "is generally a question of fact."  *Ashland Mgmt.*, 82 N.Y.2d at 407*: see

also Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986) ("Secrecy is a question of

fact."); *Eberhard Inv. Assocs., Inc. v. Santino*, No. 01 Civ. 3840, 2003 WL 22126846, at *4

(S.D.N.Y. Sept. 12, 2003) (finding question of whether publication destroyed secrecy "a factual

issue not resolvable on a Fed. R. Civ. P. 12(b)(6) motion"); *Kosower v. Gutowitz*, No. 00 Civ.

9011, 2001 WL 1488440, at *8 (S.D.N.Y. Nov. 21, 2001) (declining to resolve factual issue of

secrecy on motion to dismiss).  For this reason alone, RTSI's motion should be denied.

Second, a subsequent disclosure does not immunize an earlier wrongful appropriation.

*See*, *e.g., Medtech Prods. Inc. v. Ramir*, *LLC*, 596 F. Supp. 2d 778 (S.D.N.Y. 2008) (denying

motion to dismiss where plaintiffs alleged that defendants misappropriated information that was

ultimately intended for use in publicly marketed product).  Third, RTSI's contention that the

information at issue was susceptible to public knowledge, rendering it unprotected, is belied by

the fact that RTSI also went to great lengths to protect the confidentiality of information related

to the PBT project through its execution of NDAs and LOIs.  *See* AC ¶¶ 56, 60-61.

In *Medtech Prods. Inc. v. Ramir*, the court denied defendants' motion to dismiss

plaintiff's trade secrets claim where plaintiff alleged, as here, that defendants' misappropriation

permitted them to "create a competing product on an expedited basis, cutting out a time-

---

[41] Contrary to defendants' argument, novelty is not a requirement when the subject of the trade secret is not the submission of an idea.  *Softel*, 118 F.3d at 969 (holding that plaintiff was not required to show novelty "in the patent law sense"); *Nadel v. Play-by-Play Toys & Novelties Inc.*, 208 F.3d 368, 380 n.9 (2d Cir. 2000) (expressly abrogating the portion of *Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173 (2d Cir. 1993), cited in footnote 11 of *Softel*).

52

consuming and expensive development process."  596 F. Supp. 2d at 788.  This court should do the same.

2.    <u>Defendants Misappropriated Plaintiffs' Information<br>in Breach of Their Confidential Relationship</u>.

RTSI argues that plaintiffs' misappropriation claim fails because plaintiffs do not allege breach of an agreement or evidence of defendants' improper acquisition of trade secrets.  RTSI's argument fails to recognize that misappropriation can be based on the breach of a confidential relationship.  *See, e.g.*, *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999).  Here, plaintiffs allege that they shared their confidential information with defendants in specific reliance on the relationship of trust between them.  *See, e.g.*, AC ¶¶ 39, 49.[42]  These allegations are sufficient to withstand defendants' motion to dismiss.  *See, e.g.*, *777388 Ontario Ltd. v. Lencore Acoustics Corp.*, 105 F. Supp. 2d 56, 64 (E.D.N.Y. 2000) (denying motion to dismiss where plaintiffs alleged that information was provided to defendant "in confidence, and in the good faith expectation that [it] would be used solely for the purpose of promoting plaintiffs' commercial interests").

E.    <u>Plaintiffs' Allegations in Support of Their Claim for Unjust Enrichment<br>are Sufficient to Withstand Defendants' Motion to Dismiss</u>.

Plaintiffs adequately plead a claim for unjust enrichment against RTSI.  To successfully allege unjust enrichment, a party must plead:  "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered."  *Shapsis v. Kogan*, No. 38418/07, 2011 WL 61727, *9

---

[42] Defendants seek to avoid liability for misappropriation on the theory that no fiduciary duty or joint venture existed to create a relationship of trust or alternatively because of the purported dissolution of the joint venture.  *See* RTSI Br. at 38-39.  Both of these arguments fail.  *First*, explained in detail in section III A. *supra*, and as set forth in the Complaint, the parties entered into a valid joint venture pursuant to which a confidential relationship was created, and there was a fiduciary relationship.  *Second*, even if the joint venture were actually dissolved, duties owed between joint venturers survive the dissolution of the venture.  *See* section III B. *supra*.

53

ny-959421

(N.Y. Sup. Ct. Jan. 7, 2011) (internal quotation marks and citation omitted; alteration in original).

Here, "[p]laintiffs allege that they provided their time, money, and skill to the joint venture, and that [RTSI] misappropriated this for their own benefit without fairly compensating them.  Thus, plaintiffs have adequately pleaded an unjust enrichment claim, and dismissal of their [seventh] cause of action must be denied."  *Id.; see also Segal v. Cooper*, 49 A.D.3d 467, 467-68, 856 N.Y.S. 2d 12, 13 (1st Dep't 2008) (affirming denial of motion to dismiss unjust enrichment claim brought by joint venturer where plaintiff alleged that he acted on behalf of the joint venture and his joint venture partners diverted the benefit of the joint venture to themselves.) "Where, as here, there is a bona fide dispute as to the existence of a contract, plaintiff may proceed upon a theory of quasi contract and breach of contract and will not be required to elect his remedies.  Thus, since defendant challenges the existence of the agreements with plaintiff, it may properly plead both contractual and quasi-contract claims against defendant." *World Alliance Financial Corp. v. Guardian Fist Funding Group,* No. 1196-2010, 2010 WL 4732786 (Sup. Ct. N.Y. Cty. Nov. 12, 2010) (internal citations omitted.)

RTSI's arguments in favor of dismissal are unavailing.  Contrary to defendants' assertion, RTSI specifically assumed an obligation to pay plaintiffs.  As alleged in the Complaint, RTSI agreed to divide the profits of the joint venture with plaintiffs – in other words, compensating plaintiffs for their efforts in connection with the venture.

Likewise, the Complaint fairly establishes that upon entering into the joint venture, plaintiffs acted for its benefit and not only in their own self-interest.  *See, e.g.*, AC ¶¶ 57, 46, 53, 59 (alleging that for the benefit of the joint venture, *inter alia,* Medscan entered into an agreement with Cicero; TPIONY secured an NDA from Durst "for the benefit of the joint venture"; and Medscan participated in numerous presentations to potential clinical partners).

RTSI's contention that unjust enrichment is inapplicable because the allegations relate to non-novel business information is absurd.  As defendants are aware, there is nothing non-novel

about the development of a proton beam therapy facility.  As alleged in the Complaint, the joint venture would have resulted in the "first-ever Proton Beam Therapy facility in New York," AC ¶ 1, which RTSI itself describes as "an *emerging and potentially promising* form of radiation therapy."  *See* RTSI Br. at 5 (emphasis added).

> F.   <u>Plaintiffs Have Adequately Pleaded Breach of Contract Claims Against Cicero and OPCO</u>.

> 1.   <u>Cicero's Arguments Cannot Overcome the Well-Pleaded Allegations.</u>

In arguing that the breach of contract claim should be dismissed, Cicero does not dispute that plaintiffs have adequately pleaded the elements of the claim.  Instead, Cicero contends that the parties' contract did not concern a PBT facility.  Cicero Br. at 24.  Cicero asserts that the parties' contract was limited to preparing a CON for a PET facility that exclusively provided imaging services, not treatment services.  But Cicero cannot contravene plaintiffs' well-pleaded allegations with an argument based on its subjective interpretation of the contract.

Plaintiffs have clearly pleaded that the parties' contract covered a PBT facility, and the face of the contract supports those allegations.  AC ¶ 58 ("Medscan and VCC entered into a written agreement … for the Medscan PBT Project."); Cicero Decl. Ex. 1 ("establishment and certification of a freestanding imaging facility/Article 28 diagnostic and *treatment* center") (emphasis added).  The Complaint further alleges that Cicero advised plaintiffs in April and May concerning "the structure of the PBT practice, including whether the Medscan PBT Practice could or would include any other treatment modalities." AC ¶ 58.  At most, Cicero's contention to the contrary is an argument that the contract is ambiguous.  Courts routinely have denied motions to dismiss in such circumstances, reasoning that the meaning of the contract – if actually ambiguous – is an issue to be decided by the trier of fact.  *See, e.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) (holding that where the intention of the parties is disputed, "a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings"); *SEC. v. Lee*, 720 F. Supp. 2d 305, 332 (S.D.N.Y. 2010)

(refusing to dismiss claim where "a contract is ambiguous as applied to a particular set of facts") (citations omitted).[43]   Cicero's argument, therefore, provides no basis for dismissal.

Cicero's argument that the contract could not have covered a PBT facility because NYDOH had not yet announced the demonstration project when the parties entered the contract does not change the result.  Plaintiffs allege that Cicero emailed Travis as early as April 3, 2009, a full two months before the parties' contract, regarding "upcoming State meetings at which there would be a presentation on 'proton beam therapy and CON [certificate of need].'"  AC ¶ 57 (alteration in original).

Equally unavailing is Cicero's argument that any breach would not support the amount of damages that plaintiffs claim.  The argument does not implicate the sufficiency of the pleading— a point Cicero has essentially conceded—but rather addresses whether plaintiffs might ultimately be able to establish entitlement to the quantum of damages alleged.  It is, in short, an argument for another day.  *See, e.g.*, *Goldblatt v. Englander Commc'ns, L.L.C.*, No. 06 Civ. 3208 (RWS), 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007) (refusing to dismiss claim based on an argument about entitlement to damages).  There is no basis for dismissal of the breach of contract claim against Cicero.

### 2.   OPCO's Arguments Fail as a Matter of Law.

OPCO similarly seeks to leap frog the pleading stage to argue about what plaintiffs might eventually be able to prove in an effort to avoid plaintiffs' well-pleaded breach of contract claim against it.  For its part, OPCO contends that plaintiffs' breach claim fails because there are not

---

[43] *See also Powe v. Cambium Learning Co.*, No. 08 Civ. 1963(JGK), 2009 WL 2001440, at * 5 (S.D.N.Y. July 9, 2009) ("The meaning of an ambiguous contract is a question of fact for the fact-finder. . . . The defendant argues that there is no plausible dispute . . . [and] that the factual record does not reflect [the plaintiff's claims].  The defendant's argument is really an argument that there is no genuine issue of material fact with respect to whether and how the [contract terms should be applied].  The validity of that argument should be tested against the factual record that is developed prior to a motion for summary judgment. It cannot dispose of the plaintiffs' breach of contract claims on this motion to dismiss.") (citations omitted and emphasis added).

any "clear guidelines" to illuminate whether it actually employed its best efforts to secure

financing for plaintiffs' PBT project, as it was contractually obligated to do.  OPCO Br. at 29-30.

OPCO doesn't contend that plaintiffs failed to plead the elements of a breach of contract claim (a

contract, performance by the plaintiff, a breach by the defendant, and damages), since they

clearly have.  Instead, OPCO's argument seems to be that there will be no way to judge – at the

proof stage – whether it actually breached the contract because the contract lacks clear guidelines

as to what constitutes "best efforts."  *See id.*  That is not a question that can be resolved at the

motion to dismiss stage.  It is no surprise, therefore, that every case OPCO cites is a summary

judgment case.  *Id.*

To the extent that OPCO's argument can be construed as contending that the lack of

guidelines in the contract means that the clause is unenforceable for vagueness and therefore

plaintiffs have not stated a claim, that too fails.  New York courts consistently reject the notion

that the guidelines against which best efforts is to be judged must be set for in the contract itself:

> Under New York law, a contract need not explicitly define "best efforts" for its
> "best efforts" provision to be enforceable. . . . Moreover, to the extent that the
> term "best efforts" . . . is ambiguous, and criteria by which to measure the parties'
> "best efforts" are lacking, the extrinsic circumstances concerning the parties'
> understanding of that term may be considered by the finder of fact.

*USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 491 (S.D.N.Y. 1997)

(citing cases).  Any "guidelines" can be inferred based on the circumstances of the parties'

relationship, including prevailing industry standards.  *See, e.g.*, *id.*; *Bloor v. Falstaff Brewing*

*Corp.*, 454 F. Supp. 258, 266-67 (S.D.N.Y. 1978), *aff'd*, 601 F.2d 609 (2d Cir. 1979) ("best

efforts" takes its meaning from the circumstances involved and the abilities of the performing

party).[44]  In any event, any dispute about the clarity of the best efforts clause is a dispute for a

---

[44] *See also Bloor v. Falstaff Brewing Corp.*, 601 F.2d at 613 n.7 (collecting cases);
*McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, No. 89 Civ. 1489 (PNL), 1990 WL 138959, at *4
(S.D.N.Y. Sept. 19, 1990) ("According to the uncontradicted expert testimony of Miller, which
the court accepts as accurate, in the investment banking world, an undertaking to use 'best
efforts' to obtain financing implies multifaceted obligations, which include learning the business
to be financed, performing due diligence functions, authoring a descriptive memorandum,

(Footnote continues on next page.)

ny-959421

later juncture in the case.  "[T]he precise meaning of the 'best efforts' provision, and whether [the defendant] breached the provision, are factual issues that cannot be resolved on the face of the complaint."  *USAirways Grp.*, 989 F. Supp. at 491.

Nor can there be any serious argument that plaintiffs have not adequately pleaded facts to support their allegation that OPCO breached the best efforts provision.  In *Robin Bay Associates, LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902 (S.D.N.Y. June 3, 2008), the court concluded that the plaintiff's allegation that the defendant had failed to investigate enough financing sources was alone sufficient to state a claim that the defendant had breached the contract by failing to use its best efforts.  *Id.* at *6-7.  Plaintiffs here have similarly alleged that OPCO recommended a "purported" private equity firm ("Hayman"), which required plaintiffs to cease entertaining any other investment offers during negotiations, AC ¶ 82; that, at substantial cost, Medscan discovered that the financing firm OPCO recommended was a farce, AC ¶¶ 83-84; and that during the six-month negotiation period, prior to discovering the fraudulent nature of OPCO's recommendation, OPCO "failed to investigate a single back up source of financing despite the fact that Hayman was an objectively unqualified lender . . . [and that] OPCO failed to conduct an adequate due diligence investigation of Hayman, which would have revealed its unreliability and any fraudulent activity,"  AC ¶ 85.  As in *Robin Bay Associates*, these allegations are more than sufficient to state a claim for breach of a "best efforts" clause.  *Robin Bay Assocs., LLC*, 2008 WL 2275902, at *6-7.  OPCO's motion should be rejected.

---

(Footnote continued from previous page.)

creating and generating financial models, identifying potential investors, contacting and screening potential investors, and working with the potential investors in an effort to convince them of the merits of the transaction.").

G.    The RTSI Defendants' Defense of Economic Justification
Does Not Warrant Dismissal of Either Claim for Tortious
Interference with Contract or Prospective Business Advantage.

The Complaint adequately alleges tortious interference with contract and business

relations against RTSI.[45]  Indeed, RTSI effectively concedes that plaintiffs have made a *prima

facie* showing, as RTSI does not make a single argument that plaintiffs failed to allege the

requisite elements.[46]  Rather, in defense of both tortious interference claims, defendants assert

only that they are shielded from liability by economic justification – that is, any wrongful

conduct on the part of RTSI was motivated by economic self-interest and is therefore privileged.

*See* RTSI Br. at 40-42.  This argument fails for a number of reasons.

*First*, the RTSI defendants' reliance on an economic justification argument is fatally

flawed because it is a *defense* to plaintiffs' claims on which RTSI has the burden of proof.  *See*

*Momentive Performance Materials USA, Inc. v. Astrocosmos Metallurgical, Inc.*, No. 107-CV-

567, 2009 WL 1514912, *6 (N.D.N.Y. June 1, 2009) ("The fatal flaw to relying on [an economic

interest defense] to support a motion to dismiss is that [it is a] *defense*[] to Plaintiffs' claims, on

which Defendant…has the burden of proof.") (emphasis in original).  Because "Plaintiffs'

---

[45] "A claim of tortious interference with contract requires proof of (1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages."  *Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996).  Likewise, to state a claim for tortious interference with business relations, a plaintiff must allege that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003) (citation omitted).

[46] Curiously, RTSI argues that plaintiffs fail to allege that defendants "*knowingly caused*" any actual breach of contract.  *See* RTSI Br. at 41.  Such an allegation is not an element of the claim and RTSI's argument should be disregarded as irrelevant.   In fact, to plead a tortious interference with contract claim, plaintiffs must allege, *inter alia*, "*knowledge of the contract*" and that defendants "*intentionally* procured" the breach.  *See Foster*, 87 N.Y.2d at 750 (emphasis added).  Each of these elements is sufficiently pleaded in the Complaint.  *See, e.g.*, AC ¶ 185 ("At all times relevant [RTSI] had knowledge of plaintiffs' contracts with OPCO and VCC. Notwithstanding such knowledge,…defendants intentionally and improperly procured the breach of those contracts . . . .").

59

allegations are sufficient to state facially plausible claims for tortious interference, the Court cannot grant Defendant['s] motion based on Defendant['s] mere assertion of the business justification defense."[47] *Id.*

*Second*, as to plaintiffs' tortious interference with contract claim, New York courts have settled that the economic justification defense does not apply. "Where the alleged interference is with an existing contract rather than a prospective economic relationship, 'the defense of economic justification is inapplicable' and it is not necessary to allege that defendant used improper means or that its conduct was for the sole purpose of harming plaintiff."[48] *Island Rehab. Servs. Corp. v. Maimonides Med. Ctr.*, 19 Misc. 3d 1108 (A), *8, 859 N.Y.S.2d 903, *8 (N.Y. Sup. Ct. 2008): *see also Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 829 N.Y.S.2d 7, 9 (1st Dep't 2006).

*Third*, assuming *arguendo* that an economic justification defense could be asserted properly at this juncture with respect to the tortious interference with prospective business relations claim, RTSI's motion should nonetheless be denied because plaintiffs have made the requisite showing of malice. Defendants would lead this Court to believe that it cannot be subject to liability because their conduct was based on economic self-interest. However, in view of the complex relationship between plaintiffs and RTSI, the Court's inquiry cannot end there.

---

[47] The only cases cited by RTSI on this point do not support dismissal of the tortious interference claims on a motion to dismiss. *Imtrac Indus., Inc. v. Glassexport Co.* was not decided in the context of a motion to dismiss. Rather, in that case defendants obtained dismissal of the tortious interference claim on the basis of a business justification defense only after defendants met their burden of proof at summary judgment. *See Imtrac Indus., Inc. v. Glassexport Co.*, No. 90 Civ. 6058, 1995 WL 39294 (S.D.N.Y. Feb. 1, 1996). *Bowman Imp./Exp. Ltd. v. F.J. Elsner N. Am. Ltd.* did not turn on a business justification defense at all. There the court found that plaintiff's allegations of tortious interference complained only that defendants purchased something plaintiff wanted to purchase, which the court the concluded did not constitute a tort. *See Bowman Imp./Exp. Ltd. v. F.J. Elsner N. Am. Ltd.*, 5 Misc. 3d 1026(A), *6 (N.Y. Sup. Ct. 2004).

[48] Although not required for this claim, the Complaint includes numerous allegations that defendants used improper means. *See, e.g.*, AC ¶ 185.

*See Island Rehab. Servs. Corp.*, 19 Misc.3d at *9, 859 N.Y.S.2d at *9 (refusing to dismiss tortious interference with prospective business relations claim without further inquiry in spite of defense of economic interest, in part, because of the complexity of the parties' relationship as joint venturers).  Put differently, "where parties are not competitors, as in this case where the defendants are alleged to be co-venturers with plaintiff, there may be a stronger case that defendant's interference with the plaintiff's relationships was motivated by spite [i.e., malice]." *Id.* (citation omitted; alteration in original).

Here plaintiffs allege that defendants conspired to misappropriate confidential and proprietary information belonging either to Medscan or the joint venture and thus committed the independent torts of unfair competition, breach of fiduciary duty, misappropriation of trade secrets, and copyright infringement.  *See* AC ¶¶ 128-39, 161-83.  "Such allegations are sufficient to support a claim of tortious interference with business interests if [as here] such information was used by defendants to solicit [Durst Development and the hospital partners] and divert them to defendants' new facility."  *Island Rehab. Servs.Corp.*, 9 Misc.3d at *9, 859 N.Y.S.2d at *9 (finding that because plaintiff and defendants were joint venture partners, defendants' conduct did not amount to mere persuasion)*: see also* AC ¶ 186 (alleging that through the misuse of plaintiffs' confidential information and trade secrets, defendants successfully solicited Durst and the hospital partners away from plaintiffs).

## IV.   THE NEW YORK PROTON CENTER IS CAPABLE OF BEING SUED

The New York Proton Center has the capacity to be sued under federal and New York state law.[49]  By its plain language, Fed. R. Civ. P. 17(b)(3)(A) provides that:

> "[c]apacity to sue or be sued is determined by … the law of the state where the court is located, except that … a[n] … unincorporated association with no … capacity under that state's law *may sue or be sued in its common name to enforce*

---

[49] Counsel for the New York Proton Center has agreed that service of the Complaint was proper if the Court determines that the New York Proton Center has the capacity to be sued. Stipulation, Docket No. 50.

ny-959421

*a substantive right existing under the United States Constitution or laws.*" (emphasis added).

Federal courts have recognized that the Federal Rules allow unincorporated associations to be sued in their own name in federal court for the purpose of enforcing a federal right, including violation of federal antitrust statutes.  *University of Texas at Austin, et al. v. The Honorable Kathryn H. Vratil*, 96 F.3d 1337, 1339 (10th Cir. 1996).  Therefore, the New York Proton Center is properly named and served herein.

Moreover, even if the determination of the New York Proton Center's capacity to be sued were to be made under New York state law, the New York Proton Center may be sued.  *See* N.Y. Gen. Assns. Law § 13.  "New York law requires 'pleading and proof of authorization or ratification by all members of the group' in a state law suit against an unincorporated association."  *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union Number 3*, No. 00 Civ. 4763 (RMB), 2002 WL 91625, *11 (S.D.N.Y. Jan. 23, 2002) (citing *Martin v. Curran*, 303 N.Y. 276 (1951)).  Plaintiffs' Complaint asserts that all members of the New York Proton Center were duly authorized to act for the New York Proton Center, despite its "non-corporate" status. *See, e.g.*, AC ¶ 18 ("[t]he application of NYPC was signed 'under penalty of perjury' by the following persons,[50] each averring that they were a person *'duly authorized to subscribe and submit this application on behalf of the applicant'* NYPC.") (emphasis added).  Manifestly, the New York Proton Center cannot exist and act for purposes of seeking a CON but avoid suit because it is unincorporated.  Accordingly, the New York Proton Center's actions alleged as conspiracy with co-defendants are actionable.

Contrary to defendants argument, the lack of a president or treasurer does not protect an unincorporated association from suit.  *See* C*A-POWZ v. City of Greece, New York*, No. 10-CV-6035-CJS, 2010 WL 3663409, *3 (W.D.N.Y. Sept. 14, 2010) (noting that if an unincorporated association has no president or treasurer, it may still bring suit in the name of an officer who is

---

[50] These six persons were all independent economic actors from the other RTSI defendants.  AC ¶ 18.

ny-959421

the functional equivalent of a president or treasurer).[51]  Otherwise, associations could structure their officers' titles to avoid suit.  Further, even if the Court determines that the instant action should have been filed against the New York Proton Center's president or treasurer, or other authorized officer such a "defect is not fatal and can be corrected." *Arbor Hill Concerned Citizens Neighborhood Assoc. v. City of Albany*, 250 F. Supp. 2d 48, 62 (N.D.N.Y. 2003).[52]

---

[51] RTSI's argument that the lack of a president or treasurer prevents The New York Proton Center from being an unincorporated association is baseless.

[52] Therefore, to the extent that the Court determines that the New York Proton Center is capable of being sued, but should have been sued in the name of a president, treasurer or authorized person, plaintiffs should be granted leave to name the "authorized individuals" who signed the NYPC application.

ny-959421

## CONCLUSION

Defendants have failed to offer any legitimate basis for dismissal of plaintiffs' well-pleaded claims.  Their motions should be denied in their entirety.

Dated: January 21, 2011
      New York, NY

                                  Respectfully submitted,

                                  SCHWARTZ & THOMASHOWER LLP

                                  By:  s/William Thomashower
                                        William Thomashower, Esq.
                                        Rachel Schwartz, Esq.

                                    15 Maiden Lane, Suite 705
                                    New York, New York 10038
                                    Tel.:  (212) 227-4300

                                    MORRISON & FOERSTER LLP
                                    Michael B. Miller, Esq.
                                    LaShann M. DeArcy, Esq.
                                    1290 Avenue of the Americas
                                    New York, NY 10104
                                    Tel.:  (212) 468-8000

                                    CROWELL & MORING LLP
                                    Shari Ross Lahlou, Esq.
                                    Jeane A. Thomas, Esq.
                                    1001 Pennsylvania Avenue, N.W.
                                    Washington, D.C.
                                    Tel.: (202) 624-2500

                                    *Attorneys for Plaintiffs*

ny-959421