

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
TPTCC NY, INC., THE PROTON INSTITUTE  :
OF NY, LLC, NY MEDSCAN LLC,           :
                                      :
            Plaintiffs,               :
                                      :
            -v-                       :
                                      :     10 Civ. 7097 (JSR)
RADIATION THERAPY SERVICES, INC.,     :
RADIATION THERAPY SERVICES HOLDINGS   :     OPINION AND ORDER
INC., 21st CENTURY ONCOLOGY, INC.,    :
NEW YORK PROTON MANAGEMENT LLC, THE   :
NEW YORK PROTON CENTER, OPPENHEIMER &  :
CO., INC., CICERO CONSULTING          :
ASSOCIATES VCC, INC., NORTON L.       :
TRAVIS, FRANK M. CICERO.,             :
                                      :
            Defendants.               :
------------------------------------- x
JED S. RAKOFF, U.S.D.J.

        Plaintiffs TPTCC NY, Inc. ("TPTCC"), The Proton Institute of

New York, LLC, and NY Medscan LLC ("Medscan") bring this action

asserting federal antitrust, federal copyright, and various state law

claims arising from their allegation that defendants conspired to

exclude plaintiffs from the market for Proton Beam Therapy ("PBT")

services in New York City.  All the defendants moved to dismiss the

Amended Complaint in its entirety, and the Court, by Order dated

March 1, 2011, granted defendants' motions.  This Opinion sets forth

the reasons for that ruling and directs the entry of final judgment.

        The pertinent facts, drawn from plaintiffs' Amended

Complaint and the documents referenced therein, are as follows.  PBT

1

is an emerging form of radiation therapy for the treatment of several types of cancer.  Amended Complaint ("Am. Compl.") ¶¶ 23-26.  PBT entails the use of a cyclotron, or particle accelerator, to separate protons for use as a beam that can deliver a concentrated dose of radiation to the diseased area, thereby sparing the adjacent healthy tissue.  Id. ¶ 23.

Developing a PBT facility costs hundreds of millions of dollars and requires the coordinated efforts of a multitude of entities, including equipment vendors, financial investors, clinical research centers, and "a large multidisciplinary medical and support staff."  Id. ¶¶ 29, 63.  There are currently eight PBT facilities in the United States, with the operational facilities nearest to New York State located in Boston and Philadelphia.  Id. at ¶ 28.

Plaintiff Medscan is in the business of providing diagnostic imaging technology, and has a specific expertise in positron emission tomography ("PET") diagnostic imaging.  Id. ¶ 30.  In 2008, Medscan began exploring the possibility of developing a PBT facility in New York.  Id.  Prior to making contact with defendants, Medscan compiled certain, purportedly "confidential," information, such as business leads, a business plan, identification of a Manhattan site location, and contacts with PBT equipment vendors, clinical partners, medical directors, and investment advisors.  Id. ¶¶ 3, 31, 62.  Medscan further alleges that, "to retain its competitive advantage, [it]

2

diligently worked to protect the secrecy of its information" even though it contemplated that, at some future point in time, this information would have to be made public.  Id. ¶ 32.

In November 2008, Medscan in seeking legal counsel in connection with its PBT project, alleges that it "retained" defendant Norton Travis as its attorney and "heavily relied on" his advice. Id. ¶ 35.  Travis is Executive Vice President and General Counsel of defendant Radiation Therapy Services Inc. ("RTSI"), a position he held throughout the duration of the time period at issue in this action.  Id. ¶¶ 35, 44.  When Travis was in private practice, however, he had acted as Medscan's attorney in a variety of capacities.  Id.  Medscan further alleges that, on or about December 1, 2008, defendant Oppenheimer & Co., Inc. ("Oppenheimer") began acting as its "financial advisor" in connection with the PBT project, with Oppenheimer's primary role being to secure the outside financing that would be necessary to launch a PBT facility.  Id. ¶ 37.  In December 2008, Travis suggested to Medscan that it enter into collaboration with RTSI, a leading operator of traditional radiation therapy centers, as RTSI's participation would be likely to enhance the PBT project's viability.  Id. at ¶ 38-39.  Though Medscan and RTSI never entered into a written agreement memorializing the terms of their collaboration, over the next eleven months (until November 2009), they worked together to prepare for their possible joint

establishment and operation of a PBT facility in New York City through the auspices of an (as-yet-unformed) entity, to be called New York Proton Management LLC ("NYPM"). See id. ¶¶ 38-61.

During this period, between December 2008 and November 2009, RTSI and Medscan jointly participated in numerous meetings and other efforts to cultivate relationships with the various partners that would be necessary to launch a viable PBT facility. See id. ¶¶ 42-44, 53-57, 60-61. Objects of their outreach included potential PBT clinical partners -- most notably, the prominent New York research hospitals Beth Israel Medical Center ("Beth Israel") and Memorial Sloan-Kettering Cancer Center ("Memorial Sloan"), as well as cyclotron equipment vendors, defendant Oppenheimer, and defendant Cicero Consulting Associates VCC, Inc. ("Cicero Consulting"), a healthcare regulatory consulting company. See id. As a result of these discussions, both Beth Israel and Memorial Sloan entered into non-binding Letters of Intent, drafted by Travis, in which they expressed their desire to collaborate with Medscan and RTSI in the event they established a PBT facility. Id. ¶¶ 55, 60. The Beth Israel letter, signed in March 2009, described NYPM as a "joint venture" of RTSI and Medscan. Id. ¶ 55. By contrast, the Memorial Sloan letter, signed in October 2009, did not state that NYPM was a joint venture, but rather listed RTSI as the "managing member" of NYPM. Id. ¶ 60. Both letters stated that the parties agreed to keep

4

confidential certain information related to the PBT project.  Id. ¶¶
55-56, 60.

    Additionally, Medscan engaged a real estate consultant, who
identified a suitable physical site for the PBT project at a property
in Manhattan controlled by Durst Development LLC ("Durst").  Id. ¶
46.  Medscan and RTSI then began the process of negotiating with
Durst to lease the property, and devoted considerable time and
expense to preparing architectural and mechanical designs for the
building that was to host the PBT facility.  Id. ¶¶ 46-47; see id.
Ex. F.

    Medscan and RTSI also jointly continued to gather information
to use in connection with the development of the PBT project, such as
supplier lists and financial data, which was arranged and organized
into a "business plan."  Id. ¶¶ 61-62.  Further, Travis prepared two
versions of a draft Operating Agreement, which was to govern the
terms of the parties' prospective joint ownership and control of
NYPM.  Id. ¶¶ 50-51.  The second draft agreement articulated Medscan
and RTSI's intent to jointly operate a PBT center under a newly-
formed entity, NYPM; to share profits, losses, contributions; and to
keep certain information confidential.  Id. ¶ 52; see also
Declaration of Alan J. Arffa, dated January 7, 2011 ("Arffa Decl.")
Ex. 5 (second draft agreement).  The parties never executed either of

these agreements, but did, according to plaintiffs, "substantially
perform[] many of [the second draft's] terms." Am. Compl. ¶ 51.

By letter dated November 5, 2009, RTSI, through independent
counsel, sent Medscan a letter stating (a) that RTSI was ending
discussions with Medscan "regarding any possible collaboration in the
development of a proton beam therapy facility," and (b) that RTSI
would be "pursuing the development of a proton beam therapy facility
in the greater New York area without [Medscan's] participation." Id.
Ex. A. RTSI's stated reason for terminating its relationship with
Medscan was that Medscan had, without the knowledge or consent of
RTSI, retained its own health care consultant who, on behalf of
Medscan alone, had contacted the New York State Department of Health
("NYDOH") -- the agency vested with the authority to approve new
medical facilities in New York State, see N.Y. Pub. Health Law §
2801-a(3) -- regarding the possible establishment of a PBT facility
in New York City. Am. Compl. Ex. A. The following day, on November
6, 2011, RTSI filed documentation with the New York Secretary of
State to form defendant New York Proton Management LLC -- the same
name of the company the parties had discussed forming in the draft
Operating Agreement. Id. ¶ 66.

By letter dated November 9, 2009, Medscan responded to RTSI's
letter. Id. Ex. B. Though expressing its "shock" that RTSI had
interpreted its retention of its own health care consultant as

6

grounds for terminating the parties' collaboration, Medscan acknowledged RTSI's decision, confirmed the parties' plans to separately pursue the development of a PBT facility, and "wished [RTSI] best of luck in all its endeavors." Id. The letter also demanded that RTSI either return or destroy "all of our confidential . . . materials" in RTSI's possession. Id. No such materials were ever returned to Medscan, nor did Medscan ever receive confirmation of their destruction. Id. ¶ 68.

Following the termination of the parties' collaboration, Medscan continued to pursue a PBT project on an independent basis, which initially proved difficult because most of the joint project's partners -- including Beth Israel, Memorial Sloan, Durst, and IBA (the world's largest supplier of PBT equipment) -- each decided to continue working with RSTI rather than Medscan. Id. ¶¶ 71-75. Nevertheless, over the next several months, Medscan succeeded in securing a new physical site in New York City for its planned PBT facility, in finding a new medical director, and in establishing new clinical partnerships and relationships with new equipment suppliers. Id. ¶ 95.

However, Medscan was not able to obtain financial backing of equivalent depth to that enjoyed by RTSI's now-rival project. Id. In its effort to secure financing, Medscan, on December 28, 2009, retained Oppenheimer, which agreed to use its "best efforts" to seek

financial backing for Medscan's PBT project.  Id. ¶¶ 79-80.  Pursuant to its agreement with Medscan, Oppenheimer, over the next six months, negotiated the terms of a lending agreement with a private equity firm called Hayman Private Equity LLC ("Hayman"), as well a letter of credit from a bank to secure the loan.  Id. ¶¶ 81-84.  However, in July 2010, Medscan learned that Hayman was "an objectively unqualified lender" and therefore declined to follow-through with the transactions arranged by Oppenheimer.  Id. ¶¶ 84-85.

In May 2010, RTSI also retained Oppenheimer to assist it in its own efforts to secure financing for RTSI's rival PBT project. Id. ¶ 87.  Separately, following the end of its collaboration with Medscan, RTSI retained defendant Cicero Consulting to assist it in preparing and submitting a Certificate of Need ("CON") application to the NYDOH.  Id. ¶¶ 75-76.

On May 5, 2010, the NYDOH issued a public Request for Applications for the operation of a PBT "demonstration project," so as to "assess the efficacy, safety, and cost-effectiveness of, and need for, PBT in New York State."  Id. ¶ 93; see Arffa Decl. Ex. 8 (the Request); see also N.Y. Pub. Health Law § 2801-a(3-a) (establishing that any "new" medical technology must first proceed through a demonstration project approved by the Public Health Council of the NYDOH).  In response, the NYDOH received three CON applications, one on behalf of defendant The New York Proton Center

("NYPC"), another from plaintiff TPTCC, and another from a third

entity, ProSource.  Arffa Decl. Ex. 9.  The applications from TPTCC

and NYPC were similar in many respects.  Compare Am. Compl. Ex C with

id. Ex. D.  For example, the categories of information each party

selected to present were substantially the same, and in nearly

identical order.  See id. ¶ 98.  Separately, NYPC's application

included architectural drawings for its physical site location, one

of which marked a space with plaintiffs' name.  Id. Ex. E (marking

the ground floor lobby as "New York Proton Institute Lobby").  In the

end, however, NYDOH approved the NYPC application and disapproved the

TPTCC application.  Id. ¶ 101.

Based on the foregoing allegations, plaintiffs' Amended

Complaint asserts five causes of action against all defendants for

(1) conspiracy to restrain trade, in violation of Section 1 of the

Sherman Act, 15 U.S.C. § 1; (2) conspiracy to monopolize, in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (3)

copyright infringement, in violation of the federal Copyright Act, 17

U.S.C. § 101 et seq.; and (4) breach of fiduciary duty, in violation

of New York common law.  Further, plaintiffs bring five additional

claims, all under New York common law, against defendants RTSI, NYPC,

NYPM, Radiation Therapy Services Holdings, Inc., 21st Century

Oncology, LLC, and Norton L. Travis (collectively, the "Radiation

Therapy Defendants") for (5) breach of joint venture; (6) unjust

9

enrichment; (7) misappropriation of trade secrets or confidential

information, (8) unfair competition; and (9) tortious interference

with contractual relations and prospective business advantage.

Finally, plaintiffs also bring claims under New York common law

against Cicero Consulting and Frank M. Cicero (the "Cicero

Defendants"), as well as against Oppenheimer, for (10) breach of

contract, (11) aiding and abetting the Radiation Therapy Defendants'

misappropriation; and (12) aiding and abetting the Radiation Therapy

Defendants' unfair competition.  Each of the defendants moves to

dismiss the Amended Complaint, in its entirety, under Rule 12(b)(6)

of the Federal Rules of Civil Procedure for failure to state a claim.

Defendant NYPC also moves to dismiss the Amended Complaint as against

it on the basis that it is not a legal entity and therefore lacks the

capacity to be sued.  <u>See</u> Fed. R. Civ. P. 12(b)(2),(4),(5) & (6).

The Court first turns to plaintiffs' two antitrust claims

arising under the Sherman Act.  The Amended Complaint alleges that

defendants conspired to exclude plaintiffs from the New York State

market for PBT services, thus unlawfully seeking to restrain trade

in, and monopolize, that market.  <u>See</u> Am. Compl. ¶¶ 114-27.  In

response, defendants contend that these claims are precluded by the

<u>Noerr-Pennington</u> doctrine.  Articulated by the Supreme Court in

<u>United Mine Workers v. Pennington</u>, 381 U.S. 657 (1965) and <u>Eastern</u>

<u>R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127

(1961), the Noerr-Pennington doctrine holds that, in light of the
First Amendment right to "petition the government for a redress of
grievances," individuals and entities may not be subject to antitrust
liability for seeking to influence the behavior of government
officials.  See Pennington, 381 U.S. at 670 ("Noerr shields from the
Sherman Act a concerted effort to influence public officials
regardless of intent of purpose").  The process of seeking the
requisite government approval for a project, or that of opposing a
competitor's application for government approval of a project, is
within the scope of the activity immunized from antitrust liability
under Noerr-Pennington.  See, e.g., Kottle v. Northwest Kidney Ctrs.,
146 F.3d 1056, 1059 (9th Cir. 1998) ("a lobbying effort designed to
influence a state administrative agency's decision to issue a CON is
within the ambit of the [Noerr-Pennington] doctrine"); Interstate
Props. v. Pyramid Co. of Utica, 586 F. Supp. 1160, 1162-63 (S.D.N.Y.
1984) (under Noerr-Pennington, a defendant "does not violate the
antitrust laws in opposing . . . [a competitor's] application for
permission to destroy wetlands to build a mall, even though its
motive is to deal a fatal blow to [that] competitor.").  Moreover,
Noerr-Pennington antitrust immunity applies broadly to any conduct
that is "directed toward obtaining government actions."  Noerr, 365
U.S. at 140.  Accordingly, preparatory activities are immunized by
Noerr-Pennington, even if they occur prior to, or apart from, the

11

actual petitioning of a governmental entity.  See Sunwest Assocs. v. Davis, 99 F.3d 1147 (9th Cir. 1996).

Plaintiffs concede that Noerr-Pennington generally exempts government petitioning activities from antitrust liability, but nevertheless contend that the doctrine does not apply in the instant case because defendants' allegedly anticompetitive conduct occurred "wholly outside the government agency application process." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Mem.") at 4.  In support, plaintiffs point to U.S. Futures Exchange LLC v. Board of Trade and CME, 2005 WL 2035652 (N.D. Ill. Aug. 22, 2005), a case in which the defendants were alleged to have prevented plaintiff from launching a registered futures and options exchange by, inter alia, engaging in "predatory pricing," "threatening traders who considered doing business with Plaintiffs," and making "intentional misrepresentations" to traders and the business community in an effort "to sow doubt" as to the viability of plaintiffs' business venture.  Id. at *1.  The defendants in that case argued that Noerr-Pennington immunized their conduct because they had petitioned Congress and the CFTC against "the feasibility of [Plaintiff's] market entry."  Id. at *2.  Rejecting that defense, the Northern District Court of Illinois noted that "the exclusionary conduct alleged . . . has nothing to do with Defendants' petitioning activities."  Here, by contrast, all of the instant defendants'

12

challenged conduct was directed toward putting together a superior
PBT project proposal, in an effort to ensure that NYPC would secure
regulatory approval for a PBT facility from the NYDOH rather than
TPTCC.  Notably, the defendants' alleged misappropriation of
Medscan's "business plan," as well as its successful recruitment of
the parties' prospective PBT project partners, comprise critical
elements of NYPC's CON application.  Accordingly, unlike in U.S.
Futures Exchange, the challenged conduct in this case was directly
connected to NYPC's petitioning activities, and therefore cannot form
the basis for antitrust liability under Noerr-Pennington.

Moreover, since TPTCC did end up succeeding in assembling a
viable PBT project proposal, it seems clear that, but for the NYDOH's
decision to approve only one CON application, see Arffa Decl. Ex. 9
at 6, plaintiffs would not have been restrained from entering the
market for PBT services.  In this regard, plaintiffs vaguely assert
that the critical factor that excluded plaintiffs from competing in
the New York State PBT market -- the decision by NYDOH to approve
only one PBT demonstration project -- was brought about by the
defendants' alleged backchannel efforts to influence the NYDOH's
decision-making in this regard.  See Am. Compl. ¶ 90 (alleging that
Cicero Consulting had special influence with the NYDOH because Mr.
Cicero's father is a former DOH official).  The allegations are far
too vague and conclusory, however, to create a plausible pleading in

13

this regard.  See Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) (claim

must be "plausible on its face"); Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 555 (2007) (same).  Moreover, even assuming, arguendo, the

plausibility of plaintiffs' contentions in this regard, the Court

concludes that any lobbying on the part of the Cicero Defendants

directed toward influencing the NYDOH to approve only one PBT

facility is, in the absence of any violation of law, the type of

government petitioning activity immunized by Noerr-Pennington.  See

Pennington, 381 U.S. at 670 ("a concerted effort to influence public

officials regardless of intent of purpose" is exempt from Sherman Act

liability).

　　　　Notwithstanding the foregoing, plaintiffs contend that the

defendants may be exposed to Sherman Act liability, by operation of

the 'sham' exception to Noerr-Pennington immunity.  The sham

exception to Noerr-Pennington applies where "persons use the

governmental process -- as opposed to the outcome of that process --

as an anti-competitive weapon."  City of Columbia v. Omni Outdoor

Adver., Inc., 499 U.S. 365, 380 (1991).  As a general matter, the

sham exception cannot be premised merely upon allegations of

"wrongdoing" in the course of petitioning activity.  Id. at 383-84

(stating that the exception does not apply merely because "the

private party deliberately deceived the public and public officials

in its successful lobbying campaign."); see Armstrong Surgical Ctr.,

14

Inc. v. Armstrong Cnty. Mem'l Hosp., 185 F.3d 154, 162 (3d Cir. 1999)
(internal quotation omitted) (even "wrongful conduct that may have
affected the decision making process" does not come within the 'sham'
exception, as long as it did not affect the integrity of the
process). Rather, the exception is intended to exclude from Noerr-
Pennington immunity only "conduct that [was] never genuinely intended
to influence government action." Doron Precision Sys., Inc. v. FAAC,
Inc., 423 F.Supp. 2d 173, 192 (S.D.N.Y. 2006) (citing cases).

　　　Nevertheless, several courts of appeals in other Circuits
(whose decisions are not binding upon this Court) have held that the
sham exception is broader in administrative and adjudicative settings
than in political arenas, where lobbying and misrepresentation are
condoned, because "[adjudicatory] entities . . . rely on information
supplied by the parties to a greater extent than legislative bodies."
Armstrong, 185 F.3d at 160. Accordingly, the Sixth, Ninth, and
Eleventh Circuits have held that Noerr-Pennington immunity dissolves
if a party's alleged anticompetitive behavior entails the making of
affirmative, intentional misrepresentations to an adjudicative body.
See Kottle v. Northwest Kidney Ctrs., 146 F.3d 1056, 1059 (9th Cir.
1998); St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948
(11th Cir. 1986), Potters Medical Center v. City Hospital Ass'n., 800
F.2d 568 (6th Cir. 1986). In Armstrong, by contrast, the Third
Circuit held that Noerr-Pennington immunity is maintained, in spite

15

of a party's making affirmative misrepresentations to an adjudicative body, where "it is . . . clear that the . . . decision makers were disinterested, conducted their own investigation, and afforded all interested parties an opportunity to set the record straight."  185 F.3d at 164, 168 (noting that the Supreme Court in Omni expressed that the purpose of the sham exception was to ensure that "governmental process is not used as an anticompetitive weapon," and reasoning that this does not occur when the above conditions are met); see also Interstate Props. v. Pyramid Co. of Utica, 586 F. Supp. 1160, 1162 (S.D.N.Y. 1984) (sham exception does not apply where there is no allegation that defendants "subverted the integrity of the [agency's decision making] process or impaired the fair and impartial functioning of [the] agency").

Although the Second Circuit has not yet spoken on this issue, the Court concludes that it need not resolve the split of authority as to proper scope of the sham exception to Noerr-Pennington doctrine in the adjudicatory context, because it concludes that plaintiffs' allegations fail to meet the requirements under either the Armstrong or the Kottle standards.  Plaintiffs contend that defendants' failure to disclose to the NYDOH that NYPC's CON application was substantially based on information allegedly misappropriated from plaintiffs served to "mislead" the agency, thereby rendering its petitioning activity a "sham."  However, if the Court were to adopt

16

the Armstrong Court's analysis, the sham exception to Noerr-Pennington would clearly not apply, as there is no indication in the Amended Complaint (or in the public record) that defendants' failure to disclose that its CON application drew on information and contacts developed, in part, by plaintiffs in any way corrupted the NYDOH's decision-making process.  Moreover, the public transcripts of NYDOH proceedings make clear that the agency was fully apprised of the allegations in the instant action during the course of its deliberations.  See Arffa Decl. Ex. 12 at 20.

Moreover, even under the Kottle approach, plaintiffs have failed to adequately allege that defendants' purportedly anticompetitive behavior involved the making of affirmative intentional misstatements to NYDOH.  Notably, there is no allegation in the Amended Complaint that any aspect of NYPC's CON application contained false representations as to NYPC's capabilities, plans, or partnerships.  Instead, the Amended Complaint simply alleges that NYPC failed to disclose that its submissions were based in part on materials developed by plaintiffs.  Even under Kottle, this kind of "misleading" -- involving no affirmative misrepresentations -- is insufficient to trigger the sham exception to Noerr-Pennington in the adjudicatory context.  E.g., Kottle, 146 F.3d 1058 (defendant alleged to have made affirmative misrepresentations as to the local need for kidney dialysis services in a CON application to construct kidney

17

dialysis center); St. Joseph's Hosp., 795 F.2d at 955 (defendant opposed competitor's CON application to construct new specialized medical facility by falsely inflating its own capacity to provide such services); Potters Medical, 800 F.2d at 581 (same); Armstrong, 185 F.3d at 155 (same).  Here, plaintiffs' allegation that NYPC's CON application included information that, while allegedly misappropriated, truthfully represented NYPC's capabilities and resources, simply does not rise to the standard for applying the sham exception to Noerr-Pennington, whatever the exception's scope.

Finally, given the Court's independent conclusion, infra, that plaintiffs' claim that defendants' misappropriated plaintiffs' confidential material fails as a matter of law, plaintiffs' arguments for invoking the sham exception on the basis of defendants' failure to disclose those alleged misappropriations to the NYDOH also necessarily fail.

Having concluded that plaintiffs' claims arising under Sections 1 & 2 of the Sherman Act are barred by the Noerr-Pennington doctrine, the Court need not reach defendants' other arguments for dismissing plaintiffs' antitrust claims.  Nevertheless, the Court separately concludes that these claims must also be dismissed because of the Amended Complaint's failure to plausibly allege an "antitrust injury" -- that is, an "an actual adverse effect on competition," as opposed to an injury to an individual competitor.  See Capital

18

Imaging Assocs. P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d
537, 543 (2d Cir. 1993); see also Brooke Grp. Ltd. v. Brown &
Williams Tobacco Corp., 509 U.S. 209, 225 (1993) ("Even an act of
pure malice by one business competitor against another does not,
without more, state a claim under the federal antitrust laws; those
laws do not create a federal law of unfair competition").  While the
Amended Complaint does state, in a conclusory fashion, that
defendants' alleged misconduct will harm PBT prices and the output of
services, see Am. Compl. ¶ 7, the Court concludes that this is not a
plausible extrapolation from plaintiffs' substantive factual
allegations.  In essence, plaintiffs' Amended Complaint alleges that
defendants misappropriated plaintiffs' ideas, plans, and partners
during the course of developing an independent CON application for a
PBT facility.  By that logic, had defendants not engaged in this
alleged misconduct, plaintiffs (either alone, or pursuant to a joint
venture with defendants) would have submitted the same CON
application to the NYDOH as defendants actually did submit.

It is true that, in certain circumstances, injury to
competition at the level of entry to the market can constitute
'antitrust injury' even if the downstream outcome will be the
selection of a single provider.  See Fishman v. Wirtz, 807 F.2d 520,
537 (7th Cir. 1986).  However, in this action, none of the factual
allegations made in plaintiffs' Amended Complaint plausibly relates

19

to an injury sustained by consumers -- in terms of prices, quality of services, or output -- rather than injury to a particular competitor. See Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 488 (1977) (antitrust laws "were enacted for the protection of *competition*, not *competitors*") (emphasis in original); Balaklaw v. Lovell, 14 F.3d 793, 798 (2d Cir. 1994) (failure to show an antitrust injury where, "[f]rom the consumers' point of view, nothing about the market" was altered by the defendants' alleged misconduct).  Accordingly, for the additional reason that plaintiffs have failed to adequately plead antitrust injury, the Court concludes that it must dismiss plaintiffs' claims under the Sherman Act.

The Court now turns to plaintiffs' claim that defendants infringed Medscan's copyright in its "business plan" for the launching of a PBT facility, in violation of the federal Copyright Act, 17 U.S.C. § 101 et seq.  To assert a valid claim for copyright infringement, plaintiffs must allege: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991).

Defendants first challenge this claim on the ground that plaintiffs' business plan is not properly copyrightable.  The business plan has been registered with the United States Copyright office as a "compilation work," see Compl. Ex. C, and accordingly,

20

there is a "rebuttable presumption that the work in question is
copyrightable." Fonar Corp. v. Domenick, 105 F.3d 99, 104 (2d Cir.
1997); 17 U.S.C. § 410(c) (a copyright registration is "prima facie
evidence of the validity of the copyright and of the facts stated in
the certificate").[1]  The Copyright Act defines a compilation work as
one "formed by the collection and assembling of preexisting material
or of data that are selected, coordinated, or arranged in such a way
that the resulting work as a whole constitutes an original work of
authorship." 17 U.S.C. § 101.  When asserting the copyrightability
of a factual compilation, a plaintiff must show that the plan
possesses "some minimal degree of creativity." Feist 499 U.S. at
345.  However, the Copyright Act does not offer protection for the
mere "sweat of the author's brow." Fin. Info., Inc. v. Moody's
Investors Serv., Inc., 808 F.2d 204, 207 (2d Cir. 1986).

Having reviewed Medscan's business plan in relation to the
relevant circumstances in which it was developed, the Court concludes
that it lacks any indicia of creativity, and thus does not merit
copyright protection. See Feist, 499 U.S. at 362 (ruling a telephone
directory is not copyrightable, as it is not "creative").  First, the
Court notes that the business plan -- consisting almost entirely of

---

[1] Relying on a case from the Southern District of Mississippi,
plaintiffs contend that a court may not dismiss a copyright claim on
the pleadings if there is a copyright registration. See McCullough
v. Owens Enters., Inc., 2008 WL 2374245, at *2 (S.D. Miss. June 5,
2008).  This is not the law in the Second Circuit. See McLaren v.
Chico's FAS, Inc., 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010).

tables laying out TPTCC's expected costs and revenues -- merely compiles and arranges a relatively routine set of financial and other business information.  See Am. Compl. Ex. C.  Moreover, much of the information compiled and arranged in the plan was dictated not by Medscan's discretionary selection determinations, but rather by New York law, which sets forth in detail what must be included in CON applications.  Compare id. with Arffa Decl. Ex. 13 (CON checklist) and NYDOH, Tips for Submitting a Complete CON Application, available at http://www.nyhealth.gov/facilities/cons.  As a result, the business plan substantially results from Medscan's mere compliance with State-mandated application requirements, and thereby cannot be considered creative.  See Feist, 499 U.S. at 363 (selection dictated by state law fails the originality requirement).  While the Court has no doubt that compiling and arranging this information entailed considerable effort and expense, the Court concludes that it is a basic factual compilation that fails to exhibit any indicia of the creativity or originality that would merit its protection under the Copyright Act.

Separately, the Court concludes that plaintiffs' copyright claim must be dismissed because the parties jointly authored the business plan in question.  The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent

22

parts of a unitary whole." 17 U.S.C. § 101. Accordingly, a party claiming joint authorship must show that "that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998). As to the first factor, the Amended Complaint clearly alleges that, between December 2008 and November 2009, RTSI made independent contributions to the business plan. See, e.g., Am. Compl. ¶ 49 (stating that "RTSI . . . contributed its photon radiation experience and expertise to the [PBT] project"); see also id. ¶ 62. As to the question of the parties' respective intent to be co-authors, plaintiffs urge that this is a question of fact, and therefore not susceptible to resolution on a motion to dismiss. The Court concludes, however, that the Amended Complaint includes sufficient factual allegations that, taken as true, establish that both Medscan and RTSI intended that they be co-authors of the business plan in question. Most notably, plaintiffs allege that the business plan was authored as part of Medscan and RTSI's collaborative effort to begin the process of jointly establishing and operating a PBT facility. See id. ¶¶ 141-42. Having alleged as a factual matter that the parties collaborated to develop a business plan in preparation for their prospective joint application to the NYDOH for permission to jointly establish and run a PBT facility, plaintiffs are not free to avoid

23

dismissal by simply arguing that discovery may show that the parties did not intend to be co-authors of particular aspects of that initial business plan.  Accordingly, the Court concludes that plaintiffs' claim for copyright infringement must be dismissed for the additional reason that the alleged copyright material was, on plaintiffs' own allegations, jointly authored by Medscan and RTSI.

The Court now moves to consider plaintiffs' seven claims arising under New York common law brought against the Radiation Therapy Defendants, for breach of a joint venture, unjust enrichment, misappropriation of trade secrets, unfair competition, breach of fiduciary duty, tortious interference with business relations, and tortious interference with contractual relations, and three New York common law claims brought against defendants Oppenheimer and the Cicero Defendants, for aiding and abetting a misappropriation, breach of fiduciary duty, and breach of contract.  Based on the complexity of plaintiffs' allegations, as well as the considerable time and energy the parties have expended thus far litigating those allegations before this Court, the Court determines that the interests of judicial economy, fairness, convenience, and the need for a speedy resolution of disputes weigh strongly in favor of the Court resolving the instant action in its entirety.  See Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n. 7 (1988).  The Court further determines that considerations of comity do not counsel

24

otherwise, as there are no relevant unsettled questions of New York law implicated by plaintiffs' state law claims.  See Giordano v. City of New York, 274 F.3d 740, 754-55 (2d Cir. 2001); Astra Media Group LLC v. Clear Channel Taxi Media LLC, 2011 WL 504766 *3 (2d Cir. Feb. 15, 2011).  Accordingly, the Court, in its discretion, elects to retain supplemental jurisdiction over all of plaintiffs' pendant state law claims.  See 28 U.S.C. § 1367.

As to the substance of these claims, the Court first considers plaintiffs' claim against the Radiation Therapy Defendants for breach of joint venture.  Under New York law, five elements must be present to adequately allege the formation of a joint venture:

> (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 701 (2d Cir. 1990).  Defendants contend that plaintiffs have failed to adequately plead the formation of a joint venture in that, inter alia, the Amended Complaint fails to allege that the Radiation Therapy Defendants exercised any degree of control over the enterprise.  In support, defendants note that the Amended Complaint, on its own terms, characterizes RTSI as merely a subsidiary "consultant" on "Medscan's PBT Project."  See Am. Compl. ¶ 39; see

25

also id. (referring to the parties' collaboration as the "Medscan PBT Project" or the "Medscan PBT Practice" a total of 53 times); id. ¶ 61 (alleging that "[a]lthough . . . RTSI employees provided assistance in certain areas of the development of the Medscan PBT Project . . . [a]t all times, plaintiffs . . . took the lead").

Plaintiffs respond by noting that, according to the Amended Complaint, the parties engaged in negotiations over an unexecuted draft Operating Agreement, which "contemplated that [the parties] would 'jointly operate the proton therapy center.'" Pl. Mem. at 35; see also Am. Compl. ¶¶ 52, 142-43. However, even taking as true the Amended Complaint's allegation that the parties agreed to operate in accordance with the second unexecuted draft Operating Agreement, the Court concludes that the Amended Complaint fails to allege that RTSI actually enjoyed any measure of control over the parties' collaborative efforts. Indeed, while the draft Operating Agreement states that Medscan and RTSI "wish to form a limited liability company" that will, at some point, establish and operate a PBT facility, it is noticeably silent as the manner in which the parties' enterprise was to be controlled prior to that company's formation. See Arffa Decl. Ex. 5 (draft Operating Agreement). The draft Operating Agreement therefore demonstrates, at most, that the parties prospectively contemplated that RTSI would one day assume a substantial degree of control over the as-yet-unformed company's

26

operations.  However, this is an entirely distinct matter from

whether RTSI enjoyed any measure of control over the enterprise, as

it actually existed, during the eleven months of Medscan and RTSI's

collaboration.  Given the complete absence of any factual allegation

in the Amended Complaint by which one may infer that RTSI enjoyed

even the slightest measure of control over the parties' collaborative

efforts, and in light of the Amended Complaint's clear and repeated

characterization of the collaboration as under Medscan's complete

direction and control, plaintiffs have failed to adequately allege

the formation of a joint venture.  Accordingly, the Court concludes

that plaintiffs' claim for breach of a joint venture, as well as

their related requests for an accounting and a constructive trust,

must be dismissed.

Next, the Court considers plaintiffs' claim for unjust

enrichment, asserted against the Radiation Therapy Defendants in the

alternative to plaintiffs' claim for breach of joint venture.  To

adequately plead a claim for unjust enrichment, a plaintiff must

allege: (1) that defendant was enriched, (2) at plaintiff's expense,

and (3) that the circumstances are such that, in equity and good

conscience, defendants should compensate plaintiffs.  See, e.g., Reed

Int'l Trading Corp. v. Donau Bank AG, 866 F. Supp. 750, 757 (S.D.N.Y.

1994).  Further, in exercising the broad discretion inherent in the

"equity and good conscience" element of an unjust enrichment claim,

New York courts have, depending on the circumstances of the case, emphasized various circumstances, such as whether the plaintiff performed services for the defendant, see Heller v. Kurz, 228 A.D.2d 263, 643 N.Y.S.2d 580, 581-82 (1st Dep't 1996), whether the plaintiff performed services at the defendant's behest, see Prestige Caterers v. Kaufman, 290 A.D.2d 295, 295 (1st Dep't 2002), or whether the defendant assumed an obligation to pay the plaintiff for services the defendant received, see LaBarte v. Seneca Res. Corp., 85 A.D.2d 974, 976 (4th Dep't 2001).  Having reviewed plaintiffs' factual allegations in the light most favorable to plaintiffs, the Court concludes that the circumstances at issue here are not such that any finder of fact could reasonably conclude that the Radiation Therapy Defendants should, in equity and good conscience, be forced to compensate plaintiffs for their alleged losses.  The factual allegations set forth in the Amended Complaint depict the breakdown of a prospective, collaborative effort between two large commercial entities, and the eventual subsequent triumph of one former collaborator over the other in the regulatory and market arenas. Such circumstances -- absent maliciousness or bad faith, neither of which is fairly discernible from the Amended Complaint -- do not warrant the Court's equitable intervention.  Accordingly, the Court concludes that plaintiffs' claim for unjust enrichment must be dismissed.

28

Next, the Court considers whether plaintiffs have adequately stated a claim for misappropriation of trade secrets against the Radiation Therapy Defendants.  Under New York law, a threshold requirement for stating a claim for the misappropriation of proprietary or confidential information is that the information in question does, in fact, constitute a trade secret.  See LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492 (S.D.N.Y. 2002).  Although "secrecy is a question of fact," Lehman v. Dow Jones, & Co., Inc., 783 F.2d 285, 298 (2d Cir. 1986), information is not "secret," as a matter of law, if secrecy is necessarily lost when the service or product is placed on the open market, even if it was intended to remain secret before that time.  See Hudson Hotels Corp. v. Choice Hotels Int'l, 995 F.2d 1173, 1177 (2d Cir. 1993) (finding that hotel room design concept was not a trade secret because it would be publicly disclosed once the hotel room was built, marketed and occupied) (abrogated on other grounds); Eagle Comtronics, Inc. v. Pico, Inc., 89 A.D.2d 803 (4th Dep't 1982) (finding no trade secret where "any secrecy in the design of the [product] was lost when it was placed upon the market").  Because the business plan was publicly disclosed as part of the NYDOH's CON approval process -- as is required of any plan enclosed in a CON application -- the Court concludes that the plan cannot constitute a trade secret as a matter of law.  See Am. Compl. ¶ 32 (noting that Medscan "contemplated that,

at some future point in time, [the business plan] would be made public"). Accordingly, the Court concludes that plaintiffs have failed to state a claim against the Radiation Therapy Defendants for misappropriation of trade secrets.

The Court next considers plaintiffs' claim against the Radiation Therapy Defendants for unfair competition. Under New York law, "[t]he essence of an unfair competition claim . . . is that the defendant has misappropriated the labors and expenditures of another." Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980). Although claims of unfair competition often allege misappropriation of trade secrets, "a claim may be based on misappropriation of information not rising to that level, such as client lists, internal company documents, and business strategies." Berman v. Sugo, LLC, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008). Therefore, to sustain a claim for unfair competition under New York law, "a plaintiff need only show that defendants misappropriated its product, labors, skills, expenditures or goodwill, and displayed some element of bad faith doing so." Id. at 208. Nevertheless, recovery for unfair competition requires pleading the "misappropriation of a commercial advantage which belonged exclusively to" the plaintiff. See LoPresti v. Massachusetts Mut. Life Ins. Co. 30 A.D.3d 474 (2d Dept. 2006).

30

Defendants argue that plaintiffs' claim for unfair competition must fail because the business plan was jointly developed by RTSI and Medscan, and thus did not "exclusively belong" to plaintiffs.  While the Amended Complaint alleges that Medscan was the primary force behind the parties' collaborative development of certain information in connection with their plans to jointly establish a PBT facility, see Am. Compl. ¶ 61, it acknowledges the participation of and "assistance from defendants in . . . various capacities."  Id. ¶ 63; see also id. ¶¶ 55, 60 (noting that, "on Medscan's instruction," Travis, RTSI's general counsel, drafted several documents for the parties' joint use).  Similarly, defendants point to the fact that plaintiffs do not allege that there was an agreement between RTSI and Medscan either to maintain the confidentiality of information relating to the proposed PBT facility, or to refrain from using jointly developed information in pursuing separate projects.  See Eagle Comtronics, Inc. v. Pico Prods., Inc., 256 A.D.2d 1202, 1203 (4th Dep't 1998).  Because the Amended Complaint thus makes clear that the purportedly confidential information was jointly developed by, and freely shared between, Medscan and RTSI during their collaboration, and does not allege that this information was subject to any agreement as to its confidentiality, the Court concludes that plaintiffs' unfair competition claim must be dismissed.

Separately, because plaintiffs' primary misappropriation and unfair competition claims brought against the Radiation Therapy Defendants' fail as a matter of law, the Court concludes that plaintiffs' secondary claims that Oppenheimer and the Cicero Defendants "aided and abetted" the Radiation Therapy Defendants' alleged misappropriation of trade secrets and unfair competition must also, necessarily, be dismissed. See Berman, 580 F. Supp. 2d at 205 (S.D.N.Y. 2008).

Next, the Court considers plaintiffs' two claims against the Radiation Therapy Defendants for tortious interference with prospective business advantage and tortious interference with contractual relations. To state a claim for interference with prospective economic or business advantage, plaintiffs must allege "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Goldhirsch Grp., Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997). A claim of tortious interference with contract requires proof of "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that

contract; (3) the defendant's intentional procuring of the breach; and (4) damages." Foster v. Churchill, 87 N.Y.2d 744, 750 (1996).

Plaintiffs claim that RTSI interfered with plaintiffs' prospective business relationships with Durst, the property owner of NYPC's PBT facility site, as well as with their prospective clinical partners, Beth Israel and Memorial Sloan. Plaintiffs also claim that RTSI interfered with plaintiffs' contractual relations with Oppenheimer and Cicero Consulting. The Radiation Therapy Defendants contend, however, that RTSI's actions in this regard were motivated solely by its self-interested desire to develop its own PBT project proposal, and procure for itself the advantages associated with these partnerships. The Amended Complaint, on its face, does not allege any other possible motivation for RTSI's alleged interference with plaintiffs' relationships with its prospective PBT project partners. Moreover, the factual allegations in the Amended Complaint evince no malice, or use of improper means, on the part of RTSI. Over the course of a period lasting less than a year, RTSI and Medscan engaged in a collaborative effort to explore the possibility of jointly establishing and operating a PBT facility in New York City. After a breakdown in their relationship that, while tinged by hints of mutual recrimination, was ultimately marked by civility and respect, RTSI and Medscan each "wished [each other] the best of luck in [their]

33

future endeavors" and set about competing for the fruits of their prior collaboration. See Am. Compl. Exs B & C.

Plaintiffs nevertheless contend that RTSI's "complex relationship" with Medscan is somehow indicative of malice. See Island Rehab. Servs. Corp. v. Maimonides Med. Ctr., unpublished in 859 N.Y.S.2d 903, *8 (N.Y. Sup. Ct. 2008) (relying in part on the parties' complex relationship over their ten-year joint venture relationship to infer malice). But no vague and conclusory argument about "complex relationship" can substitute for adequate pleadings, and there is no specific pleading here sufficient to imply such malice. Moreover, while the "improper means" element is satisfied if the interference is committed by means of separate torts, see Carvel Corp. v. Noonan, 3 N.Y.3d 182, 189 (2004), this is irrelevant in the instant action based on the Court's conclusions that plaintiffs' other tort claims are without merit. Accordingly, the Court concludes that plaintiffs' claims for tortious interference are pleaded with insufficient particularity to survive a motion to dismiss and therefore must be dismissed. Nor, given that this is a detailed Amended Complaint, should leave to re-plead be granted.

The Court next turns to plaintiffs' claim for breach of fiduciary duty, asserted against all defendants. To state a claim for breach of fiduciary duty under New York law, a plaintiff must allege (1) the existence of a fiduciary duty, (2) knowing breach of

that duty, and (3) damages proximately caused by the defendant's misconduct. Whitney v. Citibank, N.A., 782 F.2d 1106, 1115 (2d. Cir. 1986). Further, a fiduciary relationship exists under New York law "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir.1991) (internal quotation omitted). Rather than determining the existence of a fiduciary relationship "by recourse to rigid formulas, New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first." Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc., 767 F.Supp.1220, 1231 (S.D.N.Y. 1991) (citing cases) (reversed on other grounds).

Considering first plaintiffs' claim for breach of fiduciary duty against defendant Norton L. Travis, this claim is predicated on Travis and Medscan's alleged attorney-client relationship. Under New York law, "the existence of an [an attorney client relationship] turns largely on the client's subjective belief that it exists, provided that belief was formed reasonably." Blue Planet Software, Inc. v. Games Inc. LLC, 331 F. Supp.2d 273, 276 (S.D.N.Y. 2004). The Amended Complaint sets forth detailed allegations regarding the parties' interactions, which plaintiffs contend caused them to reasonably believe that Travis had been acting as Medscan's attorney.

35

For example, the Amended Complaint states that Medscan "retained"
Travis in November of 2008 "to act as lead counsel in connection with
Medscan's PBT project" and "to provide general legal advice and
guidance in connection with that project."   Am. Compl. ¶ 35.

The Court concludes, however, that these allegations do not
suffice to render plaintiffs' misimpression as to the nature of their
relationship with Travis reasonable.   In particular, the Amended
Complaint acknowledges that, while he had previously represented
Medscan while in private practice, during the relevant time period
Travis served as Executive Vice President and General Counsel of
RTSI.   Id. ¶¶ 35, 44.   No reasonable business entity, not to mention
one of comparable sophistication and scale as Medscan, could possibly
believe that it could retain the general counsel of a separate
corporate entity to serve as its attorney.   (Nor is there any
allegation of the signing of a written retainer agreement or any
other written evidence of an attorney-client relationship).
Accordingly, because the allegations against Travis are solely
premised on the existence of an attorney-client relationship, the
Court concludes that the Amended Complaint fails to allege that
Travis owed plaintiffs a fiduciary duty.

With regard to RTSI and the other Radiation Therapy
Defendants, plaintiffs' allegation of a fiduciary duty is wholly
predicated on their allegation of a joint venture between Medscan and

RTSI. See Plumitallo v. Hudson Atl. Land Co., 74 A.D.3d 1038, 1039 (2d Dep't 2010) (joint venturers are fiduciaries to one another). Accordingly, based on the Court's determination, supra, that plaintiffs have failed to adequately allege the formation of a joint venture relationship between RTSI and Medscan, the Court concludes that plaintiffs' claim for breach of fiduciary duty must be dismissed as to the Radiation Therapy Defendants.[2]

Turning next to Oppenheimer, the Court notes that, under New York law, financial advisers are fiduciaries of their clients, whereas investment bankers are not. Compare EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 20 (2005) (investment adviser, who advises as to the value of securities or the advisability of investing in a certain security, see 72 N.Y. Jur. 2d Inv. Sec. § 31, is a fiduciary) with Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, LLC, 355 Fed. Appx. 516, 519 (2d Cir. 2009) (investment bankers, who locate financing for a client, are not fiduciaries). Oppenheimer contends that it cannot be found a fiduciary of plaintiffs under this standard because, as alleged in the Amended Complaint, its sole obligation to plaintiffs was to assist them in locating financing for their PBT project -- a quintessential investment banking function.

---

[2] Moreover, even if, contrary to fact, a fiduciary relationship existed at some point between RTSI and Medscan, it expired upon the termination of their collaboration. See Wynne v. Gruber, 237 A.D.2d 284, 284-85 (2d Dep't 1997) (fiduciary relationship between partners terminated with dissolution of partnership, even if it was terminated by defendant's breach of the partnership agreement).

Further, Oppenheimer points to the retainer agreement between
Oppenheimer and Medscan, dated December 9, 2009, which states that
Oppenheimer is "acting as an independent contractor, and not as a
fiduciary, agent or otherwise, of [Medscan] or any other person."
Declaration of Branden Kelly, dated January 7, 2011 ("Kelly Decl.")
Ex. A ¶ 13 (also stating that Medscan "agrees that it shall not claim
that [Oppenheimer] owes a fiduciary duty to [Medscan] in connection
with" the agreement).  In light of the foregoing, the Court concludes
that the Amended Complaint fails to allege the existence of a
fiduciary relationship between Oppenheimer and plaintiffs.

Finally, as to the Cicero Defendants, the Court notes that,
under New York law, a consultant does not ordinarily owe a fiduciary
duty to its clients.  See e.g., VTech Holdings, Ltd. V.
Pricewaterhouse Coopers, LLP, 348 F.Supp.2d 255, 268 (S.D.N.Y. 2004).
Accordingly, plaintiffs do not allege that a fiduciary relationship
emanates from its Imaging Facility Engagement letter, which sets
forth the terms of Cicero Consulting's consultancy arrangement with
Medscan.  See Declaration of Frank M. Cicero, dated November 12, 2010
("Cicero Decl.") Ex. 1.  Instead, plaintiffs contend that the
fiduciary nature of the relationship arises from extra-contractual
"advice" that Cicero offered Medscan "to help [it] navigate the
regulatory landscape and properly negotiate any regulatory
requirements for opening a PBT practice in New York."  Am. Compl. ¶

38

57.  However, this type of advice is wholly consistent with Cicero

Consulting's role as a healthcare regulatory consultant to Medscan,

as well as the terms of the parties' consultancy engagement

agreement.  See id. (noting that Cicero Consulting agrees to "work

with . . . your attorney on the legal/establishment elements" of

gaining regulatory approval from the NYDOH for Medscan's application

to establish a PBT facility).   The Court therefore concludes that

plaintiffs have failed to allege a fiduciary relationship with Cicero

Consulting and its principal, Frank M. Cicero, and, accordingly,

dismisses plaintiffs' claim for breach of fiduciary duty as against

them.

     In light of the foregoing, the Court concludes that

plaintiffs have failed to adequately allege a fiduciary relationship

with any of the defendants in this action, and, accordingly,

dismisses each of their claims alleging a breach of fiduciary duty.

     The Court turns finally to plaintiffs' breach of contract

claims against Oppenheimer and the Cicero Defendants.  As to

Oppenheimer, plaintiffs claim that Oppenheimer breached a "best

efforts" clause in its retainer agreement with Medscan, see Kelly

Decl. Ex. A ¶ 3, by pursuing a financing arrangement with Hayman,

which the Amended Complaint characterizes as "an objectively

unqualified lender."  See id. ¶¶ 84-85.  Oppenheimer urges dismissal

of this claim on two grounds.  First, Oppenheimer notes that, under

39

New York law, "a clear set of guidelines against which to measure a party's best efforts is essential to the enforcement of . . . a claim" alleging violation of a best efforts clause. Mocca Lounge, Inc. v. Misak, 94 A.D.2d 761, 763 (2d Dep't 1983); see also Pinnacle Books, Inc. v. Harlequin Enters. Ltd., 519 F. Supp. 118, 121 (S.D.N.Y. 1981); Digital Broad. Corp. v. Ladenburg, Thalmann & Co., 63 A.D.3d 647, 648 (1st Dep't 2009).  No such guidelines are included in plaintiffs' retainer agreement with Oppenheimer. See Kelly Decl. Ex. A.  Second, noting that best efforts clauses must be "read in context," Arledge v. Stratmar Sys., Inc., 948 F.2d 845 (2d Cir. 1991), Oppenheimer alleges that the retainer agreement's best efforts clause, on its face, serves as a qualifier of Oppenheimer's obligations rather than an independent source of liability.  The clause states, in full:

> **Placement; Best Efforts.** It is understood that Oppenheimer's involvement in the Funding is strictly on a best efforts basis, and that the consummation of the Funding will be subject to, among other things, market conditions.

Kelly Decl. Ex. A ¶ 3.  The Court concludes that this language must be read as clarifying that Oppenheimer was not obligated to secure financing for plaintiffs' PBT project, but merely to devote its "best efforts" to doing so.  Notably, the clause's use of the limiting language "strictly" and "subject to . . . market conditions" plainly indicates that it was meant to ensure that Oppenheimer could not be held liable for breach of contract in the event it failed to secure

40

financing for plaintiffs' PBT project.  Accordingly, the Court
concludes that the breach of contract claim as against Oppenheimer
must be dismissed.

As to plaintiffs' breach of contract claim against the Cicero
Defendants, the Amended Complaint alleges that Cicero Consulting
breached a June 2, 2009 agreement in which it agreed to prepare and
submit a CON for plaintiffs' PBT project to the NYDOH.  As an initial
matter, plaintiffs' extravagant claim that they are entitled to $300
million in damages -- despite having paid only an $8,500 initial
retainer, and having made no allegation that their CON application
was actually harmed by Cicero Consulting's alleged breach -- is
plainly spurious and may not even comport with Fed. R. Civ. Pr. 11.
Moreover, it seems clear that the June 2, 2009 agreement referenced
in the Amended Complaint refers to a CON application for a facility
providing PET-related services rather than PBT services.  See Am.
Compl. ¶ 197; Cicero Decl. Ex. 1.  As discussed, PBT is a form of
radiation-based cancer treatment.  See Am. Compl. ¶ 2.  PET, by
contrast, is a diagnostic imaging technology that does not entail the
curative treatment of patients, though PET facilities often focus on
both diagnosis and treatment.  Looking to the contract itself, it
states that Cicero Consulting shall "prepare and submit a [CON] to
the [NYDOH] in order to seek approval for the establishment and
certification of a freestanding imaging facility."  Id. Ex. 1.

41

Therefore, the breach here alleged in the Amended Complaint bears no relationship to the Cicero Defendants' actual contract with plaintiffs.  Accordingly, the breach of contract claim against the Cicero Defendants must be dismissed.

Lastly, it may be noted that, given the Court's conclusion that it must dismiss all of plaintiffs' claims, the Court need not determine whether defendant NPYC lacks the legal capacity to be sued under New York law.

For the foregoing reasons, the Court hereby reaffirms its Order dated March 1, 2011 granting defendants' motions and dismissing the Amended Complaint, in its entirety, with prejudice.  The Clerk of the Court is directed to enter final judgment in favor of defendants.

SO ORDERED.

Dated:   New York, NY
         May 16, 2011

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

42